**REDACTED VERSION**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BITMANAGEMENT SOFTWARE GMBH, | |
| Plaintiff, | Case No. 16-840 C |
| v. | Senior Judge Edward J. Damich |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**

**CONTAINS PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH
THE UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

QUESTION PRESENTED ......................................................................................... 3

STATEMENT OF THE CASE ................................................................................... 3

I.      STATEMENT OF UNDISPUTED MATERIAL FACTS ................................ 3

        A.      Bitmanagement's Intellectual Property .................................................. 3

        B.      The 2008 Contract for 100 Licenses of BS Contact .............................. 5

        C.      The 2012 Contract for 18 Licenses of BS Contact Geo ......................... 7

                i.      The Government Requests Software Modifications ..................... 7

                ii.     Discussions Between Planet 9 and the Government .................... 9

                iii.    2012 Contract for 18 Licenses of BS Contact Geo .................. 11

        D.      The Government's Mass Installation of BS Contact Geo ..................... 13

                i.      The Government's Failure to Limit Installations or Usage of BS Contact
                        Geo ........................................................................................... 13

                ii.     The Government's Installations of BS Contact Geo onto the Navy
                        Marine Corps Intranet .............................................................. 14

                iii.    The Government's Installations of BS Contact Geo onto ONE-Net ...... 15

                iv.     Additional Installations of BS Contact Geo onto Government PCs ....... 16

        E.      The Government's Failure to Compensate Bitmanagement ................. 17

II.     PROCEDURAL BACKGROUND ................................................................ 19

LEGAL STANDARD .............................................................................................. 19

ARGUMENT ........................................................................................................... 19

I.      THE GOVERNMENT INFRINGED BITMANAGEMENT'S COPYRIGHT ............ 21

        A.      Bitmanagement Owns a Valid Copyright ............................................ 21

        B.      The Government Copied BS Contact Geo Hundreds of Thousands of Times ... 22

II.     THE GOVERNMENT LACKS ANY VIABLE DEFENSE TO COPYRIGHT
        INFRINGEMENT .......................................................................................... 22

        A.      Bitmanagement Never Sold a License That Allowed Mass Installation of its
                Software ................................................................................................ 24

        B.      Both of the Government's Contracts Were Limited in Scope ............... 25

        C.      The Government Cannot Show That Bitmanagement Granted an Implied
                License for the Installation of Hundreds of Thousands of Copies of its Software
                Without Compensation ......................................................................... 30

CONCLUSION ........................................................................................................ 37

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................ 19

*Apple, Inc. v. Psystar Corp.*,
    673 F. Supp. 2d 931 (N.D. Cal. 2009) ................................................................... 22

*Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*,
    731 F.2d 831 (Fed. Cir. 1984) ............................................................................... 19

*Bean v. Pearson Education, Inc.*,
    949 F. Supp. 2d 941 (D. Ariz. 2013) ..................................................................... 20

*Beckman Instruments, Inc. v. Cincom Sys., Inc.*,
    232 F.3d 893 (9th Cir. 2000) ................................................................................. 25

*Broadcast Music, Inc. v. 84-88 Broadway, Inc.*,
    942 F. Supp. 225 (D.N.J. 1996) ............................................................................ 25

*Cardiosom, LLC v. United States*,
    117 Fed. Cl. 526 (2014) ......................................................................................... 25

*Davis v. Blige*,
    505 F.3d 90 (2d Cir. 2007) .................................................................................... 24

*Design Options, Inc. v. BellePointe, Inc.*,
    940 F. Supp. 86 (S.D.N.Y. 1996) ......................................................................... 21

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,
    80 F. Supp. 3d 535 (S.D.N.Y. 2015) ............................................................... 30, 34

*Gaylord v. United States*,
    595 F.3d 1364 (Fed. Cir. 2010) ............................................................................ 20

*Herbert v. United States*,
    36 Fed. Cl. 299 (1996) ........................................................................................... 31

*Jacobsen v. Katzer*,
    535 F.3d 1373 (Fed. Cir. 2008) ............................................................................ 20

*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*,
    322 F.3d 26 (1st Cir. 2003) ....................................................................... 21, 30, 31

*Johnson v. Jones*,
    149 F.3d 494 (6th Cir. 1998) ..................................................................... 30, 34, 37

*MAI Sys. Corp. v. Peak Computer, Inc.*,
   991 F.2d 511 (9th Cir. 1993) ...........................................................................20

*Monge v. Maya Magazines, Inc.*,
   688 F.3d 1164 (9th Cir. 2012) .........................................................................25

*Oracle Am., Inc. v. Google Inc.*,
   750 F.3d 1339 (Fed. Cir. 2014).........................................................................19

*S.O.S., Inc. v. Payday, Inc.*,
   886 F.2d 1081 (9th Cir. 1989) .............................................................20, 25, 26

*Stenograph L.L.C. v. Bossard Associates, Inc.*,
   144 F.3d 96 (D.C. Cir. 1998) ...........................................................................20

*Three Boys Music Corp. v. Bolton*,
   212 F.3d 477 (9th Cir. 2000) ...........................................................................21

**Federal Statutes**

17 U.S.C. § 101...................................................................................................21

17 U.S.C. § 410(c) ..............................................................................................21

17 U.S.C. § 411(a) ..............................................................................................21

28 U.S.C. § 1498(b) ........................................................................................3, 19

**State Statutes**

Uniform Computer Information Transactions Act § 506(b)....................................24

**Miscellaneous**

A Report of the Register of Copyrights Pursuant to Section 104 of the Digital
   Millennium Copyright Act, United States Copyright Office (August 2001)........................20

2 Patry on Copyright § 5:131...............................................................................30

3 Nimmer on Copyright § 10.15 ..........................................................................20

4 Nimmer on Copyright § 13.08(B)(1) .................................................................25

Plaintiff Bitmanagement Software GmbH ("Bitmanagement") respectfully submits this

memorandum in support of its Partial Motion for Summary Judgment on Liability.

## INTRODUCTION

This case arises out of the Government's undisputed mass installation of

Bitmanagement's software onto hundreds of thousands of Navy computers without

authorization.  For more than a decade, Bitmanagement Software GmbH has owned and

developed BS Contact Geo, a software program that enables the visualization of 3D geographic

imagery.  In 2008 and 2012, through a reseller, Bitmanagement agreed to provide a limited

license to the United States Navy for the installation of Bitmanagement's software onto a small

number of Navy computers for testing purposes.  Bitmanagement hoped that the software, if it

proved useful to the Navy and compatible with the Navy's systems, would open the door to

larger scale contracts.  The Navy, in its discussions with Bitmanagement, gave the company

every reason to be optimistic about this prospect and made clear that the software was exactly

what it needed to serve as a key component of the Navy's "SPIDERS 3D" technology

application.

These discussions did not lead to a large-scale license.  Instead, the Navy simply made

plans to install the BS Contact Geo software onto every Navy computer in the United States, and

make it available to users elsewhere, without purchasing additional licenses.  The Navy admits

that it began installing the software onto hundreds of thousands of machines in the summer of

2013, and that it ultimately installed the software onto at least 429,604 computers.  When it

learned of this mass installation, Bitmanagement was surprised, but confident that it would be

compensated for the numerous copies the Government had made.  Over time, however, it

became clear that the Navy had no intention to pay Bitmanagement for the software it had copied

1

without authorization, as it declined to execute any license on a scale commensurate with what it took.

Based on the undisputed facts, partial summary judgment should be granted on the Government's liability to Bitmanagement on its copyright infringement claim.  As the sole owner, developer, and publisher of BS Contact Geo, an original work of software, Bitmanagement owns a valid copyright in BS Contact Geo.  Bitmanagement has registered the copyright of BS Contact Geo with the United States Copyright Office and it is also protected under U.S. copyright law as an original work created outside the United States.  Moreover, the Government has admitted, and undisputed evidence confirms, that it made hundreds of thousands of copies of BS Contact Geo and installed them onto Navy computers.  Accordingly, the two elements of infringement—ownership of a valid copyright and copying of original constituent elements of the work—have been met.

The Government has no valid defense to Bitmanagement's claim of infringement. Bitmanagement did not authorize the Navy to make copies of its software exceeding the small number of installations it expressly permitted.  In 2012, Bitmanagement and a software reseller, Planet 9 Studios, executed a contract for "PC licenses" of BS Contact Geo, which were resold by Planet 9 to the Navy.  (This followed an earlier, and nearly identical, PC license that Bitmanagement had executed with Planet 9 in 2008 for a less advanced Bitmanagement software product.)  PC licenses, as Government witnesses have correctly admitted, allow for the installation of software onto a specific number of computers, and thus the Government had no right to make copies of BS Contact Geo exceeding the number of PC licenses Bitmanagement had agreed to; all installations above that number were acts of infringement.  The Government has asserted that it purchased "concurrent use" licenses rather than PC licenses, but nothing in

the record supports this position and even if it did, this would not constitute carte blanche for the

Government to make hundreds of thousands of copies.

The undisputed facts also make clear that the Government cannot meet its heavy burden

to establish that Bitmanagement somehow provided implied authorization for the mass

installation.  Bitmanagement never agreed—and was given no reason even to expect—that the

Navy would install the software on a mass scale without purchasing additional licenses or

providing any additional compensation.

In sum, uncontested evidence establishes infringement under 28 U.S.C. § 1498(b), and

the Government cannot establish any affirmative defense to that claim.  Summary judgment is

therefore appropriate as to the Government's liability for copying Bitmanagement's proprietary

software hundreds of thousands of times.

## QUESTION PRESENTED

Whether the Government infringed Bitmanagement's copyright in its proprietary

software when it installed hundreds of thousands of copies of the software onto Navy computers

after Bitmanagement authorized no more than 38 copies.

## STATEMENT OF THE CASE

### I.    STATEMENT OF UNDISPUTED MATERIAL FACTS

#### A.    Bitmanagement's Intellectual Property

1.    Founded in 2002 and located in Berg, Germany, Bitmanagement Software GmbH

("Bitmanagement") is a leader in the development of specialized virtual reality software for

rendering three-dimensional graphics.  A.075, A.077 (Schickel 30(b)(6) Tr. 22:3-4; 32:11-33:6);

A.128 (BITMGMT_0000455).  In 2006, Bitmanagement created BS Contact Geo, a computer

software application that facilitates the visualization of 3D geographic spatial information.

A.076 (Schickel 30(b)(6) Tr. 29:8-10).  As understood by Government witnesses and reflected in

Government documents, "BS Contact Geo is a proprietary software application which is solely

owned by Bitmanagement."  A.149 (Viana 30(b)(6) Ex. 10 at -221); A.039 (Buckley Tr. 118:1-

10); *see also* A.079 (Schickel 30(b)(6) Tr. 79:6-11).

       2.   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

       3.        Bitmanagement published BS Contact Geo version 8.001 on January 24, 2012,

and registered its copyright in BS Contact Geo version 8.001, as well as two other versions, on

July 6, 2016.  A.078 (Schickel 30(b)(6) Tr. 67:8-15); A.161 (Vazquez Ex. 2 (copyright

registration of BS Contact Geo 8001)); *see also* A.162 (US-0008638 (copyright registration of

BS Contact Geo 7002)); A.164 (US-0008634 (copyright registration of BS Contact Geo 9000)).

       4.        The Government utilizes BS Contact Geo in conjunction with a Navy technology

known as SPIDERS 3D, a virtual reality environment rendered through geospatial X3D data of

Navy installations and facilities.  A.126 (Viana 30(b)(6) Tr. 135:8-15).  In a Justification for

Other than Full and Open Competition describing its need for the BS Contact Geo software, the

Government in part stated:

> NAVFAC is currently implementing the [Navy Marine Corps Intranet] certified BS Contact Geo application to directly enable SPIDERS 3D to conduct Naval SYSCOM technical collaboration in support of Major Defense Acquisition Programs.  The BS Contact Geo application is a *critical component required to support* platform-shore interface design 3D visualization.

A.150 (Viana 30(b)(6) Ex. 10 at -222 (emphasis added)).

5.      SPIDERS 3D is currently in use and could not function without BS Contact Geo, on which it continues to rely to render 3D data.  A.126-127 (Viana 30(b)(6) Tr. 135:8-136:6, 137:16-138:2).

**B.      The 2008 Contract for 100 Licenses of BS Contact**

6.      Prior to the development of SPIDERS 3D by the Navy, the Naval Facilities Engineering Command ("NAVFAC") had a need for software that could "render X3D content on the web browser"; to meet that need, NAVFAC Deputy Program Manager Alexandre Viana selected Bitmanagement's software based on a recommendation from the Web3D Consortium. A.109 (Viana 30(b)(6) Tr. 28:3-21).  The Web3D Consortium is an industry group which "promotes deployment of X3D standards for the communication of 3D scenes in multiple applications, use cases, platforms, and verticals."  A.166 (*About Web3D Consortium*, http://www.web3d.org/about (last visited Feb. 5, 2018)).

7.      To procure Bitmanagement's software, the Government elected to contract with the U.S.-based reseller Planet 9 Studios, Inc. ("Planet 9"), rather than directly with Bitmanagement, based on the advice of counsel against contracting with foreign entities.  A.095 (Viana Tr. 66:17-21); A.109 (Viana 30(b)(6) Tr. 29:5-20).  Bitmanagement and Planet 9 entered into a finder's fee agreement in July 2006, which stipulated that Planet 9 "is neither entitled to represent [Bitmanagement] in any legal or other transaction nor to make any binding or

5

nonbinding statement on behalf of [Bitmanagement]."  A.169 (BITMGMT_0000662 at -<u>663</u>).

Bitmanagement and the Navy have never entered into any direct contractual relationship.  ECF

No. 11 ¶ 15; A.114, A.125 (Viana 30(b)(6) Tr. 50:12-16; 120:15-24).

       8.      In an agreement dated March 27, 2008, Bitmanagement sold Planet 9 "100 PC

licenses" of BS Contact, a predecessor to BS Contact Geo.  A.174 (BITMGMT_0001032 at -

<u>036</u>).  A PC license for software is a license that provides for the installation of the software onto

a specified number of computers.  A.047-048 (Chambers 30(b)(6) Tr. 53:24-54:5); A.042

(Chambers Tr. 36:11-37:2); A.072 (McCarns Tr. 53:16-24); A.077, A.081 (Schickel 30(b)(6) Tr.

31:4-6, 116:2-4).  The agreement also provided that Planet 9 was "entitled to resell the licenses

to FISC San Diego (NAVY Purchasing) for their respective use as per this agreement."  A.174

(BITMGMT_0001032 at -<u>036</u>).

       9.      In a contract dated February 12, 2008, Planet 9 resold the 100 PC licenses to the

Government for $300 each.  A.185 (Viana 30(b)(6) Ex. 3 at -<u>885</u>).  A Navy contracting officer

executed the contract, Contract No. N00244-08-P-1039, on behalf of the Government, and Planet

9 CEO David Colleen signed on behalf of Planet 9.  A.183 (Viana 30(b)(6) Ex. 3 at -<u>883</u>);

A.109-110 (Viana 30(b)(6) Tr. 27:1-28:2, 28:22-29:4, 33:21-23).  The Government understood

that the 100 licenses it was purchasing were "seat" or "PC" licenses, which would allow for

installations onto up to 100 Navy computers.  A.111-112 (Viana 30(b)(6) Tr. 38:3-40:9; 42:5-

11).  The contract did not contain the term "concurrent."

       10.     Mr. Viana, the Government's principal negotiator with Bitmanagement,

understood the 2008 contract to contemplate "seat" licenses even though the term does not

appear in the contract.  A.095-096 (Viana Tr. 69:24-70:18); A.110-111 (Viana 30(b)(6) Tr. 32:4-

18; 38:3-10).  Additionally, Mr. Viana understood that Planet 9 was not the publisher of the

software and that Planet 9 characterized itself as Bitmanagement's "reseller," rather than as

Bitmanagement's "agent." A.109-110 (Viana 30(b)(6) Tr. 29:25-30:4; 31:13-32:3). Planet 9

made no representations as to its authority regarding Bitmanagement's software, other than that

as a reseller, and Bitmanagement also described Planet 9 as its reseller. A.116-118 (Viana

30(b)(6) Tr. 59:21-60:2; 65:18-66:12).

### C. The 2012 Contract for 18 Licenses of BS Contact Geo

#### i. The Government Requests Software Modifications

11.     By 2011, the Navy, through Planet 9, had engaged in discussions with

Bitmanagement regarding a possible purchase of additional software licenses, even though 20 of

the original 100 PC licenses for BS Contact had not yet been deployed to Navy computers.

A.191 (Viana Ex. 13); A.097 (Viana Tr. 74:16-75:6). In a June 2011 email, Mr. Viana proposed

using a license server tracker application called "FlexNet" or "Flexera,"[1] which was already

approved for use on the Navy Marine Corps Intranet ("NMCI"). A.192 (Viana Ex. 13 at -006).

Flexera allows for the tracking of software that has been deployed through a central server.

A.011-013 (Defendant's Responses to Plaintiff's Interrogatories Nos. 6-7); A.043 (Chambers Tr.

41:1-6). Mr. Viana asked if the 20 unused licenses purchased in the 2008 contract could be

deployed and tracked using the Flexera function. A.192 (Viana Ex. 13 at -006). Mr. Colleen

responded on June 10, 2011 that "Bitmanagement says OK." *Id.*

12.     Mr. Viana has admitted that in his email exchange with Planet 9 in June 2011, he

did not indicate any intent to deploy BS Contact or BS Contact Geo throughout the Navy's

---

[1] "FlexNet" has alternatively been referred to as FlexNet Manager for Engineering Applications (FMEA), FlexLM, or software that is "Flexwrapped" or enabled by "Flexera." *See, e.g.*, A.106 (Viana Tr. 233:9-12) ("Q. And the various terms Flexera, FlexNet, FlexLM, FlexWrap and AdminStudio, do you roughly interpret them to be synonymous? A. All the same, yes.").

network.  A.191 (Viana Ex. 13); A.098 (Viana Tr. 80:5-9).  Neither Mr. Colleen nor Mr. Viana

mentioned any new quantity of licenses or introduced the concept of "concurrent use" licenses.

A.191 (Viana Ex. 13).  Single-seat PC licenses could be centrally managed, and both concurrent

and PC/seat licenses could be managed and tracked by Flexera.  A.043 (Chambers Tr. 40:14-

41:22); A.065 (Chambers 30(b)(6) Tr. 197:4-16).

13.     In late 2011, Mr. Viana emailed both Bitmanagement and some of his Navy

colleagues, discussing future contracts for licenses of BS Contact Geo that would incorporate the

Flexera feature.  Mr. Viana's correspondence with Bitmanagement referred to "PC licenses," but

did not mention "concurrent licenses," did not mention any number of installations greater than

20, and confirmed that the testing of the Flexera license tracking could enable the purchase of

additional licenses.  A.198 (Viana Ex. 17 at -385).

14.     On October 21, 2011, Dean McCarns, NAVFAC's Director of Computer-Aided

Design and Engineering Application Management, sent an email to Mr. Viana stating that he was

"writing up the agreement letter (for this on other applications) which will protect NAVFAC

(DoN, DoD) from any future litigation."  A.204 (Viana 30(b)(6) Ex. 4 at -287); A.071 (McCarns

Tr. 10:8-16).  *See also* A.113 (Viana 30(b)(6) Tr. 46:14-21) (testifying that he "would not have

any reason to question Mr. McCarns" as to whether a vendor agreement was necessary).

15.     On November 24, 2011, Mr. Viana sent Bitmanagement a draft vendor agreement

between Bitmanagement and NAVFAC.  A.221 (BITMGMT_0001178 at -185).  Neither Mr.

Viana's cover email nor the draft vendor agreement referenced concurrent licenses, nor did they

mention mass installation of the software.  A.215-222 (BITMGMT_0001178-186); A.084

(Schickel 30(b)(6) Tr. 153:1-9).  Rather, the draft described the license as "BS Contact Geo – PC

license (special version)" with an unspecified quantity.  A.220 (BITMGMT_0001178 at -183).

16.     On December 15, 2011, NAVFAC's Mr. McCarns sent another email to Mr.
Viana and other NAVFAC colleagues "to make sure Bitmanagement signs the
document…agree[ing] to a perpetual license agreement (this will protect us in case the vendor
decides to pull the agreement and we are on the hook to license all the installed software – e.g.
*install on 500 desktops but only own 10 licenses, we would have to buy 490 more licenses*)."
A.201 (Viana 30(b)(6) Ex. 4 at -284 (emphasis added)).  Later the same day, Mr. Viana
forwarded Mr. McCarns' email and a draft vendor agreement to Planet 9's Mr. Colleen,
containing a draft End User License Agreement between Bitmanagement and NAVFAC.  A.201,
A.208-214 (Viana 30(b)(6) Ex. 4 at -284, -362-368).  The draft End User License Agreement, in
particular "Appendix A: Network License Enabling," read: "Licensor grants Licensee the right to
use third party products to repackage Licensor software (within the use rights and guidelines
established in section 2.2) to enable concurrent (network) licensing."  A.212 (Viana 30(b)(6) Ex.
4 at -366).  Neither Mr. Colleen nor any Navy representative shared this version of the draft
agreement with Bitmanagement.  A.114-115 (Viana 30(b)(6) Tr. 53:20-22, 55:13-23).

17.     Ultimately, the Government did not execute any version of the vendor agreement
with Bitmanagement, or any other agreement directly with Bitmanagement.  A.114 (Viana
30(b)(6) Tr. 50:12-16); A.084 (Schickel 30(b)(6) Tr. 153:10-13).  Instead, the Government
elected to buy additional licenses through a simple purchase order with Planet 9 similar to the
contract it had executed in 2008.  A.224-238 (Viana 30(b)(6) Ex. 6 at -027-041).

ii.     Discussions Between Planet 9 and the Government

18.     On January 18, 2012, Mr. Viana emailed Mr. Colleen requesting that specific
language be added to a draft "proposal" Mr. Colleen had prepared:

Deliverables

20 existing copies of BS Contact Geo version 7.215 to be network (concurrent) license enabled by NAVFAC using Flexera Software's FlexWrap utility of the AdminStudio software suite.

Terms

We will provide a non-exclusive, perpetual license…

A.239 (Viana 30(b)(6) Ex. 5 at -843 (ellipses in original)); A.116 (Viana 30(b)(6) Tr. 58:9-21).

Mr. Colleen replied on January 20, 2012, with a draft of the proposal containing the language

Mr. Viana had requested.  A.239, A.241-242 (Viana 30(b)(6) Ex. 5 at -843, -845-846).  The

proposal also described the licenses as "seats of BS Contact Geo," and provided for technical

support for up to 35 users.  A.241 (Viana 30(b)(6) Ex. 5 at -845).  Neither Mr. Viana nor Mr.

Colleen shared the proposal document with Bitmanagement.  A.116 (Viana 30(b)(6) Tr. 59:5-

20).

      19.    Patrick Chambers, the Government's 30(b)(6) witness who oversees every NITC

contract, testified in his deposition that while the Government regularly licenses software

through resellers, it nonetheless takes care to agree to license terms "directly with the publisher."

A.067-068 (Chambers 30(b)(6) Tr. 214:4-10; 216:9-13; 220:5-9).  Bitmanagement did not

authorize Mr. Colleen's January 2012 proposal, and it never learned of the proposal prior to its

disclosure in this litigation.  A.085 (Schickel 30(b)(6) Tr. 159:20-160:11, 161:10-15).

      20.    Mr. Viana could not identify any oral or written communications that he had with

Bitmanagement describing the contemplated BS Contact Geo licenses as "concurrent," and could

not identify any other such communications with Planet 9 besides the January 2012 email

exchange about the contract proposal, which was not shared with Bitmanagement.  A.116 (Viana

30(b)(6) Tr. 60:3-61:2).[2]  Bitmanagement does not commercially offer concurrent-use licenses.

A.086 (Schickel 30(b)(6) Tr. 163:19-20); A.249 (Buckley Ex. 17).

iii.    <u>2012 Contract for 18 Licenses of BS Contact Geo</u>

21.    On June 14, 2012, Bitmanagement entered into an agreement with Planet 9 to sell

it a "PC license" for "BS Contact [Geo] (Windows version v 7.215 or v.8.001)."  A.256

(BITMGMT_0021514 at -<u>519</u>).  The agreement provided that the software "be enabled by the

Licensor for 18 PCs."  *Id.*  The agreement also provided that "Licensee is permitted to provide

the software … to NAVFAC for the customers usage according to this agreement."  *Id.*[3]  The

agreement did not contain the term "concurrent" or otherwise refer to concurrent licenses.

22.    In a contract dated May 24, 2012, Planet 9 resold the 18 licenses of BS Contact

Geo to the Navy at $305 per license.  ECF No. 11 ¶ 13; A.227 (Viana 30(b)(6) Ex. 6 at -<u>030</u>).

The portion of the contract referencing the BS Contact Geo license reads:

---

[2] On March 22, 2012, Stella Rizalla, a contract specialist with NAVFAC, contacted
Bitmanagement through its website expressing interest in purchasing software through a U.S.
distributor with the subject line "Bitmanagement BS Contact version 7.215."  Axel Koerfer,
Bitmanagement's Financial Officer, responded that Bitmanagement offers digital license keys by
email or sells software through U.S. resellers, and asked Ms. Rizalla which product she was
interested in and in what quantity.  Ms. Rizalla responded: "Bitmanagement BS Contact Geo
Version 7.215 with network (concurrent) license keys.  Do you have any distributors in the US
that carry this software?"  Bitmanagement did not respond to this email.  On March 24, 2012,
Mr. Koerfer sent another email responding to Ms. Rizalla's original general expression of
interest, recommending that she contact David Colleen of Planet 9 "for reselling in the US of BS
Contact Geo."  A.243 (Schickel 30(b)(6) Ex. 23 at -<u>345</u>); A.246 (Schickel 30(b)(6) Ex. 24 at -
<u>507</u>); A.087 (Schickel 30(b)(6) Tr. 167:18-168:3); A.117 (Viana 30(b)(6) Tr. 62:21-24).
Bitmanagement had no further communications with Ms. Rizalla.
[3] The document was not signed by the parties, but they agreed to its terms and Planet 9 paid the
amount invoiced under the agreement.  A.261 (Planet 9_0004828 at -<u>831</u>).

11

BS CONTACT GEO VERSION 7.215 LICENSES
FFP
ENABLED BY NAVFAC USING FLEXERA SOFTWARE'S FLEXWRAP
UTILITY OF THE ADMIN STUDIO SOFTWARE SUITE

A.227 (Viana 30(b)(6) Ex. 6 at -030).  The 2012 contract was signed on behalf of the

Government by Debra Buckley, a Navy contracting officer.  A.034 (Buckley Tr. 70:1-71:2).  Ms.

Buckley drafted the May 24, 2012 contract with input from Mr. Viana and assistance from other

NAVFAC employees.  A.117 (Viana 30(b)(6) Tr. 63:19-64:9).

23.     The 2012 contract contained no End User License Agreement.  A.224-238 (Viana

30(b)(6) Ex. 6 at -027-041); *see also* A.121-122 (Viana 30(b)(6) Tr. 81:14-82:4 (describing the

14 pages of the contract as the "entire" contract)).  The contract did not contain the term

"concurrent" or otherwise refer to concurrent licenses.  A.224-238 (Viana 30(b)(6) Ex. 6 at -027-

041); A.036 (Buckley Tr. 89:6-9).  And the contract was conditioned on the Navy's tracking its

usage of BS Contact Geo via the Flexera software.  A.120 (Viana 30(b)(6) Tr. 77:7-17).

24.     The 2008 and 2012 agreements between Bitmanagement and Planet 9, and the

2008 and 2012 contracts between Planet 9 and the Navy, were the only agreements in which the

Navy purported to purchase, and Bitmanagement in turn agreed to provide, licenses for BS

Contact or BS Contact Geo.

25.     When Navy contracts provide for concurrent software licenses, they expressly say

so.  A.030 (Buckley Tr. 43:1-5 (in a contract for concurrent use licenses, she would include "a

description stating that it was a concurrent license")); A.066 (Chambers 30(b)(6) Tr. 211:15-20);

A.043 (Chambers Tr. 39:23-25 (in his experience, "a concurrent license would clearly state the

word 'concurrent'")); A.066 (Chambers 30(b)(6) Tr. 211:24-212:6 (agreeing he was unaware of

any software license agreements for concurrent licenses that did not use the term "concurrent,"

or a similar explicit term)). For example, the Government's license for a software program called Autodesk—which the Navy's Mr. McCarns and Mr. Viana shared and referenced when discussing a license for BS Contact Geo—contained the term "concurrent" and explained the precise bounds of what was permitted. A.073 (McCarns Tr. 123:4-7); A.207 (Viana 30(b)(6) Ex. 4 at -<u>331</u> ¶ 4).

### D.  The Government's Mass Installation of BS Contact Geo

26.    The Government installed BS Contact Geo onto "hundreds of thousands" of Navy computers. ECF No. 11 ¶ 4. In particular, beginning in July 2013, the Government installed BS Contact Geo onto at least 429,604 Navy computers on its Navy Marine Corps Intranet ("NMCI") network. A.006-009 (Defendant's Response to Interrogatory No. 3). Additionally, beginning in January 2014, the Government also installed BS Contact Geo onto an indeterminate number of computers on another Navy network, ONE-Net. *Id.* Further, the Government may have also installed BS Contact Geo onto computers outside of the NMCI and ONE-Net networks. A.022-024 (Defendant's Response to Interrogatory No. 11).

> i.    <u>The Government's Failure to Limit Installations or Usage of BS Contact Geo</u>

27.    On June 12, 2012, during the testing and certification process for upgrading to the latest version of BS Contact Geo, Mr. Viana emailed Mr. Schickel and others inquiring as to whether BS Contact Geo could be modified with a "silent installer." A.264 (Schickel 30(b)(6) Ex. 26 at -<u>969</u>). A silent installer would allow for BS Contact Geo "to be remotely deployed (via network) and installed without any need for end user interaction." *Id.* On June 13, 2012, Mr. Schickel wrote: "Bitmanagement confirms our concurrence to replace BS Contact Geo v7.215 with v8.001 as a 'no cost' modification *under the same terms* of the recently awarded BS

Contact Geo license procurement with NAVFAC." *Id.* (emphasis added).  Bitmanagement also

agreed to code the updated version with the silent installer capability "for bulk installation,"

which Mr. Schickel explained meant "either a few licenses, for example, just one or two even for

testing purposes, or – or even multiple ones." *Id.*; A.088 (Schickel 30(b)(6) Tr. 175:1-176:1;

177:11-14).  Bitmanagement believed this modification would facilitate the installation of BS

Contact Geo through a central server for testing purposes as requested by the Government, and

that the Government would track installations through the FlexNet license manager.  A.083,

A.088-090, A.092 (Schickel 30(b)(6) Tr. 142:6-17; 177:2-14; 178:21-179:12; 182:7-18; 194:20-

195:12).  In these communications regarding the modification, the Government did not inform

Bitmanagement that it planned to install BS Contact Geo on a mass scale without purchasing

additional licenses.

28.     The Government understood that the 2012 contract required BS Contact Geo

licenses to be tracked through the Flexera technology.  A.120 (Viana 30(b)(6) Tr. 77:7-17);

A.107 (Viana Tr. 246:18-22).  Nonetheless, the Flexera software did not track or limit usage or

installation of the OCX file, or browser plugin, of BS Contact Geo, which was the file SPIDERS

3D relied on for 3D geospatial rendering.  A.266 (Chambers 30(b)(6) Ex. 8 at -909); A.056-058

(Chambers 30(b)(6) Tr. 120:15-121:1, 122:24-123:10, 127:20-22); A.011-012 (Defendant's

Responses to Interrogatory No. 6).

ii.     The Government's Installations of BS Contact Geo onto the Navy Marine

Corps Intranet

29.     As early as August 2012, before Bitmanagement had sold the additional 18 PC

licenses to Planet 9, the Government was planning to install BS Contact Geo throughout its

NMCI network.  A.270 (Viana Ex. 31 at -554).  The mass installations began the following year.

A.006-009 (Defendant's Response to Interrogatory No. 3).  Between July 2013 and September

2016, the Government installed BS Contact Geo 8.001 throughout the NMCI network, which the

Government admits consisted of at least "429,604 installs of the software over time."  *Id.*[4]  At no

point before or during the installation process did the Government indicate to Bitmanagement

that the existing contracts allowed for this mass deployment.

30.     The software remained installed on hundreds of thousands of Navy computers

through at least September 2016, after the filing of this lawsuit, when the Government claims it

implemented an uninstall directive purporting to remove BS Contact Geo on all but 34 NMCI

PCs or "seats."  *Id.*; A.055 (Chambers 30(b)(6) Tr. 114:4-115:2).  According to the Government,

250,403 uninstallations took place.  A.006-009 (Defendant's Response to Interrogatory No. 3);

A.055 (Chambers 30(b)(6) Tr. 114:4-115:2).

iii.     <u>The Government's Installations of BS Contact Geo onto ONE-Net</u>

31.     In addition to its mass installation onto the NMCI network, the Government also

deployed BS Contact Geo 8.001 onto ONE-Net, its unclassified network outside the continental

United States.  A.006-009 (Defendant's Response to Interrogatory No. 3).  The Government

made BS Contact Geo available for download from a catalogue to all ONE-Net users.  A.049

(Chambers 30(b)(6) Tr. 65:19-24); A.006-009 (Defendant's Response to Interrogatory No. 3).  It

is unknown how many ONE-Net installations occurred, but BS Contact Geo was made available

---

[4] Around the time that it began the mass installation, the Government drafted a deployment
schedule that would have pushed BS Contact Geo 8.001 onto as many as 558,466 NMCI PCs,
and the Government added between 15,000 and 40,000 eligible PCs to NMCI between July 2013
and September 2016.  A.276 (Chambers 30(b)(6) Ex. 7); A.006-009 (Defendant's Response to
Interrogatory No. 3); A.046 (Chambers 30(b)(6) Tr. 47:9-48:20).  The Government's deployment
schedule showed 553,286 installations, but failed to include in that sum an additional 5,180
planned installations shown on the schedule.  A.276 (Chambers 30(b)(6) Ex. 7).

for download to every ONE-Net user.  A.051-053 (Chambers 30(b)(6) Tr. 81:18-82:8, 90:22-91:8); A.006-009 (Defendant's Response to Interrogatory No. 3).  At least some Navy employees have speculated that BS Contact Geo was "pushed to all ONE-Net [] seats."  A.290 (Buckley Ex. 15); A.040 (Buckley Tr. 141:19-20).  Debra Buckley, the contracting officer who signed the 2012 contract on behalf of the Government, did not know whether the contract permitted NAVFAC to install BS Contact Geo onto ONE-Net PCs, and never gave "any thought" as to whether it permitted NAVFAC to make BS Contact Geo available outside the Navy.  A.035-036 (Buckley Tr. 82:19-21, 88:4-89:5).

iv.    <u>Additional Installations of BS Contact Geo onto Government PCs</u>

32.     Bitmanagement never authorized the Navy to install BS Contact Geo onto any non-Navy or non-NAVFAC computers.  A.121 (Viana 30(b)(6) Tr. 79:14-23, 81:8-13).  On December 4, 2014, Mr. Viana discussed deploying BS Contact Geo to additional Government computer networks, including the Strategic Systems Programs network and MARCOR, the Marine Corps network.  A.295 (Chambers 30(b)(6) Ex. 6).  The Government has not investigated whether such installations actually occurred, or whether any installations occurred outside the Navy generally.  A.054, A.064 (Chambers 30(b)(6) Tr. 104:12-105:5; 192:24-193:10).

33.     The Government has generated SPIDERS 3D usage logs which show that Government employees at other service branches (such as the Department of the Air Force and the Department of the Army), civilian contractors, and employees of Government intelligence agencies (like the Defense Logistics Agency) accessed SPIDERS 3D through the NAVFAC Portal.  A.297 (Chambers 30(b)(6) Ex. 14); A.306 (Chambers 30(b)(6) Ex. 15); A.063-064 (Chambers 30(b)(6) Tr. 186:25-187:11, 190:15-191:13).  Mr. Chambers testified in his 30(b)(6) deposition that approximately 1,600 known non-Navy Government personnel had access to

16

SPIDERS 3D through the portal.  A.050 (Chambers 30(b)(6) 75:5-11).  For those users to utilize SPIDERS 3D, they would have had to use the OCX version of BS Contact Geo.  A.056, A.058 (Chambers 30(b)(6) Tr. 120:22-121:1, 127:20-22); A.266 (Chambers 30(b)(6) Ex. 8).

34.     Additionally, the Government does not know and has not investigated whether and to what extent Navy or any Government personnel used BS Contact Geo outside of SPIDERS 3D.  A.022-024 (Defendant's Response to Interrogatory No. 11); A.060-065 (Chambers 30(b)(6) Tr. 158:11-159:5, 174:14-17, 184:13-20, 186:21-24, 192:24-194:2).

### E.     The Government's Failure to Compensate Bitmanagement

35.     The Government has not paid Bitmanagement for the Navy's mass installation of BS Contact Geo.  ECF No. 11 ¶ 4.  The Government has refused to compensate Bitmanagement on the ground that it has already paid Planet 9 $35,490 for licenses of BS Contact and BS Contact Geo.  ECF No. 11 ¶ 4; A.123-124 (Viana 30(b)(6) Tr. 97:24-98:23).

36.     During the testing and certification process for BS Contact Geo, Mr. Viana repeatedly expressed the Government's desire to purchase additional licenses of the software. Bitmanagement understood him to be promising large contracts for additional licenses.  For example, in November 2011, Mr. Viana wrote to Bitmanagement: "We are extremely confident that [centrally managing the licenses] will facilitate the ability for us to justify future upgrades [] and purchase additional licenses."  A.326-327 (Schickel 30(b)(6) Ex. 18 at -887-888).  Later, on August 16, 2012, Mr. Viana emailed Mr. Schickel and Mr. Colleen:

> Wanted [to] provide you an update on our efforts to deploy BS Contact Geo within NMCI. … Once the option is exercised, we will initiate a follow-on contract in 2013 to maintain technical support and *procure additional licenses of v8.001 or newer if available*.

A.330-331 (Schickel 30(b)(6) Ex. 27 at -953-954 (emphasis added)).  Bitmanagement "did not

expect the rollout specifically without having an adequate contract."  A.090 (Schickel 30(b)(6)

Tr. 182:20-183:1).

37.     In April 2013, Mr. Viana wrote to Mr. Schickel that "[s]equestration is forcing

delay of establishing any new contracts this fiscal year…"  A.334 (Schickel 30(b)(6) Ex. 28).

Three months later, in July 2013, shortly before the Government began its mass installation of

BS Contact Geo, Mr. Viana emailed Mr. Schickel attaching a deployment schedule, writing:

"Looks like there will be great opportunity to increase the number of B[S] Contact Geo licenses

in the future. ;)."  A.340 (Viana Ex. 34 at -224).

38.     In October 2013, after the mass installations had begun, Mr. Colleen wrote to Mr.

Viana: "When Bitmanagement saw the 100,000+ distributions, they thought that the Navy had

purchased that many copies of BS Contact and that a large check was soon to be in the mail.

What they did not realize was that this was a pool of potential users that could access the floating

license for the number of copies already purchased.  Let's hope that this availability of their

software inspires people to use it such that the increased demand causes the sales of more seats."

A.349 (Viana Ex. 36 at -349).

39.     In April 2014, Mr. Viana wrote to Bitmanagement that he was "asking to have a

contract established with a ceiling of $3.5M to allow for additional purchases over a multiple

year period."  A.351 (Viana Ex. 22 at -358).

40.     Bitmanagement's Mr. Schickel "was always convinced that the Navy would

compensate [Bitmanagement] appropriately for an installation, a large-scale installation and

would offer us a major contract …."  A.091 (Schickel 30(b)(6) Tr. 189:3-12).  Mr. Viana never

corrected Bitmanagement's expectation.  A.105 (Viana Tr. 195:8-16).

18

## II.     PROCEDURAL BACKGROUND

Bitmanagement filed suit on July 15, 2016.  ECF No. 1.  On September 12, 2016, the

Court granted the Government's unopposed motion for an enlargement of time to respond to

Bitmanagement's Complaint, and the Government answered Bitmanagement's Complaint on

November 14, 2016.  ECF Nos. 8, 9, 11.  The parties filed their Joint Preliminary Status Report

on January 6, 2017.  ECF No. 12.

Pursuant to the Court's November 13, 2017 order, the parties completed fact discovery

on December 22, 2017.  ECF No. 20.  The parties have begun expert discovery, which they will

complete on May 18, 2018, pursuant to the Court's January 19, 2018 scheduling order.  ECF No.

22.  Bitmanagement now files this motion for summary judgment, in accordance with the Court's

January 25, 2018 scheduling order.  ECF No. 24.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  R. Ct. Fed. Cl. 56(a).  "Mere

denials or conclusory statements are insufficient," however, to defeat summary judgment.

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835-836 (Fed. Cir.

1984).  "Factual disputes that are irrelevant or unnecessary" are similarly discounted.  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

"It is undisputed that computer programs … can be subject to copyright protection[.]"

*Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1354 (Fed. Cir. 2014).  Like a private party, the

United States may be liable for copyright infringement.  28 U.S.C. § 1498(b).  To prevail on its

copyright infringement claim, Bitmanagement must establish ownership of a valid copyright and

copying by the Government.  *See Gaylord v. U.S.*, 595 F.3d 1364, 1372 (Fed. Cir. 2010) (citing

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  Indisputably, both

elements are present here: BS Contact Geo is an original work of software registered with the

U.S. Copyright Office and the Government has acknowledged making hundreds of thousands of

copies of that software.  "[T]he loading of software into a computer constitutes the creation of a

copy under the Copyright Act."  *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 519 (9th

Cir. 1993); *see also Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96, 100 (D.C. Cir.

1998) ("The language of the Copyright Act, case law, and common sense support the proposition

that the installation of software onto a computer results in 'copying' within the meaning of the

Copyright Act.").[5]

Nor can the Government establish any affirmative defense for its actions.  It is well

established that a "licensee infringes the owner's copyright if its use exceeds the scope of its

license."  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989); *see also Jacobsen v.*

*Katzer*, 535 F.3d 1373, 1380 (Fed. Cir. 2008); *Bean v. Pearson Educ., Inc.*, 949 F. Supp. 2d 941,

945 (D. Ariz. 2013); 3 Nimmer on Copyright § 10.15 (2017) ("when a license is limited in scope,

exploitation of the copyrighted work outside the specified limits constitutes infringement").  The

Government made copies of Bitmanagement's software that far exceeded the number of copies it

was permitted to make under the licenses that Bitmanagement had authorized.  Moreover, as the

party asserting as an affirmative defense to copyright infringement the existence of an implied

---

[5] *See also* A.361 (*A Report of the Register of Copyrights Pursuant to § 104 of the Digital Millennium Copyright Act*, Executive Summary, at xxii (U.S. Copyright Office, Aug. 2001), https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf (acknowledging that even "making [] temporary copies of a work in RAM implicates the reproduction right so long as the reproduction persists long enough to be perceived, copied, or communicated")).

license, the Government bears the "burden of proving [its] existence."  *See John G. Danielson,*

*Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 40 (1st Cir. 2003).  The Government

cannot meet its burden here.

In sum, as a matter of law, the Government did not have the right to copy and distribute

Bitmanagement's software in excess of the scope of the licenses that Bitmanagement sold to

Planet 9 for resale to the Navy.  The Government's copying of BS Contact Geo beyond the scope

of its license thus constitutes copyright infringement.

## I.      THE GOVERNMENT INFRINGED BITMANAGEMENT'S COPYRIGHT

### A.      Bitmanagement Owns a Valid Copyright

It is undisputed that Bitmanagement is the sole author and owner of BS Contact Geo.

Statement of Undisputed Material Facts ("SUMF") ¶ 1.  Bitmanagement has federally registered

copyrights covering three different versions of its BS Contact Geo software, SUMF ¶ 3,

representing prima facie evidence of its valid ownership of a copyright.  *See, e.g.*, *Three Boys*

*Music Corp. v. Bolton*, 212 F.3d 477, 488-489 (9th Cir. 2000); *Design Options, Inc. v.*

*BellePointe, Inc.*, 940 F. Supp. 86, 89 (S.D.N.Y. 1996); *see also* 17 U.S.C. § 410(c) ("the

certificate of a registration made before or within five years after first publication of the work

shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the

certificate").  In addition, Bitmanagement has marketed and sold BS Contact Geo, as well as its

predecessor software, BS Contact, for over a decade, including to the Government, which began

licensing Bitmanagement's software in 2008.[6]  The undisputed facts thus demonstrate that

---

[6] Moreover, because BS Contact Geo was first created and published outside the United States, it
is a non-"United States work" under 17 U.S.C. §§ 101 and 411(a), that is protected by United
States copyright law.  It is also a protected work under the Berne Convention for the Protection
of Literary and Artistic Works, to which the United States and Germany are parties.

Bitmanagement "has established ownership of" the software at issue here. *Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 935 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011).[7]

### B. The Government Copied BS Contact Geo Hundreds of Thousands of Times

It is undisputed that the Government had purchased no more than 38 licenses of BS Contact Geo by 2012. ECF No. 11 ¶ 2. It is also undisputed—indeed, the Government admitted in its answer—that the Government subsequently loaded BS Contact Geo onto hundreds of thousands of computers without any additional compensation to Bitmanagement. ECF No. 11 ¶¶ 2, 4, 21. In particular, the Government has expressly admitted to "429,604 installs of the software over time" on the Government's NMCI network, in addition to an unknown number of installations on the Government's overseas ONE-Net network. SUMF ¶¶ 29, 31. It is thus undisputed that the Government copied the copyright-protected BS Contact Geo software hundreds of thousands of times.

## II. THE GOVERNMENT LACKS ANY VIABLE DEFENSE TO COPYRIGHT INFRINGEMENT

Having admitted that it made hundreds of thousands of copies of BS Contact Geo, the Government's principal argument is that Bitmanagement both "expressly and impliedly authorized the Defendant to reproduce and distribute copies of BS Contact Geo to computers on the Navy's network." ECF No. 11, Defenses ¶ 2; ECF No. 12 at 5-6. Specifically, the



Government alleges that mass installation of BS Contact Geo was authorized in 2012 by a "concurrent" license. A concurrent license is "based on the number of simultaneous users accessing the program." A.363 (Buckley Ex. 2 at 2 (Department of Defense COTS Software Training Glossary) ("For example, in a five-user concurrent use license, after five users are logged on to the program, the sixth user is prohibited.")). A "PC" license (also known as a "seat" license), by contrast, necessarily limits installation of the software to a specific number of computers. A.042 (Chambers Tr. 36:21-37:2); A.072 (McCarns Tr. 53:16-21 ("PC license means that the license—that the software can be installed on any workstation but only on the number of workstations for the number of licenses you own.")).

The Government's defenses fail as a matter of law. *First*, Bitmanagement sold only PC licenses to Planet 9, its reseller. The Government did not, and could not have, purchased a valid concurrent license, or any license allowing for the installation of BS Contact Geo onto hundreds of thousands of computers, because Bitmanagement's reseller, Planet 9, was itself only authorized to resell a specified—and very limited—number of PC licenses. *Second*, even if Planet 9 somehow were authorized to sell licenses to the Government that allowed for mass installation, it did not in fact do so. The plain terms of the 2008 and 2012 contracts make clear that the Government did not purchase concurrent licenses, or any license allowing for mass installation. Indeed, neither contract even includes the word "concurrent," despite the Government's established practice of specifying when licenses are concurrent. *Last*, the Government cannot carry its burden of demonstrating implied authorization here.

### A.      Bitmanagement Never Sold a License That Allowed Mass Installation of its Software

In 2008 and 2012, Bitmanagement sold its reseller Planet 9 a limited number of "PC licenses" and nothing else.  SUMF ¶¶ 8, 21.  The Government's witnesses have repeatedly acknowledged that a PC license, also known as a "seat license," allows for the installation of the licensed software onto a specified number of machines.  A.103 (Viana Tr. 122:5-8); A.042-043 (Chambers Tr. 36:21-22; 38:10-13); A.072 (McCarns Tr. 53:18-24).  The 2008 contract allowed for the installation of 100 copies of BS Contact.  SUMF ¶ 9.[8]  The 2012 contract allowed for the installation of an additional 18 copies of BS Contact Geo.  SUMF ¶ 22.

It is undisputed that the Government did not have a direct contractual relationship with Bitmanagement, SUMF ¶ 7, but instead purchased its licenses for BS Contact Geo from Planet 9, Bitmanagement's reseller.  Indeed, at all relevant times, the Government correctly understood Planet 9 to be Bitmanagement's reseller, not its agent.  SUMF ¶ 10.

Under copyright law, a party cannot convey more than it owns.  *See, e.g.*, *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007) (in a copyright infringement case, citing the "venerable principle of the law of property that, while an owner may convey any of his rights to others permanently or temporarily, he may not convey more than he owns") (citing cases); Uniform Computer Information Transactions Act § 506(b) ("a transferee [of a license] acquires no more than the contractual interest or other rights that the transferor was authorized to transfer").  Here, Planet 9's finder's fee agreement with Bitmanagement provided that Planet 9 "is neither entitled to represent [Bitmanagement] in any legal or other transaction nor to make any binding or

---

[8] The Government later requested that 20 of those licenses be repurposed as licenses for the more advanced BS Contact Geo application.  SUMF ¶ 11.

nonbinding statement on behalf of [Bitmanagement]."  SUMF ¶ 7.  Because Planet 9 only

purchased PC licenses from Bitmanagement, Planet 9 could not have conveyed concurrent

licenses to the Government.  And because Bitmanagement's agreements with Planet 9 provided

no more than 38 PC licenses of BS Contact Geo for resale, Planet 9 could not have conveyed any

license—concurrent or otherwise—that allowed the Government to make hundreds of thousands

of copies of the software.

Even if the Government believed that it had acquired a license from Planet 9 that allowed

it to make hundreds of thousands of copies of BS Contact Geo, that would be no defense to

copyright infringement.  *Broadcast Music, Inc. v. 84-88 Broadway, Inc.*, 942 F. Supp. 225, 230

(D.N.J. 1996) ("Defendants' erroneous belief that the Agreement authorized [their conduct],

even if bona fide, does not exonerate them from liability for copyright infringement."); *see also*

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012) ("the innocent intent of the

defendant constitutes no defense to liability" (quoting 4 Nimmer on Copyright § 13.08(B)(1))).

The Government cannot, as a matter of law, argue that it procured from Planet 9 more rights than

Planet 9 had to convey.

## B.  Both of the Government's Contracts Were Limited in Scope

Even if Planet 9 did have the authority (which it did not) to resell to the Government an

express license allowing for the mass copying of BS Contact Geo, it did not do so here.  When

interpreting the terms of government contracts, this Court assesses "[t]he intention of the parties

from the four corners of the contract."  *See Cardiosom, LLC v. U.S.*, 117 Fed. Cl. 526, 530

(2014).  The Court considers the "plain language of the contract" and construes the contract "in

accordance with its express terms."  *Id.*  Moreover, "copyright licenses," in particular, "are

assumed to prohibit any use not authorized."  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088

(9th Cir. 1989); *see also Beckman Instruments, Inc. v. Cincom Sys., Inc.*, 232 F.3d 893 (9th Cir.

2000) (unpublished) ("We have rejected the argument that license agreements permit that which

they do not prohibit.").  When analyzing what was authorized pursuant to "the scope of the

license," "[t]he license must be construed in accordance with the purposes underlying federal

copyright law[, c]hief among [them] the protection of the author's rights." *S.O.S.*, 886 F.2d at

1088 (citations omitted).

 Nothing in the plain language of the contracts here indicates that they allowed for the

mass installation of BS Contact Geo.  The Government executed two contracts with Planet 9,

Bitmanagement's reseller, for Bitmanagement's software: (1) the 2008 contract, which allowed

for 100 copies of BS Contact; and (2) the 2012 contract, which allowed for 18 copies of BS

Contact Geo.  A.182-190 (Viana 30(b)(6) Ex. 3 (2008 contract)); A.224-238 (Viana 30(b)(6) Ex.

6 at -027-041 (2012 contract)).  Neither contract used the term "concurrent."  SUMF ¶¶ 9, 23;

*see also* A.111 (Viana 30(b)(6) Tr. 40:25-41:3 ("Q.  Now, the word 'concurrent' does not appear

in this [2008] contract, does it?  A.  No.")); A.036 (Buckley Tr. 89:6-8 ("Q.  Do you see the word

concurrent anywhere in this [2012] contract?"  A.  I did not see it.  No . . . .")).

 In fact, the Government admits that the 2008 contract was for a PC, or "seat," license that

"would not have allowed [the Government] to make any more copies" than it specified.  SUMF

¶  9; A.112 (Viana 30(b)(6) Tr. 42:5-11); A.096 (Viana Tr. 70:6-8 (Q.  "This [2008] contract

called for the purchase of 100 particular seats; is that correct?  A. Yes.")); A.094 (Viana Tr. at

38:20-22 ("Q.  And an individual seat is an individual computer?  A.  Yes.")).  And there is also

no genuine factual dispute that the 2012 contract (like the 2008 contract before it) was for

anything other than a PC license.  The 2012 contract explicitly defined the number of copies

allotted to the Government ("quantity: 18") and the price per copy paid by the Government

26

("unit price: $305.00"). SUMF ¶ 22-23. Contrary to the Government's argument that it was
"expressly authorized … to reproduce and distribute copies of BS Contact Geo to computers on
the Navy's network," ECF No. 12 at 5, over the course of two different depositions, the Navy's
subject matter expert for BS Contact Geo, Mr. Viana, was unable to point to any provision in the
2012 contract that provided such authorization. A.102 (Viana Tr. 120:11-22); A.119 (Viana
30(b)(6) Tr. 71:16-72:21). Nor could the contracting officer who signed the contract on the
Government's behalf (an officer who had been involved in hundreds of software procurements)
identify any provision intended to allow wide-scale copying or distribution of BS Contact Geo.
A.037 (Buckley Tr. 92:25-93:5).[9]

The Government's failure to include in the 2012 contract any mention of a concurrent
license—or to include any provision at all expressly authorizing its conduct—is not only
determinative, it is sharply out of keeping with the Government's own contracting practices for
concurrent licenses. The Department of Defense's "Software Buyer's Guide" establishes "a
standardized set of steps [for buyers] to follow" and emphasizes that—among the "Key Terms to
be Finalized at the Time of Placing an Order"—buyers must "clearly define" in the contract the
"basis or metric for counting the number of licenses the Government may use" as well as the
"actual quantity the Government may use." A.364-368 (Buckley Ex. 3 (Department of Defense

---

[9] The 2012 contract for 18 licenses states that BS Contact Geo must be "enabled by NAVFAC
using Flexera software's flexwrap utility." SUMF ¶ 22. To the extent the Government relies on
this language to contend that the licenses were concurrent, such an argument would be similarly
defeated by the testimony of the Government's own witnesses. *See, e.g.*, A.065 (Chambers
30(b)(6) Tr. 197:4-11); A.043-044 (Chambers Tr. 41:7-22, 57:18-24 (the Government's 30(b)(6)
witness with respect to the Government's software licensing practices admitting that Flexera can
be "enabled" for non-concurrent licenses)); A.102 (Viana Tr. 118:23-119:12 (Mr. Viana
testifying that this language simply meant that BS Contact Geo "would be enabled to be
managed by a separate software")).

ESI Software Buyer's Guide) at 2-3, 20 (Sec. 3.1.9, "Quantity"), 26 (Sec. 3.2.3, "Metric Used to Determine the License Price")); A.031-032 (Buckley Tr. 49:8-50:5).  Accordingly, Debra Buckley, the Government's contracting officer for the 2012 contract, admitted that she herself would include in a contract for a concurrent license a "description stating that it was a concurrent license."  SUMF ¶ 25.  She further agreed that a concurrent license would "clearly state that it is a concurrent user license."  A.031 (Buckley Tr. 49:16-20).  Indeed, the Government did just that when it executed a license agreement with Autodesk, another software provider, that expressly used the word "concurrent."  SUMF ¶ 25.

Moreover, when it was considering purchasing additional licenses for BS Contact Geo, the Government was well aware of the need to distinguish "concurrent" licenses from "PC" licenses in contractual language if a concurrent license was what it wanted.  During the licensing discussions for BS Contact Geo in 2011, Government employees drafted a vendor agreement for concurrent licenses of BS Contact Geo whose purpose was to "protect NAVFAC (DoN, DoD) from any future litigation."  SUMF ¶ 14.  The Government's proposed "Software License Agreement" between NAVFAC and Bitmanagement clearly stated the licenses were concurrent use licenses.  SUMF ¶ 16.  However, the Government never shared this draft agreement with Bitmanagement, nor was it ever executed.  SUMF ¶¶ 16-17.  And, in preparing this draft, Navy officials reviewed another Government software license agreement that contained express concurrent language "as a similar construct" for a draft vendor agreement with Bitmanagement.  A.099-100 (Viana Tr. 101:21-102:16); A.201 (Viana 30(b)(6) Ex. 4).  Similar language was not included in any executed license for BS Contact Geo.[10]

---

[10] Indeed, Mr. Viana demonstrated his own awareness of the need to include a reference to concurrent licenses when, in January of 2012, he emailed Planet 9's David Colleen, directing Mr.

In any event, even if the Government could somehow establish that it properly purchased a concurrent license, it still could not show that such a license authorized it to install BS Contact Geo onto hundreds of thousands of Government computers.  A concurrent use license does not in itself authorize mass installation; it simply provides for limits on simultaneous usage on machines where the licensed software has been installed.  *See* A.363 (Buckley Ex. 2 at 2).  There is no basis in the record to conclude that the Government's 2012 contract (or any other agreement) permitted the Government to make hundreds of thousands of copies of BS Contact Geo.  In deposition testimony, Government witnesses have been unable to explain how the license permitted this mass installation:

- Ms. Buckley, the Navy's contracting officer who signed the contract and had been involved in "hundreds" of software procurements, could not identify any provision intended to allow wide-scale copying or distribution of BS Contact Geo.  A.032, A.037 (Buckley Tr. 50:16-51:7; 92:25-93:5).

- Mr. Viana testified in his 30(b)(6) deposition that he did not believe the 2012 contract allowed for unlimited copies of BS Contact Geo.  A.114 (Viana 30(b)(6) Tr. 52:13-17 ("Q. … is it your understanding that the actual contract that was executed in 2012 allowed for unlimited copies of BS Contact Geo?  A.  No.")).

- Mr. Viana could not point to any provision in the contract allowing the Government to distribute more than 18 copies of BS Contact Geo.  A.119 (Viana 30(b)(6) Tr. 71:16-72:20).

To the contrary, Dean McCarns wrote an internal email to Mr. Viana on August 14, 2012 expressing concern that Mr. Viana planned to deploy BS Contact Geo throughout NMCI with "only 38 licenses."  A.370 (McCarns Ex. 16 at -553).

---

Colleen to include language in a new license proposal for BS Contact Geo that the licenses "be network (concurrent)."  SUMF ¶ 18; *see also* A.101 (Viana Tr. 107:21-108:20).  As discussed above, this proposed language was never shared with or approved by Bitmanagement, but the fact that the agreement that was subsequently executed did *not* include such language only bolsters the conclusion that the 2012 contract extended the Government's past practice of licensing Bitmanagement software on a PC basis.

Because its contracts failed to include any reference to concurrent licenses, or anything allowing for mass installation, there is no dispute that the Government lacked express authorization to copy and install BS Contact Geo beyond the limited number of licenses it purchased.

### C. The Government Cannot Show That Bitmanagement Granted an Implied License for the Installation of Hundreds of Thousands of Copies of its Software Without Compensation

The Government also argues that it had an *implied* license permitting its conduct. "Implied licenses," however, "are found only in narrow circumstances." *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 40 (1st Cir. 2003). As "[t]he party asserting an implied license," the Government "bears the burden of proving the license's existence and that the license, if any, covers the use in question." 2 Patry on Copyright § 5:131 (listing cases); *see also John G. Danielson, Inc.* 322 F.3d at 40 (listing cases); *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998) (affirming district court's finding of no implied license); *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 3d 535, 540 (S.D.N.Y. 2015) (finding "no genuine issue of material fact relating to any implied license bars entry of summary judgment"). "The touchstone for finding an implied license … is intent," which requires "an objective inquiry into facts that manifest such contractual intent." *John G. Danielson*, 322 F.3d at 40, 42. To establish that it had an implied license, the Government must show that Bitmanagement—despite having licensed a less advanced copy of its software to the Government in 2008 on a PC basis that allowed for installation on *a total of **100 computers** in exchange for $30,000*—later authorized the Government to make ***an unlimited*** *number of installations of its advanced software product for $5,490*. *See* A.227 (Viana 30(b)(6) Ex. 6 at -030). The Government cannot meet this burden.

While courts have used various multi-factor tests for discerning the licensor's intent to create an implied license, one widely cited articulation considers:

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts … providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*John G. Danielson*, 322 F.3d at 41 (quoting *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 516 (4th Cir. 2002)).  No matter how the test is articulated, no factor favors the Government here.

*First*, it is undisputed that Bitmanagement did not engage in a mere short-term discrete transaction with the Defendant, immediately distinguishing this case from many in the implied licensing realm.  *See, e.g.*, *Herbert v. United States*, 36 Fed. Cl. 299, 310 (1996) (finding implied license where author voluntarily worked on creation of a book at the request of the National Academy of Sciences without "anticipat[ing] … receiving any remuneration").  Bitmanagement is a commercial entity with proprietary software that it has spent more than a decade independently developing and licensing to customers across the world and across different industries.  SUMF ¶ 1.  In its capacity as a software licensor, Bitmanagement offers its customers—including the Government—ongoing service that includes technical consultation and software upgrades.  SUMF ¶¶ 18, 36; A.035-036 (Buckley Tr. 85:21-86:25); A.264 (Schickel 30(b)(6) Ex. 26 at -969); A.088 (Schickel 30(b)(6) Tr. 175:1-176:1); A.149 (Viana 30(b)(6) Ex. 10 at -221).  Bitmanagement's interactions with the Navy, in particular, were protracted and involved numerous discussions regarding licensing, deployment methods, software modifications, and technical support.  SUMF ¶¶ 4, 6-25, 27-28, 35-39.  Thus, this factor

"point[s] away from a license, because … [it] suggest[s Bitmanagement's] intent to remain involved in the job."  *John G. Danielson*, 322 F.3d at 41.

*Second*, it is undisputed that Bitmanagement used written agreements that delineated the scope of the rights conveyed.  Indeed, in both of its written agreements with its reseller, Bitmanagement specified the number, price, and type of the purchased software licenses.  A.170 (BITMGMT_0001032 (2008 reseller agreement)); A.251 (BITMGMT_0021514 (2012 reseller agreement)).  The agreements also required the licensee to observe "the limits of the grant of rights" provided by Bitmanagement, A.171 (BITMGMT_0001032 at -033), and that NAVFAC could only use the resold licenses "according to this agreement."  SUMF ¶ 21.  Moreover, when Bitmanagement did agree to change existing license terms, it did so expressly and in writing.  For example, in a 2013 email, Bitmanagement agreed to upgrade the 18 licenses purchased in 2012 to version 8.001 of the software "as a 'no cost' modification under the same terms of the recently awarded BS Contact Geo license procurement contract with NAVFAC."  SUMF ¶ 27.  This factor also points away from an implied license.

*Third*, nothing about Bitmanagement's conduct during delivery of BS Contact Geo indicated that the Government's mass installation of the software without Bitmanagement's consent or involvement, or additional licenses, was permissible.  As described above, *see supra* Part II.B, Bitmanagement expressly granted the Government no more than 38 PC licenses.  Moreover, the Government's own course of conduct objectively substantiates Bitmanagement's reasonable understanding of the limited authorization it had granted.

In 2011, Mr. Viana negotiated on behalf of the Government for additional software licenses.  SUMF ¶¶ 11-17.  Rather than simply inform Bitmanagement that the Government

wanted to switch from a PC license to a concurrent license,[11] or that the Government wanted to install BS Contact Geo onto its entire network,[12] Mr. Viana informed Bitmanagement via email that the Government wanted to manage and deploy software centrally from a server.  A.097 (Viana Tr. 75:7-11); A.198 (Viana Ex. 17 at -385).  Mr. Viana's email communications never indicated to either Bitmanagement or Planet 9 that the Government intended to deploy the software on a mass scale throughout the Navy's network.  *See, e.g.*, A.097 (Viana Tr. 75:15-18). Bitmanagement's reasonable understanding was not that the Government was changing the terms of its 2008 contract for PC licenses, but that, as Mr. Viana told Bitmanagement, the technical shift to manage the software through a server would enable the Government to "justify the purchase of additional BS Contact Geo licenses in the future."  A.198 (Viana Ex. 17 at -385).

Instead of explaining that it intended to install BS Contact Geo on a mass scale without compensating Bitmanagement, the Government persisted over the course of the next two years in repeatedly telling Bitmanagement that the Government was on the verge of purchasing a large number of additional licenses beyond the "test" licenses it had procured pursuant to the 2012

---

[11] The only communication by any party with Bitmanagement containing the word "concurrent," before the 2012 contract was executed, was an email exchange initiated through Bitmanagement's website from Stella Rizalla of the Navy's acquisition office on March 22, 2012.  Ms. Rizalla emailed about "Bitmanagement BS Contact Geo Version 7.215 with network (concurrent) license keys."  This exchange was Bitmanagement's only communication with Ms. Rizalla, as all its other communications, before and after, regarding the 2012 license were with Mr. Viana.  Ms. Rizalla did not even copy Mr. Viana on her email and she did not serve as contracting officer for the 2012 license.  A.243 (Schickel 30(b)(6) Ex. 23 at -345).  Her email was also vague, putting "concurrent" in parentheses and giving no indication of what this meant. Bitmanagement did not respond to her in any way indicating that it was agreeing to a concurrent license.  SUMF ¶ 20.  Under the circumstances, this email exchange did not manifest Bitmanagement's consent to a concurrent use license.

[12] Mr. Viana could not recall any instance where he or anyone else at the Government informed Bitmanagement prior to the 2012 contract that its software would be deployed across the NMCI enterprise.  A.104 (Viana Tr. 190:17-191:4).

contract.  SUMF ¶¶ 36-40.  Even in July 2013, when the Government revealed to

Bitmanagement its plan to conduct a mass installation of BS Contact Geo, Mr. Viana

simultaneously assured Bitmanagement that a contract for additional licenses would follow.

Specifically, Mr. Viana sent Mr. Schickel a "deployment schedule" that showed that the software

would be installed on at least 558,466 computers in July and August 2013.  SUMF ¶¶ 29, 37.  In

his email, Mr. Viana wrote: "looks like there will be great opportunity to increase the number of

BS Contact Geo licenses in the future. ;)."  SUMF ¶ 37.  The only plausible reading of such a

message is that the Government had confirmed the usability and benefits of BS Contact Geo and

that its planned mass deployment would be accompanied by a major volume of additional

licenses.  SUMF ¶ 40.  In such circumstances, no reasonable factfinder could conclude that

Bitmanagement authorized the Government to install BS Contact Geo onto hundreds of

thousands of computers without purchasing additional licenses.  *See Johnson*, 149 F.3d at 500

(finding that plaintiff would not have authorized defendant's conduct without "additional

compensation").

 The Government may contend that Bitmanagement did not immediately object when it

was informed of the mass installation of its software, but such an argument would fail as a matter

of law.  As an initial matter, "[m]ere acquiescence is insufficient to establish an implied license."

*Flo & Eddie*, 80 F. Supp. 3d at 539; *see also Johnson*, 149 F.3d at 500 ("In any event, one

isolated instance of inaction, coming as it did just before the breakdown of negotiations, is not

enough to outweigh [plaintiff's] repeated expressions of intent … .").  Moreover, the

Government is still obligated to show "a meeting of the minds between" it and Bitmanagement.

*Flo & Eddie*, 80 F. Supp. 3d at 539.  There is no credible evidence here that Bitmanagement

intended to forego payment for hundreds of thousands of additional licenses.  To the contrary,

the record shows that Bitmanagement welcomed the possibility of the Government's mass installation because it believed that Mr. Viana's forecast of a "great opportunity to increase the number of BS Contact Geo licenses" had come to pass.  As Planet 9's Mr. Colleen told Mr. Viana: "When Bitmanagement saw the 100,000+ distributions, they thought that the Navy had purchased that many copies of BS Contact and that a large check was soon to be in the mail." SUMF ¶ 38.  Mr. Viana admitted that he did nothing to dispel Bitmanagement's impression. SUMF ¶ 40.

*Finally*, at the very least, there can be no question that Bitmanagement never authorized the Government to deploy BS Contact Geo on a mass scale *without* any functional mechanism for controlling the volume of usage.  And that was exactly what the Government did.  The Government has admitted that its 2012 contract for licenses of BS Contact Geo was conditioned on the Navy's tracking of BS Contact Geo via the Flexera software.  SUMF ¶¶ 23, 28.  But Flexera was not capable of monitoring or limiting the usage of the BS Contact Geo web browser plugin, which was the only way BS Contact Geo could be used in conjunction with SPIDERS 3D.  SUMF ¶ 28.[13]  And to the extent Flexera did *anything* to monitor or limit any kind of usage of BS Contact Geo, that ended when the Government elected to disable Flexera in 2014, the year after the mass deployment began.  A.011-013 (Defendant's Response to Interrogatory No. 6);

---

[13] The Government has asserted that weblogs allowed it to reconstruct the usage of SPIDERS 3D.  However, even this purported after-the-fact reconstruction only covered a limited period of time.  Moreover, there is no question that the weblogs did not *restrict* the usage of the software, meaning there was no limitation on the maximum number of users who could access BS Contact Geo generally or at the same time.  *See* A.003-004 (Defendant's Response to Interrogatory No. 1); A.022-024 (Defendant's Response to Interrogatory No. 11).

A.058-059 (Chambers 30(b)(6) Tr. 128:25-130:24); A.266 (Chambers 30(b)(6) Ex. 8).[14]

Moreover, neither Flexera nor any other mechanism limited the usage of BS Contact Geo outside

the NMCI network, such as on ONE-Net, or when it was used other than as part of SPIDERS

3D.

Likewise, Bitmanagement's removal of its internal control mechanism for tracking

license usage cannot establish implied authorization for mass deployment without compensation.

As part of its "testing and certification" of BS Contact Geo, the Navy requested that

Bitmanagement allow for a "silent installer" that would enable the "application to be remotely

deployed (via network) and installed without any need for end user interaction."  SUMF ¶ 27.

Bitmanagement made this modification to enable the Navy to determine, under its limited test

license, *whether* the software could be deployed from a central server—not so it would actually

perform a mass deployment without additional licenses or compensation.  *Id.*; *see also* A.088

(Schickel 30(b)(6) Tr. at 177:2-14 ("bulk installation means either a few licenses, for example,

just one or two even for testing purposes, or—or even multiple ones")).  Moreover,

Bitmanagement removed its own external mechanism that tracked installation and usage of its

software on the express contractual condition that the Government would instead use Flexera to

track BS Contact Geo.  SUMF ¶ 28; A.107 (Viana Tr. 246:18-22 ("Q.  [S]o your understanding,

---

[14] The Navy officials involved in the licensing of BS Contact Geo were well aware of the
requirement that Flexera function properly.  SUMF ¶ 28.  Dean McCarns, in an email to Mr.
Viana at the time the 2012 license was being negotiated, wrote: "I just want to make sure
BitManagement signs the document that addresses the following:  1.  They agree to allow us to
FlexWrap their software; 2.  They agree to a perpetual license agreement (this will protect us in
case the vendor decides to pull the agreement and we are on the hook to license all the installed
software – e.g. install on 500 desktops but only own 10 licenses, we would have to buy 490 more
licenses)."  A.201 (Viana 30(b)(6) Ex. 4 at -<u>284</u>).

again, of the 2012 contract was that it was conditioned on the use of FlexWrap, correct?  A.

Yes.")).

In sum, "almost every objective fact in the present case points away from the existence of

an implied license."  *Johnson*, 149 F.3d at 500.  Rather than use Bitmanagement's valuable

software within the limits of its contracts, the Government engaged in a deliberate campaign of

mass copying.  Nothing in the record substantiates the Government's attempt to retroactively

justify its conduct.  As a matter of law, this Court should conclude that the Government's mass

installation constituted infringement.

## CONCLUSION

Bitmanagement respectfully requests that this Court grant summary judgment as to the

Government's liability for copyright infringement and hold that the Government copied BS

Contact Geo beyond the limits of its license, on a scale equal to the hundreds of thousands of

unauthorized copies of BS Contact Geo that the Government either installed or made available

for installation.

**REDACTED VERSION**

Dated: March 2, 2018

Respectfully Submitted,

*Attorneys for Plaintiff*

/s/ Carl J. Nichols
Carl J. Nichols
*Counsel of Record*
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: carl.nichols@wilmerhale.com

*Of Counsel*
Adam Raviv
David G. Beraka
Michael Carpenter
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: adam.raviv@wilmerhale.com
        david.beraka@wilmerhale.com
        michael.carpenter@wilmerhale.com

Allison Trzop
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
Email: allison.trzop@wilmerhale.com

*Counsel for Bitmanagement Software GmbH*