**REDACTED VERSION**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BITMANAGEMENT SOFTWARE GMBH,

        Plaintiff,

    v.

THE UNITED STATES,

        Defendant.

No. 16-840 C

Senior Judge Edward J. Damich

## DEFENDANT'S RESPONSE IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY

CHAD A. READLER
Acting Assistant Attorney General

GARY L. HAUSKEN
Director

SCOTT BOLDEN
Deputy Director
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC  20530
Email: Scott.Bolden@USDOJ.gov
Telephone:     (202) 307-0262
Facsimile:      (202) 307-0345

Of Counsel:
RICHARD J. HUBER
Department of the Navy

April 13, 2018

**REDACTED VERSION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

COUNTERSTATEMENT OF THE QUESTIONS PRESENTED ................................. 3

COUNTERSTATEMENT OF THE CASE .................................................................... 3

I.     DISPUTED MATERIAL ISSUES ..................................................................... 3

II.    DEFENDANT'S ASSERTED FACTS .............................................................. 5

ARGUMENT ................................................................................................................ 19

I.     LEGAL STANDARDS .................................................................................... 19

II.    THE   2012   CONTRACT   EXPRESSLY   LICENSED   THE   NAVY'S
       DEPLOYMENT OF BS CONTACT GEO ...................................................... 20

       A.     The Plain Language of the 2008 and 2012 Contracts is Ambiguous with
              Respect to the Scope of the Licenses ................................................... 20

       B.     The Parties Dispute Material Aspects of the Extrinsic Evidence ......... 21

              1.     Extrinsic   Evidence   Establishes   that   the   2008   Contract
                     Encompasses Seat Licenses ...................................................... 22

              2.     Extrinsic Evidence Suggests that the 2012 Contract Encompasses
                     Concurrent Licenses .................................................................. 23

                     a.     The Parties' Course of Dealing Suggests a Concurrent
                            License ........................................................................... 23

                     b.     The Parties' Course of Performance Suggests a Concurrent
                            License ........................................................................... 26

              3.     Bitmanagement's Reliance on Its Post Hoc Agreements with
                     Planet 9 is Misleading and Improper ........................................ 29

              4.     Bitmanagement's Interpretation of the Extrinsic Evidence is
                     Flawed ....................................................................................... 32

III.   BITMANAGEMENT IMPLIEDLY LICENSED THE NAVY'S DEPLOYMENT
       OF BS CONTACT GEO ................................................................................. 34

       A.     The Navy Requested that Bitmanagement Create a Modified Version of
              BS Contact Geo ..................................................................................... 36

  B.  Bitmanagement Modified BS Contact Geo at the Navy's Request and Delivered it to the Navy ...................................................................................... 36

  C.  Bitmanagement Intended that the Navy Deploy BS Contact Geo on Navy Computers ............................................................................................................. 36

IV.  TO THE EXTENT THAT BITMANAGEMENT ASSERTS A BREACH OF CONTRACT, ITS CLAIM IS JURISDICTIONALLY BARRED .................................. 38

V.  28 U.S.C. § 1498(C) BARS BITMANAGEMENT'S INFRINGEMENT CLAIM WITH RESPECT TO THE OVERSEAS ONE-NET NETWORK ................................... 39

CONCLUSION ............................................................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**

Airplane Sales Int'l Corp. v. United States,
    54 Fed. Cl. 418 (2002) ........................................................................................... 22

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ............................................................................................... 19

Asset Marketing Sys., Inc. v. Gagnon,
    542 F.3d 748 (9th Cir. 2008) ........................................................................... 35, 36

Baisden v. I'm Ready Productions, Inc.,
    693 F.3d 491 (5th Cir. 2012) ................................................................................. 35

Baistar Mech., Inc. v. United States,
    128 Fed. Cl. 504 (2016) ......................................................................................... 22

Beta Sys., Inc. v. United States,
    838 F.2d 1179 (Fed. Cir. 1988) ............................................................................. 21

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) ............................................................................................... 19

Cienega Gardens v. United States,
    194 F.3d 1231 (Fed. Cir. 1998) ............................................................................. 39

Davis v. Blige,
    505 F.3d 90 (2d Cir. 2007) ............................................................................... 31, 32

E.L. Hamm & Assocs., Inc. v. England,
    379 F.3d 1334 (Fed. Cir. 2004) ............................................................................. 20

Feist Publications, Inc. v. Rural Telephone Service Co.,
    499 U.S. 340 (1991) ............................................................................................... 19

Gardiner, Kamya & Assoc., P.C. v. Jackson,
    467 F.3d 1348 (Fed. Cir. 2006) ............................................................................. 21

Gaylord v. United States,
    595 F.3d 1364 (Fed. Cir. 2010) ............................................................................. 19

Herbert v. United States,
  36 Fed. Cl. 299 (1996) ................................................................................ 34, 35

I.A.E., Inc. v. Shaver,
  74 F.3d 768 (7th Cir. 1996) ............................................................................... 35

Jacintoport Int'l LLC v. United States,
  121 Fed. Cl. 196 (2015) ..................................................................................... 21

John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.,
  322 F.3d 26 (1st Cir. 2003) ........................................................................... 37, 38

Keehn v. United States,
  110 Fed. Cl. 306 (2013) ..................................................................................... 39

LAI Services, Inc. v. Gates,
  573 F.3d 1306 (Fed. Cir. 2009) .......................................................................... 20

Latimer v. Roaring Toyz, Inc.,
  601 F.3d 1224 (11th Cir. 2009) .......................................................................... 37

Leonardo v. United States,
  55 Fed. Cl. 344 (2003) ....................................................................................... 40

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
  475 U.S. 574 (1986) ...................................................................................... 19, 24

MDY Indus., LLC v. Blizzard Entertainment, Inc.,
  629 F.3d 928 (9th Cir. 2010) .............................................................................. 39

Metric Constructors, Inc. v. NASA,
  169 F.3d 747 (Fed. Cir. 1999) ............................................................................ 20

MPE Business Forms, Inc. v. United States,
  44 Fed. Cl. 421 (1999) ....................................................................................... 20

RT Computer Graphics, Inc. v. United States,
  44 Fed. Cl. 747 (1999) .................................................................................. 19, 35

S.O.S., Inc. v. Payday, Inc.,
  886 F.2d 1081 (9th Cir. 1989) ............................................................................ 32

Storage Tech. Corp. v. Custom Hardware Eng. & Consulting, Inc.,
  421 F.3d 1307 (Fed. Cir. 2005) .......................................................................... 39

TEG-Paradigm Env., Inc. v. United States,
    465 F.3d 1329 (Fed. Cir. 2006) ................................................................. 21, 22, 32

United States v. Diebold, Inc.,
    369 U.S. 654 (1962)..................................................................................... 19

United States v. Ford Motor Co.,
    463 F.3d 1267 (Fed. Cir. 2006) ................................................................... 22

Wilchombe v. TeeVee Toons, Inc.,
    555 F.3d 949 (11th Cir. 2009) ..................................................................... 37

**Statutes**

17 U.S.C. § 106................................................................................................. 20, 37, 39

28 U.S.C. § 1491............................................................................................... 39

28 U.S.C. § 1498............................................................................................... 19, 39, 40

**Other Authorities**

Restatement (Second) of Contracts.................................................................... 22

Rule 56 of the Rules of the Court of Federal Claims......................................... 19

Defendant, the United States ("the Government"), respectfully submits its response in opposition to Plaintiff's Motion for Partial Summary Judgment on Liability (Doc. No. 25) filed by Plaintiff Bitmanagement Software GmbH ("Bitmanagement").

## INTRODUCTION

Bitmanagement's summary judgment motion is based on the flawed premise that the United States Navy deployed BS Contact Geo onto its computer networks without Bitmanagement's knowledge and consent. Bitmanagement bases its premise on a selective reinterpretation of the facts of record, obscuring Bitmanagement's active support of the Navy's deployment. Bitmanagement's motion must be denied in full because its assertions contradict the facts of record, rely on disputed questions of fact, and exceed the Court's jurisdiction.

Contrary to Bitmanagement's premise, the facts of record show that Bitmanagement collaborated with the Navy and Planet 9 Studios, Inc., Bitmanagement's authorized reseller, to enable deployment of BS Contact Geo onto hundreds of thousands of Navy computers. In 2006, Bitmanagement claimed that it was "open for any licensing scheme that suits the US Navy better" – a claim that Bitmanagement proved when it negotiated flexible standalone licenses for BS Contact Geo with the Navy and Planet 9. In 2011, Bitmanagement proved its claim again when it negotiated, over the course of many months, a completely new type of license for BS Contact Geo with the Navy and Planet 9. This new type of license – understood by all parties as a "floating license" and/or a "concurrent license" – changed BS Contact Geo so that it could be simultaneously used by up to 38 Navy users. The parties understood that the change to the software was more than legal. The parties knew that concurrent licensing required technical changes to the software program itself, changes that Bitmanagement happily implemented.

Bitmanagement asserts that it was "surprised" at the Navy's subsequent "mass installation" of BS Contact Geo in July 2013, see Pl. Memo at 1, but its reaction is not credible in

light of a comprehensive view of the record evidence. Twenty months before deployment, Bitmanagement confirmed its understanding that the Navy was deploying BS Contact Geo "across a broad spectrum of the [Navy network] realm" in conjunction with a "floating license server." A1094, A1112. Thirteen months before deployment, Bitmanagement delivered a specially-modified version of BS Contact Geo to the Navy with "a silent installer capability as requested for bulk installation." A1160. Five months before deployment, the Navy told Bitmanagement that it was "one step closer to deploying [BS Contact Geo] to all computers on the NMCI network." A1202. Three months before deployment, the Navy provided Bitmanagement with a deployment schedule and told it that BS Contact Geo was going to be "push[ed] . . . to all 350,000+ NMCI computers" – information Bitmanagement cited in its promotional materials three weeks before deployment. A1209. One week after deployment had begun, Bitmanagement told its authorized reseller that it was "ex[c]ited that they install BS Contact GEO on 553000 seats now." A1232.

During the three years between the Navy's deployment and this lawsuit, Bitmanagement **never** asked the Navy to uninstall or stop using BS Contact Geo. To the contrary, Bitmanagement advertised the deployment of BS Contact Geo in a promotional film and in its presentations to potential customers.

These facts – and many others discussed below – establish that Bitmanagement's summary judgment motion is meritless. Bitmanagement cannot prove, as a matter of undisputed fact, that the Navy's deployment of BS Contact Geo was unauthorized. To support its motion, Bitmanagement improperly: ignores and misconstrues key facts, suggests that the Court afford little weight to unfavorable facts, and reorders the facts to support its case. Accordingly, Bitmanagement's motion should be denied. Finally, Bitmanagement cannot claim, as a matter of

jurisdiction, that the Navy breached a contract or is liable for extraterritorial copyright infringement.

## COUNTERSTATEMENT OF THE QUESTIONS PRESENTED

1. Whether Bitmanagement's summary judgment motion should be denied because disputed facts suggest that it expressly licensed the Navy's deployment of BS Contact Geo on Navy computer networks.

2. Whether Bitmanagement's summary judgment motion should be denied because disputed facts suggest that it impliedly licensed the Navy's deployment of BS Contact Geo on Navy computer networks.

3. Whether Bitmanagement's contract and extraterritorial claims are jurisdictionally barred.

## COUNTERSTATEMENT OF THE CASE

### I.  DISPUTED MATERIAL ISSUES

Bitmanagment's Statement of Undisputed Material Facts ("Plaintiff's Asserted Facts" or "PAF") contains factual assertions that are disputed, immaterial, and unfounded. The parties' respective pleadings identified several fundamental undisputed, material facts. For example, the parties agreed that the Navy purchased 38 licenses for a software program named "BS Contact Geo" in 2012. See Answer ¶ 2. The parties agreed that Bitmanagement modified the software to enable its deployment on the Navy's computer network. See id. The parties agreed that the Navy subsequently installed BS Contact Geo onto hundreds of thousands of computers within its network. See id. ¶ 4. The parties agreed that there is no direct contractual relationship between the Navy and Bitmanagement. See id. ¶ 15.

Bitmanagement's statement of facts, however, contains many assertions that are genuinely disputed, particularly with respect to the issues material to its motion. In response, the

Government respectfully submits, *infra*, its counterstatement of material facts ("Defendant's Asserted Facts" or "DAF"). As highlighted by the Government's counterstatement, Bitmanagement's assertions are genuinely disputed because:

*First*, **the plain language of the 2008 Contract and 2012 Contract is ambiguous as to the types of license procured by the Navy, requiring extrinsic evidence.** See DAF ¶¶ 11-12, 24-25, compare with PAF ¶¶ 9-10, 21-23. Bitmanagement asserts that the license type procured in the 2008 Contract and 2012 Contract was a "PC license" – as opposed to a "concurrent license" – based on the "plain terms" of the contracts. Pl. Memo at 23, 26. Neither contract, however, identifies the type of license in its "plain terms." Accordingly, extrinsic evidence is necessary to interpret the contracts, and the weight and meaning of the extrinsic evidence – particularly with respect to the 2012 Contract – is genuinely disputed.

*Second*, **disputed facts suggest that Bitmanagement authorized BS Contact Geo's deployment in conjunction with the 2012 Contract.** See DAF ¶¶ 14-23, compare with PAF ¶¶ 11-20. The parties' course of dealing demonstrates that Bitmanagement eagerly offered to work with the Navy to implement unique licensing arrangements. During the 13 months prior to the execution of the 2012 Contract, Bitmanagement, the Navy, and Bitmanagement's reseller carefully negotiated the parameters of a new licensing agreement. Bitmanagement repeatedly agreed to the use of a "floating license." The contract proposal offered "network (concurrent)" licenses, and a Navy contracting specialist sought out the same from Bitmanagement. These facts genuinely conflict with Bitmanagement's assertions that it, *inter alia*, sold its reseller and the Navy "'PC licenses' and nothing else." Pl. Memo at 24.

*Third*, **disputed facts suggest that Bitmanagement authorized BS Contact Geo's deployment after the execution of the 2012 Contract.** See DAF ¶¶ 26-40, compare with PAF

¶¶ 26-40.  During the three years between deployment in July 2013 and the filing of this lawsuit in July 2016, Bitmanagement **never** asked the Navy to uninstall or stop using BS Contact Geo. Such a request would have been at odds with Bitmanagement's efforts supporting installation of the program on all of the computers on the Navy's networks.   After the 2012 Contract was signed, Bitmanagement worked with the Navy for more than a year to resolve technical issues in deploying its software across the network.  Bitmanagement modified its software at least twice to accomplish the effort.  The Navy routinely notified Bitmanagement regarding the anticipated timing and extent of the deployment.  And when the Navy ultimately deployed the software, Bitmanagement proclaimed that it was "exited [*sic*] that they install BS Contact GEO on 553,000 seats now" and celebrated the Navy's deployment of the software to potential customers.  These facts genuinely conflict with Bitmanagement's assertions that the Government "never indicated . . . that [it] intended to deploy the software on a mass scale throughout the Navy's network."  Pl. Memo at 33.

## II.  DEFENDANT'S ASSERTED FACTS

### Bitmanagement and BS Contact Geo; NAVFAC and SPIDERS 3D

1.  Bitmanagement Software GmbH ("Bitmanagement") is a German corporation located in Berg, Germany.  See Complaint ¶ 6; PAF ¶ 1.  Bitmanagement develops software for rendering three-dimensional (3D) graphics.  See PAF ¶ 1.

2.  ████████████████████████████████████████████████████

████████████████████████████████████████  ████████████████

████████████████████████  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

3. 

4.      Since its founding, Schickel has functioned as the CEO of Bitmanagement, and Koerfer has been responsible for management of sales for Bitmanagement.  See A1373-74 (Schickel 30(b)(6) Tr. 33:20-34:6).  As of August 2013, Bitmanagement's revenues were derived from sales of BS Contact, related variants (including BS Contact Geo), and associated services. See A1236-37 (-078-79); A1375-76 (Schickel 30(b)(6) Tr. 49:7-51:12).

5.      "[T]he market [for BS Contact Geo] is limited."  A1381 (Schickel 30(b)(6) Tr. 120:22-21:12).  Between 2007 and 2016, Bitmanagement sold licenses for BS Contact Geo to no more than 16 entities.  See A1022-24 (Resp. Rog. 9).  X3D files can be viewed in X3D browsers other than Bitmanagement's products because X3D is a royalty-free open-standard file format. See A22-24 (Resp. Rog. 11); see also A1379 (Schickel 30(b)(6) Tr. 78:5-21).  Since at least 2014, computer users have been able to automatically view X3D content in HTML5-compatible browsers using free-to-use X3D programs.  See id.[2]

---

[1] See http://www.bitmanagement.com/products/interactive-3d-clients/bs-contact-geo
[2] See, e.g., A166-67; http://www.web3d.org/html-3d (a description in a link on A166-67); http://www.web3d.org/x3d-models/Globe/globe-weather.html (an example).

6.      Bitmanagement also offers free trial versions of BS Contact Geo to the public. See A1377 (Schickel 30(b)(6) Tr. 73:19-21).  A free trial version of BS Contact Geo offers the same functionality as a licensed version, except that the free trial version displays Bitmanagement's logo as part of the rendered graphics.  See A1377-78 (Schickel 30(b)(6) Tr. 73:22-74:19).  Bitmanagement allows the public to freely download from its website the trial version of BS Contact Geo.  See A1378 (Schickel 30(b)(6) Tr. 75:3-76:20).  Between 2011 and 2017, Bitmanagement estimates that the free trial version of BS Contact Geo was downloaded 1,569 times.  See A1029-30 (Supp. Resp. Rog. 8); A1351 (website).

7.      Naval Facilities Engineering Command ("NAVFAC") is "a system command within the Department of the Navy, responsible for . . . building, destruction[,] and ultimate underlying care" of Navy facilities.  See A1361 (Chambers Tr. 24:15-20).  For the last 10 years, NAVFAC has been developing a software application known as SPIDERS 3D, a virtual reality environment rendered through geospatial X3D data of Navy installations and other models.  See A126 (Viana 30(b)(6) Tr. 135:12-15); PAF ¶ 4.  As depicted below, SPIDERS 3D allows NAVFAC technicians to view three-dimensional models of ships and other Navy equipment in the context of Navy facilities through a web browser:



See A1254, 66 (-237, -249).  SPIDERS 3D is hosted on NAVFAC's internal enterprise portal, and can only be accessed by users with:  (1) an appropriately-credentialed Department of Defense Common Access Card; and (2) access permissions granted by a NAFVAC sponsor.  See

A1402-03 (Chambers 30(b)(6) Tr. 70:17-75:11). Alex Viana ("Viana"), a NAVFAC deputy program manager, has served as NAVFAC's primary point of contact for development of SPIDERS 3D. See A1368 (Viana Tr. 31:8-22). NAVFAC contracted with Synergy Software Design ("Synergy") to develop SPIDERS 3D. See A1370 (Viana Tr. 273:7-11).

**Bitmanagement, Planet 9, NAVFAC, and the 2008 Contract**

8.      In 2005, Bitmanagement began working with David Colleen ("Colleen") of Planet 9 Studios, Inc. ("Planet 9") to sell and market its products in the United States. See A1036-41. On June 10, 2005, Colleen contacted Bitmanagement regarding a request from NAVFAC for a VRML viewer. See A1036 (-576). Bitmanagement prepared offers to sell BS Contact VRML/X3D to NAVFAC through either: (1) CD licenses; or (2) a "website license." See A1043 (-445). NAVFAC opted to purchase the CD licenses. See A1042 (-444).

9.      In 2006, Viana reached out to Planet 9 to purchase additional licenses of BS Contact VRML, but noted that Bitmanagement's default licensing procedures would not work for secure environments. See A1051 (-360). Planet 9 relayed the request to Bitmanagement, and on November 24, 2006, Schickel responded by stating that Bitmanagement was:

> open for any licensing scheme that suits the US Navy better and are willing to do our utmost to enable an other [*sic*] licensing functionality, if requested.

Id. Viana subsequently explained that NAVFAC sought to have an "application with its own license key (not PC specific)." A1050 (-359). Bitmanagement, in accord with its "willing[ness] to do our utmost to enable [another] licensing functionality," provided custom-designed licensing files to NAVFAC that were not PC specific. A1047-51 (-356-60).

10.      During 2006 and 2007, Bitmanagement and NAVFAC worked together to resolve technical issues with deploying BS Contact VRML on the Navy's network. For example, on June 1, 2007, Bitmanagement provided a modified version of BS Contact Geo version 7.035 to

NAVFAC with a silent installer "intended for bulk installations." A1053 (-111). According to Bitmanagement, the modified version was "helpful for an administrator to do installations on a large scale even on remote computers connected via intranet or internet." Id.

11. Bitmanagement and NAVFAC successfully resolved the technical issues, and on February 12, 2008, Planet 9 and NAVFAC entered into Contract No. N00244-08-P-1039 ("the 2008 Contract"). See A182-90. Pursuant to the express language of CLIN 0001 of the 2008 Contract, the Navy procured:

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---------|-------------------|----------|------|------------|--------|
| 0001 | | 100 | Each | $300.00 | $30,000.00 |
| | BIT MANAGEMENT BS CONTACT VRML AND X3D VIEWER-VERSION 7.038 RFS #104181, DADMS ID 49208 (ONE TIME LICENSE) POC IS ALEX VIANA 202-433-5516 FOB: Destination MILSTRIP: N6921880083021 PURCHASE REQUEST NUMBER: N6921880083021 | | | | |

See A185.

12. The 2008 Contract used the phrase "ONE TIME LICENSE," but the contract did not expressly contain the terms "copies," "PC license," "seat license," or "concurrent license." Id.; see also A182-90.

13. Pursuant to the 2008 Contract, Bitmanagement delivered BS Contact Geo version 7.204 to Planet 9 for NAVFAC on May 26, 2009. See A1061-62 (-377-78); A1010-13 (Resp. Rog 4).

**The 2012 Contract**

14. Bitmanagement continued to explore different opportunities to license its products to the Navy after its performance in connection with the 2008 Contract. For example, on May 27, 2010, Bitmanagement authorized an offer to the Navy for a 50,000-seat license. See A1066-69 (-870-73). Separately, on August 4, 2010, Bitmanagement contacted Planet 9 to discuss a

proposal to license BS Contact Geo to the Naval Postgraduate School.  <u>See</u> A1083-84 (-708-09) (suggesting a "BS Contact Geo Domain license with unlimited downloads of BS Contact GEO").

15.     During this time period, NAVFAC continued to use BS Contact Geo and began contemplating upgrading the program to a newer version.  On September 30, 2010, Bitmanagement authorized a 20-seat upgrade to BS Contact Geo version 7.215.  <u>See</u> A1086-87 (-715-16).  NAVFAC paid Planet 9 $2500 for the upgrade.  <u>See</u> A1091 (-545); A1117 (-633).

16.     NAVFAC, however, experienced difficulty with properly utilizing the licenses for BS Contact Geo, particularly in situations where a hard drive failed or a single user had multiple computers.  <u>See</u> A1092-93 (-352-53).  On April 20, 2011, Planet 9 contacted Bitmanagement regarding the possibility of implementing "a floating license scheme" for NAVFAC.  On April 21, 2011, Bitmanagement responded with three proposals.  <u>See</u> A1096-98 (-264-65).  On June 8, 2011, NAVFAC proposed using the Flexera license manager application pursuant to Bitmanagement's third proposal.  <u>See</u> A1095 (-263).  Planet 9 relayed the proposal to Bitmanagement, describing Flexera as "an existing floating license server that is already being used [by NAVFAC] for AutoCad," <u>id.</u>, and Bitmanagement quickly (on June 10, 2011) authorized "the floating license server approach," A1094 (-262).

17.     The Flexera license manager[3] is a server-based computer program that "distributes and prevents the use of licenses" for other computer software.  A1389-90 (McCarns Tr. 66:18-70:10).  Relatedly, the FlexWrap tool puts a "network licensing wrapper" around a standalone application to "turn[] it into a networking license or concurrent license" controlled by

---

[3] Flexera – a software company – identifies its license manager as "FlexLM" and "FlexNet." <u>See</u> A1389 (McCarns Tr. 67:22-68:2).  Bitmanagement incorrectly asserted that "FlexLM" and "FlexNet" are the same as "Flexera," "FlexWrap," and "FlexNet Manager for Engineering Applications (FMEA)."  Pl. Memo at 7 n.1.  While the second category of terms is related to the first, they are not identical.  <u>See</u> A1389-90, 92 (McCarns Tr. 66:18-70:10, 71:9-72:5, 248:19-23).

the Flexera license manager. A1389 (McCarns Tr. 68:23-69:12); see also A1386, 91 (McCarns

Tr. 17:6-24, 97:3-10); A1362 (Chambers Tr. 57:2-17).

18.     In conjunction with the agreement to use a "floating license server approach,"

NAVFAC and its partners repeatedly contacted Bitmanagement to discuss the anticipated

deployment of BS Contact Geo throughout the Navy's Navy Marine Corps Intranet ("NMCI")

network. On October 23, 2011, Synergy contacted Bitmanagement to let it know that the Navy

planned to "roll out . . . BScontact to the entire [N]avy realm [NMCI]." A1100 (-798). On

November 9, 2011, Viana directly contacted Bitmanagement to let it know that he planned:

> to get the current licenses of BS Contact Geo version 7.215 deployed with the
> server license management software. Then we will push it out to several of the
> NMCI realms to begin tracking the usage and demand signal of the 20 license
> keys.

A1108 (-887).

19.     Bitmanagement agreed with NAVFAC on the planned deployment of BS Contact

Geo throughout the Navy's NMCI network in conjunction with a license server. On November

24, 2011, Viana directly contacted Bitmanagement to explain the deployment of BS Contact Geo

"across a broad spectrum of the NMCI realm" managed by Flexera license management

software:

> Wanted to make sure we have the same understanding of our planned approach
> for BS Contact Geo with regards to the user's agreement. We currently have 20
> PC licenses of BS Contact Geo version 7.215 which we have not deployed and
> **are requesting to manage from our Navy server**. This will be accomplished by
> utilizing the software application AdminStudio by **Flexera** in conjunction with
> BS Contact Geo from our server. **This will allow us the ability to track the use
> of the 20 licenses across a broad spectrum of the NMCI realm (versus having
> those 20 licenses mapped to individual PCs).** Once we have successfully
> implemented this approach, we will be able to document (through the
> AdminStudio) the usage of the 20 BS Contact Geo licenses and enable us to
> justify the purchase of additional BS Contact Geo licenses in the future.

A1112 (-385). Bitmanagement quickly confirmed the approach. See A1111 (-384) ("That is our understanding as well. The user agreement in principal covers your approach from our point of view.").

20. To cover the "floating license server" approach, Bitmanagement and NAVFAC exchanged draft vendor agreements. See generally PAF ¶ 15. On January 3, 2012, NAVFAC concluded that a separate vendor agreement was unnecessary if Planet 9's proposal included the required stipulations. See A1115 (-852). NAVFAC told Bitmanagement, see A1383 (Schickel 30(b)(6) Tr. 153:10-16), and Planet 9 agreed to provide a proposal with the stipulations, see A1115 (-852).

21. Planet 9 worked closely with Bitmanagement to get its approval for the proposal. On January 13, 2012, Planet 9 informed NAVFAC that a draft proposal was ready, pending Bitmanagement's "final blessing on terms." A1129 (-765). Planet 9 sent several emails to Bitmanagement that day. See A1130-34 (-277-81). On January 16, 2012, Bitmanagement expressly re-confirmed the "floating license system" approach:

> The 20 old and 30 new copies of [BS Contact Geo] would be available in the Navy['s] floating license system. You can have a quarterly use report if you like. If this works for you, I'll complete the agreement and invoice them.

A1130-31 (-277-78). Bitmanagement responded "ok" to the proposal. Id.[4] NAVFAC asked that the proposal specifically recite "network (concurrent) license enabled by NAVFAC using Flexera," and Planet 9 agreed to the request. A239.

22. Pursuant to these discussions, Planet 9 submitted a formal proposal on January 20, 2012. According to the proposal, Planet 9 offered to provide:

---

[4] The only issue raised by Bitmanagement related to pricing, causing Colleen to "reduce the number [of] new seats to 18." Id.

> - 20 existing + 18 new copies of BS Contact Geo version 7.215 to be network (concurrent) license enabled by NAVFAC using Flexera Software's FlexWrap utility of the AdminStudio software suite.

A241; see generally A239-42; Doc. No. 12-3.

23. Upon receipt of Bitmanagement's proposal, Viana contacted NAVFAC's contracting personnel to work on a formal contract. On March 22, 2012, Stella Rizalla, a NAVFAC contract specialist, reached out directly to Bitmanagement to see if it had any domestic resellers. See A244 (-346). Rizalla specifically explained that NAVFAC was interested in:

> Bit management BS Contact Geo Version 7.215 **with network (concurrent) license keys**. Do you have any distributors in the US that carry this software?

A243 (-345) (emphasis added). Bitmanagement did not reject or seek to clarify Rizalla's request for "network (concurrent) license keys." Instead, it simply directed Rizalla to Planet 9, Bitmanagement's official reseller. A245-46 (-506-07). Bitmanagement subsequently followed up with Planet 9 to see if it had any news with respect to the "request by Rizalla." A1145 (-902).

24. On May 21, 2012, Planet 9 and the Navy entered into a Contract No. N62583-12-P-0767 ("the 2012 Contract"). A223-38. Pursuant to the express language of CLIN 0001 of the 2012 Contract, the Navy procured:

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---------|-------------------|----------|------|-----------|--------|
| 0001 | | 18 | Each | $305.00 | $5,490.00 |
| | BS CONTACT GEO VERSION 7.215 LICENSES FFP ENABLED BY NAVFAC USING FLEXERA SOFTWARE'S FLEXWRAP UTILITY OF THE ADMIN STUDIO SOFTWARE SUITE. FOB: Destination | | | | |

A227.

25. The 2012 Contract used the phrases "LICENSES" and "ENABLED BY NAVFAC USING FLEXERA SOFTWARE'S FLEXWRAP" but the contract did not expressly contain the terms "copies," "PC license," "seat license," or "concurrent license." See A223-38.

**Delivery and Deployment of BS Contact Geo 8.001**

26.     Shortly before the 2012 Contract was executed, Bitmanagement, NAVFAC, and Planet 9 had already begun to work together to test and adapt BS Contact Geo for deployment on the NMCI network.  For example, Planet 9 contacted Bitmanagement on May 7, 2012 to work out technical issues regarding the installation of BS Contact Geo as a browser plugin or a standalone application.  See A1150 (-921).

27.     After the 2012 Contract was executed, Bitmanagement and NAVFAC continued to collaborate to test and adapt BS Contact Geo for its deployment on the NMCI network.  On June 8, 2012, NAVFAC reported that BS Contact Geo version 7.215 was not compatible with the Windows 7 computers on the Navy's network.  See A1164-65 (-973-74).  On June 13, 2012, Schickel delivered a modified version of BS Contact Geo 8.001 to NAVFAC for deployment:

> Bitmanagement confirms our concurrence to replace BS Contact Geo v7.215 with v8.001 as a "no cost" modification under the same terms of the recently awarded [BS Contact Geo] license procurement contract with NAVFAC.
>
> We have provided an actual version of BS Contact Geo version 8.001 for you at your customer space.   Please   download   the   file "BS_Contact_Geo_Installer_8001_R1_x86_Admin_Silent.exe".
>
> For this version we have removed the floating licensing logo from the standard build, changed the splash screen as known to you before in v7.215 and prepared a silent installer capability as requested for bulk installation.
>
> This new version exhibits the version 8 features, except the optionally switchable new user interface as this loads the userinterface [*sic*] data from our webserver when clicked by the user. We anticipated that this feature should be disabled.

A1159-60 (-968-69).  Similarly, Bitmanagement and NAVFAC continued to collaborate to adapt BS Contact Geo for use with the Flexera license-management software.  On July 3, 2012, NAVFAC contacted Bitmanagement because the previously provided BS Contact Geo installation file was not enabling concurrent use with Flexera.  See A1189 (-661) ("I was testing multiple users on the install yesterday and found that we can only use one license at a time.").

-14-

Twenty days later, Bitmanagement delivered a new installation file to NAVFAC so that BS Contact Geo could be FlexWrapped in connection with Flexera.  See A1187 (-659).

28.    After Bitmanagement delivered the modified versions of BS Contact Geo 8.001, Bitmanagement and NAVFAC continued discussing the planned deployment of the software on NAVFAC's networks.  On August 16, 2012, Viana contacted Schickel and Colleen to discuss the planned deployment on both "the NMCI enterprise" and "the Navy's overseas ONE-NET enterprise":

> Once I have access to the server license manager portal, I will send you a copy of the license tracking and utilization data to confirm we are ready to **deploy the application across the NMCI enterprise**.  We are also looking at a similar approach for **the Navy's overseas ONE-NET enterprise**.

A1193-94 (-953-54) (emphasis added).  Similarly, NAVFAC notified Bitmanagement that it was "working . . . to enable the deployment of BS Contact Geo across all Navy computers" on September 26, 2012.   A1196 (-465); see also id. (responding with "thank you for your encouraging e-mail").

29.    During the early part of 2013, Bitmanagement, NAVFAC, and Planet 9 continued discussing the planned deployment of BS Contact Geo on the Navy's computer networks.  For example, NAVFAC forwarded several emails to Bitmanagement and Planet 9 on January 11, 2013 that sought to provide an "estimated timeline for transitioning BS Contact Geo v8.001 out from NMCI testing & certification and deployment to all NMCI (understand there is also a STS ticket to test & certify for ONE-Net)."  A1201 (-393); see also A1200 (-392) (noting that the installation files "are the flex-wrapped files to allow network licensing").  Similarly, on February 14, 2013, NAVFAC informed Bitmanagement:

> Looks like we are one step closer to deploying the viewer to all computers on the NMCI network.  Once the viewer is up and running, I will work with our CIO team to produce an initial enterprise license key usage report and transmit to you.

A1202 (-168); see also id. (responding with "thanks for the good news!"). Bitmanagement subsequently contacted Planet 9 on March 26, 2013 for further information on the planned rollout:

> [W]e have heard . . . that the project at the Navy is going on towards approval/roleout [*sic*] and therefore first enterprice [*sic*] license key usage report. Do you have new information about the approval and the role out [*sic*]?

A1207 (-622).

30.     On April 9, 2013, NAVFAC specifically informed Bitmanagement that BS Contact Geo would be "push[ed] . . . to all 350,000+ NMCI computers" after NAVFAC concluded its testing of the application.  A1209 (-195).  NAVFAC also forwarded a deployment schedule to Bitmanagement.  See id.  In a project offer to a potential customer dated July 5, 2013, Bitmanagement cited this deployment:

> US Navy; After five years of testing, the approval for the use of the BS Contact Geo is in May 2013 on 350,000 PCs of the US Navy and the central distribution has begun. In a second Step is to distribute the BS Contact Geo to 800,000 PCs in the largest computer network World.

A1228 (-973) (translated from German); see also A1231 (-958).

31.     On July 18, 2013, NAVFAC forwarded another NMCI deployment schedule for BS Contact Geo to Bitmanagement.  See A276-89.  The schedule predicted that BS Contact Geo would be deployed throughout the NMCI network between July 22, 2013 and August 15, 2013. A282-87.  According to the schedule, the total number of seats on the NMCI network totaled 553,286.  Id.  Bitmanagement enthusiastically received the news.  See A1232 (-642) ("We are exited [*sic*] that they install BS Contact GEO on 553,000 seats now.").

32.     Beginning in July 2013, NAVFAC installed BS Contact Geo 8.001 on all non-classified NMCI computers.  See A6-9.  Between July 2013 and September 2016,[5] the maximum number of active NMCI computers was 295,000.  See A1401 (Chambers 30(b)(6) Tr. 43:4-44:12).  During this time, the software was installed 429,604 times on NMCI computers.  See A6-9.

33.     On August 21, 2013, NAVFAC contacted Bitmanagement to provide an update on the deployment of BS Contact Geo on NMCI.  See A1239-40 (-377-78).  According to the email, BS Contact Geo had been successfully deployed on 104,922 NMCI computers at that time.  See id.  On October 8, 2013, Bitmanagement responded, thanking NAVFAC for the deployment schedule and information.  See A1238 (-376).

### Post-Deployment and the 2015 Contract

34.     In 2014, Bitmanagement continued to praise the Navy's deployment of BS Contact Geo.  On May 20, 2014, Schickel reached out to Synergy, requesting that Synergy modify a film it had created for SPIDERS 3D to include a slide with the following information:

> Spiders3D: Multi-user information system designed for 800,000 + users.
>
> Software: BS Contact GEO from Bitmanagement Software GmbH as light BIM 3D front-end for web-based visualization and collaboration connected to real-time databases.

A1272-73 (-733-34).  Synergy agreed to modify the film as requested by Bitmanagment.  Id.

35.     Similarly, Bitmanagement incorporated talking points in its presentations that identified the Navy's deployment for the purpose of concurrent use as a selling point over competitors.  See A1278, 81 (-279, -282) (citing an installation base of 800,000).

---

[5] In September 2016, NAVFAC uninstalled BS Contact Geo 8.001 on all but 34 NMCI seats.  See A55 (Chambers 30(b)(6) Tr. 114:19-15:2).  Bitmanagement cites this action as a material asserted fact, but the government objects that NAVFAC's uninstallation of BS Contact Geo is inadmissible for the purpose of proving infringement.  See Objection ¶ 3; RCFC 56(c)(2); compare PAF ¶ 30 with FRE 407.

Bitmanagement incorporated the Navy film about SPIDERS 3D into its presentations, see A1380 (Schickel 30(b)(6) Tr. 95:1-17), and in its talking points, Bitmanagement asserted that BS Contact Geo provided the Navy with a "simple interface for concurrent Usage for multiple users," A1281, 89 (-282, -321).

36.    Bitmanagement used the same talking points in its presentations between 2014 and 2016.  For example, Bitmanagement cited the Navy's deployment of BS Contact Geo in a November 2016 presentation – more than three months after it had filed this suit against the Government.  Compare A1330, 38 (-769, -794) with Dkt. 1.

37.    NAVFAC installed BS Contact Geo 8.001 onto computers on a total of two Navy computer networks:  NMCI and ONE-Net.  See A6-9 (Resp. Rog. 3).  NAVFAC did not provide BS Contact Geo to any entity or network outside the Navy.  See A9-11 (Resp. Rogs. 4-5); A1369 (Viana Tr. 223:8-24); see also Objection ¶ 2.

38.    On September 15, 2015, NAVFAC and Synergy executed a contract to provide NAVFAC with, inter alia, 88 "NMCI enterprise capable BS Contact Geo application license keys" for a total of $30,800.  A1320 (-132).  Bitmanagement refused to provide Synergy with the license keys for the contract, and the contract was cancelled.

39.    On June 21, 2016, Bitmanagement's counsel sent a letter to the Navy, asserting that NAVFAC had infringed Bitmanagement's copyrights in BS Contact Geo.  See A1321-24 (-368-71).  Bitmanagement filed this suit on July 14, 2016.  See Doc. No. 1.  In its Complaint, Bitmanagement asserted entitlement to compensation "in an amount not less than $596,308,103." Doc. No. 1 at 9.

40.    During the three years between deployment in July 2013 and the filing of this lawsuit in July 2016, Bitmanagement never requested that NAVFAC uninstall BS Contact Geo

from the NMCI and ONE-Net networks.  During that same time period, Bitmanagement never requested that NAVFAC discontinue use of BS Contact Geo.

## ARGUMENT

### I.    LEGAL STANDARDS

Summary judgment is appropriate only if Bitmanagement can prove that "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  RCFC 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  A "genuine" dispute exists when the issue "may reasonably be resolved in favor of either party."  Id. at 250.  A fact is "material" when it "might affect the outcome of the suit under the governing law."  Id. at 248.

As the moving party, Bitmanagement has the burden of establishing that no genuine issue of material fact exists.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Therefore, the Court must draw all factual inferences "in the light most favorable to the party opposing the motion."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

To establish copyright infringement pursuant to Section 1498(b) of Title 28, a plaintiff must prove two elements:  "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Gaylord v. United States, 595 F.3d 1364, 1372 (Fed. Cir. 2010) (quoting Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991)).  Nevertheless, "[t]he existence of either an exclusive or nonexclusive license creates an affirmative defense to a claim of copyright infringement."  RT Computer Graphics, Inc. v. United States, 44 Fed. Cl. 747, 754 (1999) (J. Horn).

The Government, for the purpose of responding to Bitmanagement's motion only, does not dispute Bitmanagement's ownership of a valid copyright in BS Contact Geo 8.001 and the Navy's reproduction[6] of that version.[7] The parties genuinely dispute, however, whether Bitmanagement expressly and impliedly licensed the Navy's deployment of BS Contact Geo on its computer networks.

## II.  THE 2012 CONTRACT EXPRESSLY LICENSED THE NAVY'S DEPLOYMENT OF BS CONTACT GEO

### A.  The Plain Language of the 2008 and 2012 Contracts is Ambiguous with Respect to the Scope of the Licenses

Contrary to Bitmanagement's assertion, the "plain terms" of the 2008 and 2012 Contracts are ambiguous. Pl. Memo at 23. Interpretation of a contract "to determine whether there is an ambiguity is a question of law." LAI Services, Inc. v. Gates, 573 F.3d 1306, 1310 (Fed. Cir. 2009); see also MPE Business Forms, Inc. v. United States, 44 Fed. Cl. 421, 426 (1999) (J. Damich). "An ambiguity exists when a contract is susceptible to more than one reasonable interpretation." E.L. Hamm & Assocs., Inc. v. England, 379 F.3d 1334, 1341 (Fed. Cir. 2004) (citing Metric Constructors, Inc. v. NASA, 169 F.3d 747, 751 (Fed. Cir. 1999)); see also LAI Servs., 573 F.3d at 1314 ("Ambiguity exists when contract language can reasonably be interpreted in more than one way.") (citation omitted).

Bitmanagement erroneously asserts that "[t]he plain terms of the 2008 and 2012 contracts make clear that the Government did not purchase concurrent licenses," Pl. Memo at 23, but the express language of the contracts is silent with respect to the type of the licenses purchased by

---

[6] See 17 U.S.C. § 106(1). Bitmanagement implies that the Government infringed the exclusive right "to distribute" BS Contact Geo, but Bitmanagment fails to assert or prove that any of NAVFAC's distributions were "to the public." 17 U.S.C. § 106(3). Bitmanagement has never alleged that that any other exclusive right protected by copyright is implicated in this case.

[7] Bitmanagement has never asserted that the Government infringed any version of BS Contact Geo other than BS Contact Geo 8.001. See, e.g., A1013-14 (Resp. Rog. 5).

NAVFAC.  See generally Gardiner, Kamya & Assoc., P.C. v. Jackson, 467 F.3d 1348, 1353

(Fed. Cir. 2006) ("We begin with the plain language of the contract.").  The 2008 Contract uses

the phrase "one time license," but does not expressly contain the terms "copies," "PC license,"

"seat license," or "concurrent license."  DAF ¶ 12.  Similarly, the 2012 Contract uses the word

"licenses," but does not expressly contain the terms "copies," "PC license," "seat license," or

"concurrent license."  DAF ¶ 25.[8]  Thus, the plain language of the 2008 and 2012 Contracts

establishes that NAVFAC purchased BS Contact Geo "licenses" from Planet 9, but provides no

guidance with respect to the exact type of the licenses.

### B.    The Parties Dispute Material Aspects of the Extrinsic Evidence

Since the plain language of the 2008 and 2012 Contracts provides no guidance as to the

type of the licenses purchased by NAVFAC, the Court should look to extrinsic evidence.  See

TEG-Paradigm Env., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006); Jacintoport

Int'l LLC v. United States, 121 Fed. Cl. 196, 202 (2015) (J. Kaplan) ("For example, the court

may consider contemporaneous circumstances, evidence of the parties' intent, or their course of

performance.").  Bitmanagement implicitly concedes that extrinsic evidence is required to

interpret the scope of the licenses in both contracts:  it relies heavily on its interpretation of

extrinsic emails, documents, and testimony of witnesses.  See Pl. Memo at 26-29.  As explained

below, Bitmanagement's interpretation of the extrinsic evidence is incomplete, flawed, and

disputed.  Thus, in this case, summary judgment is not appropriate.  See Beta Sys., Inc. v. United

States, 838 F.2d 1179, 1183 (Fed. Cir. 1988) ("To the extent that the contract terms are

---

[8] Bitmanagement incorrectly asserts that the 2012 Contract "explicitly defined the number of copies allotted to the Government and the price per copy paid."  Pl. Memo at 26 (parenthetical omitted).  Bitmanagement's focus on "copies" has no basis in fact – the plain language of the contract defines the quantity of "licenses" and the price per license.  See DAF ¶¶ 24-25.

ambiguous, requiring weighing of external evidence, the matter is not amenable to summary resolution."); see also Airplane Sales Int'l Corp. v. United States, 54 Fed. Cl. 418, 422 (2002).

## 1. *Extrinsic Evidence Establishes that the 2008 Contract Encompasses Seat Licenses*

As an initial matter, the Government agrees with Bitmanagement that the extrinsic evidence establishes that the parties interpreted the licenses purchased in the 2008 Contract as standalone "seat" licenses. The parties' interpretation is clear from their course of dealing[9] and course of performance.[10] In 2006, NAVFAC and Bitmanagement discussed an alternate licensing structure to suit NAVFAC's secure environment. See DAF ¶ 9. Bitmanagement expressed a willingness to work with NAVFAC on licensing, stating that it was:

> open for any licensing scheme that suits the US Navy better and are willing to do our utmost to enable an other [*sic*] licensing functionality, if requested.

A1051 (-360). Bitmanagement, in complete accord with its "willing[ness] to do our utmost to enable [another] licensing functionality," provided custom-designed licensing files to the Navy that were "not PC specific." A1047-51.[11] A standalone license is consistent with a reasonable interpretation of the ambiguous "one time license" language in the 2008 Contract. A185. After the parties executed the 2008 Contract, the parties' course of performance reinforces the

---

[9] "A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Restatement (Second) of Contracts § 223(1); see also TEG-Paradigm, 465 F.3d at 1339-40 (relying on course of dealing evidence to confirm an interpretation).

[10] "Course of performance can become instructive when the contract terms are ambiguous." Baistar Mech., Inc. v. United States, 128 Fed. Cl. 504, 523 (2016) (citing United States v. Ford Motor Co., 463 F.3d 1267, 1278-79 (Fed. Cir. 2006); Restatement (Second) of Contracts § 220.

[11] Given the parties' course of dealing and Bitmanagement's delivery of non-PC-specific licensing files in advance of the 2008 Contract, the Government disputes Bitmanagement's false equivalence between a "PC" and a standalone "seat" license. See PAF ¶¶ 9, 12, 30; Pl. Memo at 23, 24, 26.

conclusion that they understood the 2008 Contract to relate to standalone licenses that were not PC-specific.  See DAF ¶¶ 9, 13.

> **2.**  ***Extrinsic Evidence Suggests that the 2012 Contract Encompasses Concurrent Licenses***

For the 2012 Contract, however, the plain language, the parties' course of dealing, and the parties' course of performance strongly suggest that the "licenses" purchased were concurrent licenses.  As discussed above, the plain language, by itself, is ambiguous as to the type of license.  Nevertheless, the differing terms used between the 2008 and 2012 Contracts establishes that the type of license procured was not the same.  In particular, the 2008 Contract includes a "one time license" term – the term is conspicuously absent from the 2012 Contract.  Compare A185 with A227.  The 2012 Contract, on the other hand, includes a new term: "enabled by NAVFAC using Flexera Software's FlexWrap utility."  Id.

| SUPPLIES/SERVICES | QUANTITY | UNIT | | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE |
|---|---|---|---|---|---|---|---|
| BIT MANAGEMENT BS CONTACT VRML AND X3D VIEWER-VERSION 7.038 RFS #104181, DADMS ID 49208 (ONE TIME LICENSE) | 100 | Each | | BS CONTACT GEO VERSION 7.215 LICENSES FFP ENABLED BY NAVFAC USING FLEXERA SOFTWARE'S FLEXWRAP UTILITY OF THE ADMIN STUDIO SOFTWARE SUITE | 18 | Each | $305.00 |

Neither contract identifies whether the type of license is a "PC license" or a "concurrent license," but the plain language suggests material differences between the two contracts.

> *a.*  *The Parties' Course of Dealing Suggests a Concurrent License*

Extrinsic evidence is necessary to understand the meaning of "enabled by NAVFAC using Flexera Software's FlexWrap" in the 2012 Contract.  The Flexera license manager "distributes and prevents the use of licenses" for other computer software.  A1389-90 (McCarns Tr. 66:18-70:10).  FlexWrap is the tool that puts a "network licensing wrapper" around a standalone application to "turn[] it into a networking license or concurrent license" controlled by the Flexera license manager.  A1389 (McCarns Tr. 68:23-69:12); see also A1386, 91 (McCarns Tr. 17:6-24, 97:3-10); A1362 (Chambers Tr. 57:2-17).  Bitmanagement, NAVFAC, and Planet 9

agreed to the use of the Flexera license manager for BS Contact Geo after extensive negotiations. Thus, Flexera and FlexWrap are clearly focused on enabling concurrent use of other software applications. Bitmanagement speculatively asserts that "PC/seat licenses **could be** managed and tracked by Flexera," PAF ¶ 12 (emphasis added); see also Pl. Memo at 27 n.9, but Dean McCarns, NAVFAC's former IT Portfolio Manager for Technical License Tracking and Usage Strategy, explained that a network license manager was unnecessary for "[a] computer or a standalone license":

> Q And did standalone or PC licenses need Flexera tracking as well?
>
> A No.
>
> Q They did not. Why not?
>
> A Because a network license manager controls or checks out licenses to a computer when they start the program. A computer or a standalone license is installed in your – you're granted the use of that license to anybody who uses that computer. Two people can't be logged into the computer at the same time typically.

A1387 (McCarns Tr. 50:8-18); see also A1388 (McCarns Tr. 58:17-21). Similarly, there is no logical reason that the parties would have agreed to use Flexera to manage standalone licenses of BS Contact Geo. Even under Bitmanagement's version of the facts, NAVFAC already had 100 standalone licenses of BS Contact Geo by 2011 (deployed without license management software), but was not using 20 of the licenses. See PAF ¶¶ 8-9, 11. In the situation described by Bitmanagement, there would be no point for NAVFAC to negotiate to use a concurrent-license management tool to simply manage 18 additional standalone licenses. Thus, the reasonable factual inference is that the purpose of the "Flexera/FlexWrap" term of the 2012 Contract was to implement concurrent licensing. See Matsushita Elec., 475 U.S. at 587-88.

The parties' negotiation for the use of Flexera is only a single element of a multi-year course of dealing to acquire concurrent licenses of BS Contact Geo. As early as 2005, Bitmanagement eagerly told NAVFAC that it was:

> open for **any** licensing scheme that suits the US Navy better and are **willing to do our utmost** to enable an other [sic] licensing functionality, if requested.

A1050-51 (-359-60) (emphasis added); see also A1039 (-579) ("With regards to distribution licensing we try to be very flexible in order to meet the needs of our customers."). In the context of the 2008 Contract, Bitmanagement readily enabled a non-PC-specific licensing scheme. See A1047-51. Three years later, NAVFAC struggled to utilize its standalone licenses of BS Contact Geo, and Planet 9 contacted Bitmanagement to discuss using "a floating license scheme" for NAVFAC. See DAF ¶ 16. Bitmanagement responded with three different licensing options, and, pursuant to the third option, NAVFAC proposed using the Flexera license server application. See id. Bitmanagement authorized "the floating license server approach." Id. (citing A1094 (-262)). NAVFAC repeatedly contacted Bitmanagement to discuss the approach, and Bitmanagment confirmed an approach whereby a license server would "track the use of the . . . licenses across a broad spectrum of the NMCI realm (versus having those 20 licenses mapped to individual PCs)." A1112 (-385). Bitmanagement and Planet 9 subsequently worked together on a contract proposal, and Planet 9 submitted a contract proposal that offered "network (concurrent)" licenses. See DAF ¶¶ 21-22. Stella Rizalla, a NAVFAC contracting specialist, specifically explained to Bitmanagement that NAVFAC was interested in:

> Bit management BS Contact Geo Version 7.215 with **network (concurrent) license keys**. Do you have any distributors in the US that carry this software?

A243 (-345) (emphasis added). Bitmanagement did not deny or seek to clarify Rizalla's request

for "network (concurrent) license keys." Instead, Bitmanagement directed Rizalla to Planet 9.[12]

A245-46 (-506-07). The parties' course of dealing strongly suggests that they intended

concurrent licensing for BS Contact Geo.

> b.      *The Parties' Course of Performance Suggests a Concurrent*
> *License*

After NAVFAC and Planet 9 executed the 2012 Contract on May 21, 2012,

Bitmanagement worked closely with NAVFAC to implement concurrent licensing for BS

Contact Geo. Up to NAVFAC's actual deployment of BS Contact Geo in July 2013,

Bitmanagement materially assisted NAVFAC resolve technical problems regarding the

program's deployment across the Navy networks, as well as concurrent licensing.

Bitmanagement's deliveries of BS Contact Geo highlight its material assistance. On June 13,

2012, Bitmanagement delivered BS Contact Geo to NAVFAC. See DAF ¶ 27. Bitmanagement

modified BS Contact Geo for NAVFAC by: (1) replacing the contracted-for version with BS

Contact Geo 8.001 to resolve technical issues with respect to NAVFAC's operating system; (2)

adjusting the graphics of the program for NAVFAC; (3) preparing a "silent installer capability"

to permit the program's deployment across the Navy networks; and (4) disabling a "new user

interface." See id. (quoting A1159-60 (-968-69)). Critically, when NAVFAC later experienced

---

[12] Bitmanagement argues that the Court should afford little weight to this exchange because Bitmanagement did not have any other communications with Rizalla and because the email was "vague." Pl. Memo at 33 n.11. Bitmanagement's argument regarding the weight of the evidence is not proper for summary judgment. But even so, the record contradicts Bitmanagement's arguments. Rizalla and Bitmanagement continued to correspond regarding whether Planet 9 was Bitmanagement's "only authorized distributor in the United States." A1143 (-352) ("Yes, Planet9 is our key reseller for the NAVY."). Approximately three weeks after the exchange with Rizalla, Bitmanagement followed up with Planet 9 to see if there were any updates, demonstrating Bitmanagement's keen interest in Rizalla's inquiry. See A1145 (-902); see also A1147 (-367). Finally, the contracting officer's deposition testimony explains the role of the contract specialist. See A34 (Buckley Tr. 73:1-23) ("the contract specialist would do the actual procuring of [the good or service]").

difficulty in enabling concurrent use of BS Contact Geo with the Flexera license-management software, Bitmanagement delivered a new installation file of the software to NAVFAC. See id. (quoting A1189 (-661)) ("I was testing multiple users on the install yesterday and found that we can only use one license at a time.").

The subsequent context of Bitmanagement's course of performance is also key. During the late-summer and early-fall of 2012, Bitmanagement and NAVFAC continued discussing the planned deployment of the software "across the NMCI enterprise." See DAF ¶ 28 (quoting A11194 (-954)). On August 16, 2012, NAVFAC contacted Bitmanagement and Planet 9 to discuss the planned deployment on both "the NMCI enterprise" and "the Navy's overseas ONE-NET enterprise." Id. Similarly, NAVFAC notified Bitmanagement that it was "working . . . to enable the deployment of BS Contact Geo across all Navy computers" on September 26, 2012. See id. (quoting A1196 (-465); see also id. (responding with "thank you for your encouraging e-mail").

By early 2013, NAVFAC had begun to provide specific details to Bitmanagement regarding the planned deployment of BS Contact Geo on the Navy's computer networks. For example, NAVFAC forwarded several emails to Bitmanagement and Planet 9 on January 11, 2013 that sought to provide an "estimated timeline for transitioning BS Contact Geo v8.001 out from NMCI testing & certification and deployment to all NMCI (understand there is also a STS ticket to test & certify for ONE-Net)." See DAF ¶ 29 (quoting A1201 (-393)); see also A1200 (-392) (noting that the installation files "are the flex-wrapped files to allow network licensing"). On February 14, 2013, NAVFAC informed Bitmanagement that NAVFAC was "one step closer to deploying the viewer to all computers on the NMCI network." See id. (quoting A1202 (-168)); see also id. (responding with "thanks for the good news!"). On April 9, 2013, NAVFAC

specifically informed Bitmanagement that BS Contact Geo would be "push[ed] . . . to all 350,000+ NMCI computers" after NAVFAC concluded its testing of the application. See DAF ¶ 30 (quoting A1209 (-195)). NAVFAC also forwarded a deployment schedule to Bitmanagement. See id. Bitmanagement cited the proposed deployment in a project offer to a potential customer. See DAF ¶ 30 (quoting A1228 (-726), A1231 (-958) (translated)).

Shortly before NAVFAC's deployment of BS Contact Geo on the NMCI network, NAVFAC forwarded another schedule to Bitmanagement. See A276-89. Bitmanagement enthusiastically received the news. See DAF ¶ 31 (citing A1232 (-642)) ("We are exited [*sic*] that they install BS Contact GEO on 553,000 seats now."). After NAVFAC informed Bitmanagement that BS Contact Geo had been successfully deployed on 104,922 NMCI computers, Bitmanagement responded by thanking NAVFAC for the deployment schedule and information. See DAF ¶ 33.

Bitmanagement aggressively marketed its role in NAVFAC's deployment of BS Contact Geo after its deployment. On May 20, 2014, Bitmanagement reached out to Synergy, requesting that Synergy modify a film it had created for SPIDERS 3D to include a slide with the following information:

> Spiders3D: Multi-user information system designed for 800,000 + users.
>
> Software: BS Contact GEO from Bitmanagement Software GmbH as light BIM 3D front-end for web-based visualization and collaboration connected to real-time databases.

See DAF ¶ 34 (quoting A1272 (-733)). Similarly, Bitmanagement incorporated talking points in its presentations that identified the Navy's deployment for the purpose of concurrent use as a selling point over competitors. See A1278, 81 (-279, -82) (citing an installation base of 800,000). Bitmanagement incorporated the Navy film about SPIDERS 3D into its presentations,

see DAF ¶ 35, and in its talking points, Bitmanagement asserted that BS Contact Geo provided the Navy with a "simple interface for concurrent Usage for multiple users":



Id. (A1281 (-282)) (as excerpted and annotated above).  Bitmanagement continued using the same talking points up in its presentations through at least November 2016 – more than three months after it had filed this suit against the Government.  See DAF ¶ 36.  Finally, until it filed the present lawsuit, Bitmanagement **never** asked NAVFAC to uninstall or stop using BS Contact Geo.  See DAF ¶ 40.  Thus, the parties' course of performance strongly suggests that they intended concurrent licensing for BS Contact Geo.

### 3. *Bitmanagement's Reliance on Its* Post Hoc *Agreements with Planet 9 is Misleading and Improper*

Bitmanagement argues that it only allowed Planet 9 to sell "a limited number of 'PC licenses' and nothing else," Pl. Memo at 24-25, but its argument is factually and legally erroneous.  With respect to the material facts, Bitmanagement's "limited license" argument is based on inadmissible evidence and a misleading view of the chronology.  As explained in the simultaneously-filed objections, the unsigned Software License Agreement between Planet 9 and

Bitmanagement is inadmissible hearsay without proper authentication for the parties' final agreement.  See Objection ¶ 1; A251-57.  But even if admitted, Bitmanagement obscures a critical issue of fact – its license agreements with Planet 9 post-date the relevant contracts.

To support its erroneous arguments, Bitmanagement implies that its licenses with Planet 9 predate Planet 9's contracts with the Government.  See PAF ¶¶ 8-9, 21-22; Pl. Memo at 24-25.  Bitmanagement's implication is based on a false reordering of the facts.  Bitmanagement's assertions of fact are generally chronological, except, as highlighted below, when discussing the license agreements and contracts:

> 8.      In an agreement dated **March 27, 2008**, Bitmanagement sold Planet 9 "100 PC licenses" of BS Contact . . . .
>
> 9.      In a contract dated **February 12, 2008**, Planet 9 **resold** the 100 PC licenses to the Government . . . .
>
> 21.      On **June 14, 2012**, Bitmanagement entered into an agreement with Planet 9 to sell it a "PC license" for [BS Contact Geo] . . . .
>
> 22.      In a contract dated **May 24, 2012**, Planet 9 **resold** the 18 licenses of BS Contact Geo to the Navy . . . .

Pl. Memo at 6, 11 (emphasis added).  Bitmanagement's jumbled chronology misrepresents the parties' actual course of dealing.  Put into a proper order with the other asserted facts, it becomes clear that the contracts with the Government were based on the parties' extrinsic negotiations and proposals, without reference to Bitmanagement's *post hoc* license agreements with Planet 9.

Indeed, Bitmanagement's improper restructuring of the facts conceals its very close relationship with Planet 9 for more than a decade.  Bitmanagement suggests its relationship with Planet 9 began in 2006 when "the Government elected to contract with [Planet 9] rather than directly with Bitmanagement," PAF ¶ 7, but the record reveals that Bitmanagement and Planet 9 began exploring business opportunities together no later than June 2005, see DAF ¶ 8.  After Planet 9 reached out to Bitmanagement to inquire about pricing for "a distribution license" for

customers, Bitmanagement responded "[w]ith regards to distribution licensing we try to be very flexible in order to meet the needs of our customers." A1039 (-579). After receiving the information, Planet 9 began to bring business opportunities to Bitmanagement – including with NASA, NAVFAC, and a German cities project. See A1037-38 (-577-78). Bitmanagement also suggests that its relationship with Planet 9 was limited and restricted, see, e.g., PAF ¶¶ 7-11, 21-22, but the record contradicts this suggestion. Planet 9 repeatedly brought business opportunities to Bitmanagement and informally negotiated the contours of offers by email. For example, Bitmanagement worked closely with Planet 9 in 2010 on a 50,000-seat license offer to the Navy at $10 per seat, ultimately authorizing the offer with a casual "[p]lease go for it and get the deal." A1066 (-870).[13] In 2011, Bitmanagement worked closely with Planet 9 to craft the proposal for the 2012 Contract over a series of emails, see DAF ¶¶ 16-22, repeatedly agreeing to a "floating license system" and ultimately signing off on the proposal with an informal "ok." A1130-31 (-277-78). Based on their close working relationship and their informal structuring of offers, Bitmanagement and Planet 9 typically did not enter into a license agreement until well after the customer's acceptance of the offer (if at all).[14]

In light of a proper view of the material facts, Bitmanagement's legal authorities are inapposite. Bitmanagement cites Davis v. Blige, 505 F.3d 90, 99 (2d Cir. 2007) in support of the undisputed proposition that "a party cannot convey more than it owns," but the co-authorship issues discussed in Davis do not apply to a case where Bitmanagement – the sole asserted

---

[13] Despite the unambiguous language of the 2010 email, Bitmanagement's corporate representative testified, in the context of this litigation, that Bitmanagement never authorized the quote. See A1382 (Schickel 30(b)(6) Tr. 144:3-45:8). This testimony is not credible.

[14] See Objection ¶ 1.

copyright owner – agreed to convey a concurrent/floating license to the Government.[15]  See Pl. Memo at 24 (citing).  Bitmanagement's reliance on S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1088 (9th Cir. 1989) is similarly misplaced.  See Pl. Memo at 20, 25-26 (citing).  The contract language at issue S.O.S. was "unambiguous" in stating that "S.O.S retained all ownership rights," making Payday's derivative works potentially infringing.  S.O.S., 886 F.2d at 1088.  S.O.S. is not applicable to this situation, where the 2012 Contract is silent with respect to the type of licenses procured.

### 4.    Bitmanagement's Interpretation of the Extrinsic Evidence is Flawed

Beyond its reorganization of the facts, Bitmanagement relies on other improper evidence to support its assertion that the 2012 Contract related only to PC licenses.  For example, Bitmanagement relies on a Software Buyer's Guide as evidence of "the Government's own contracting practices," Pl. Memo at 27-28, but the document was published more than three years after the effective date of the 2012 Contract.  Compare A354 with A227.  As an initial matter, a 2015 guide cannot function as evidence of trade practice and custom for a 2012 contract.  Bitmanagement's use of the guide in this circumstance is also legally dubious because "trade practice and custom evidence may only be used to interpret a term of art," TEG-Paradigm, 465 F.3d at 1340, and "license" is not a term of art.  Similarly, Bitmanagement claims that the contracting officer "admitted that she herself [sic] would . . . clearly state that [a concurrent license] is a concurrent user license," Pl. Memo at 28, but Bitmanagement fails to disclose that the witness was responding to a leading question based on the 2015 guide, see A31 (Buckley Tr.

---

[15] To the extent that Davis is relevant here, it supports the conclusion that retroactive limiting licenses "violate basic principles of tort and contract law, and undermine the policies embodied by the Copyright Act."  Id. at 97-98.

46:13-49:20), rather than her custom in 2012.[16]  And ultimately, even if the guide were applicable here,[17] it simply reinforces the ambiguity of the 2012 Contract since the contract did not expressly define the basis for counting the number of licenses – whether concurrent or PC.

Bitmanagement also mistakenly relies on a draft vendor agreement between NAVFAC and Bitmanagement in 2011.  See Pl. Memo at 28-29.  The draft vendor agreement does not indicate that the parties believed that the 2012 Contract was limited to PC licenses.  Instead, after initially including concurrent license terms in the draft vendor agreement, NAVFAC concluded that a separate vendor agreement was unnecessary if the required stipulations were incorporated into Bitmanagement's proposal.  See A1115 (-852).  NAVFAC notified Bitmanagement and Planet 9 of its conclusion.  See id.; A1383 (Schickel 30(b)(6) Tr. 153:10-16).  Two weeks later, Planet 9 submitted its formal proposal on behalf of Bitmanagement, offering "20 existing + 18 new copies of BS Contact Geo version 7.215 to be network (concurrent) license enabled by NAVFAC using Flexera."  A241.

Shifting its argument, Bitmanagement contends that the 2012 Contract did not authorize installation of "BS Contact Geo onto hundreds of thousands of Government computers," even if the contract did provide for concurrent licenses.  Pl. Memo at 29.  Once again, whether installation was authorized is an issue of contract interpretation.  And once again, the 2008 and 2012 Contracts are silent with respect to the extent of the installation of BS Contact Geo.  Bitmanagement's reliance on witness testimony regarding the absence of express authorization in the 2012 Contract fails to establish that installation across the Navy networks was prohibited.

---

[16] The contracting officer's deposition testimony merely serves to highlight the ambiguity of the plain language of the 2008 and 2012 Contracts.  The witness testified that she was not familiar with a "PC license," and "probably" would have specified the scope of the contract whether it was for "named users" or "concurrent users."  A30 (Buckley Tr. 42:12-43:5).

[17] A dubious proposition, given the guide's express focus on "Enterprise Software Initiative" contract vehicles.  See A366.

Compare id. (citing testimony) with A1395 (Viana 30(b)(6) Tr. 70:25-73:7); A1355-57 (Buckley Tr. 50:2-15, 80:24-81:13, 82:19-25). Bitmanagement's contention is contradicted by the record, which demonstrates that NAVFAC repeatedly informed Bitmanagement about the planned deployment, and that Bitmanagement expressly and tacitly authorized the deployment. See, e.g., DAF ¶¶ 18-19, 27-33.

Ultimately, Bitmanagement, NAVFAC, and Planet 9 engaged in a lengthy[18] course of dealing and performance that strongly suggest that they interpreted the ambiguous "licenses" term in the 2012 Contract as "concurrent licenses." Bitmanagement, NAVFAC, and Planet 9 jointly agreed to allow NAVFAC to manage BS Contact Geo with Flexera to enable "floating licenses." See DAF ¶¶ 16-21. NAVFAC alternately described these "floating licenses" as "concurrent" – a term incorporated into Planet 9's proposal to NAVFAC, communicated to Bitmanagement by NAVFAC's contracting specialist, and highlighted in Bitmanagement's talking points to prospective customers. See DAF ¶¶ 21-23, 35. NAVFAC and Planet 9 repeatedly told Bitmanagement that BS Contact Geo would be "pushed" to all computers on the NMCI network and deployed on the ONE-Net network – a course of action that Bitmanagement facilitated and celebrated. See DAF ¶¶ 18-19, 27-35. These facts suggest that the parties interpreted the 2012 Contract to expressly authorize NAVFAC's deployment of BS Contact Geo on its computer networks.

## III. BITMANAGEMENT IMPLIEDLY LICENSED THE NAVY'S DEPLOYMENT OF BS CONTACT GEO

To determine whether Bitmanagement impliedly licensed the Navy, the Court must focus on "the conduct of the parties." Herbert v. United States, 36 Fed. Cl. 299, 310 (1996) (J.

---

[18] Bitmanagement characterizes its interactions with NAVFAC as "protracted," indicating that summary judgment on this issue is not appropriate. Pl. Memo at 31 ("Bitmanagement's interactions with the Navy, in particular, were protracted and involved numerous discussions regarding licensing, deployment methods, software modifications, and technical support.").

Tidwell); see also RT Computer Graphics, 44 Fed. Cl. at 754 ("[N]onexclusive copyright licenses can be granted orally or implied from conduct."). "The existence and scope of such an implied license depends upon the facts of the individual case." Herbert, 36 Fed. Cl. at 310. "Delivery of a copy of the work is one type of conduct that demonstrates the existence of an implied license." Id. In Herbert, this Court concluded that the plaintiff had granted an implied license to the Government by participating in a volunteer committee created to help prepare the 10th edition of the Recommended Dietary Allowances for the National Institutes of Health, submitting a manuscript, and actively seeking its publication. See id. at 310-11.

The Court's focus on the conduct of the parties in Herbert is in complete accord with the approach used by other authorities. For example, the Seventh and Ninth Circuits have examined three factors to determine whether a copyright owner has impliedly licensed the use of its work:

> Thus, we have held that an implied license is granted when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work.

Asset Marketing Sys., Inc. v. Gagnon, 542 F.3d 748, 754-55 (9th Cir. 2008); I.A.E., Inc. v. Shaver, 74 F.3d 768, 776 (7th Cir. 1996). In Baisden v. I'm Ready Productions, Inc., the Fifth Circuit cited these factors with approval, but emphasized that implied licenses could also "arise in other circumstances were the totality of the parties' conduct supported such an outcome." 693 F.3d 491, 501 (5th Cir. 2012).

Additional implied license principles are important in this case. In particular, "[c]onsent for an implied license may take the form of permission or lack of objection." Baisden, 693 F.3d at 500. And where an implied license is found, it becomes irrevocable once consideration has been paid. See Asset Marketing, 542 F.3d at 757.

**A.** **The Navy Requested that Bitmanagement Create a Modified Version of BS Contact Geo**

First, the record is clear – and Bitmanagement does not dispute – that NAVFAC requested that Bitmanagement create a modified version of BS Contact Geo that could be deployed on the Navy's networks by unattended installation and enabled for use with the Flexera license manager. See, e.g., Complaint ¶ 2; Answer ¶ 2; DAF ¶ 27. Thus, the first implied license factor weighs in favor of the Government.

**B.** **Bitmanagement Modified BS Contact Geo at the Navy's Request and Delivered it to the Navy**

Second, the record is clear – and Bitmanagement does not dispute – that Bitmanagement modified BS Contact Geo 8.001 as requested and delivered it to NAVFAC. See, e.g., Complaint ¶ 2; Answer ¶ 2; DAF ¶ 27. Thus, the second implied license factor weighs in favor of the Government.

**C.** **Bitmanagement Intended that the Navy Deploy BS Contact Geo on Navy Computers**

Third, Bitmanagement's intent is material, fact-bound, and disputed. The Court should deny Bitmanagement's motion for partial summary judgment because the record strongly suggests that Bitmanagement intended that NAVFAC copy and distribute BS Contact Geo 8.001 on Navy computers.

Bitmanagement erroneously asserts that it never intended that NAVFAC deploy BS Contact Geo 8.001 across Navy networks despite actively facilitating that effort. The relevant inquiry is Bitmanagement's "**objective intent** at the time of the creation and delivery of the software **as manifested by the parties' conduct**." Asset Marketing, 542 F.3d at 756 (emphasis added). As cited by Bitmanagement, non-exhaustive objective factors can provide guidance with respect to intent. See Pl. Memo at 31 (citing John G. Danielson, Inc. v. Winchester-Conant

Properties, Inc., 322 F.3d 26, 41 (1st Cir. 2003) (noting that the cited factors are not exhaustive)). Contrary to Bitmanagement's assertion, objective intent factors are disputed and favor the Government.

The evidence for the objective intent factors parallels the contract interpretation extrinsic evidence, see supra Section II.B.2, with a focus on the copyright exclusive right at issue – reproduction. See 17 U.S.C. § 106(1); supra n.6. As cited above, the parties do not dispute that NAVFAC requested that Bitmanagement create a modified version of BS Contact Geo that could be deployed on the Navy's networks, and Bitmanagement delivered the software. See supra Section III.A-B.[19] NAVFAC repeatedly confirmed with Bitmanagement that BS Contact Geo would be used across the Navy's networks. See DAF ¶¶ 18-19, 26-28. As NAVFAC approached deployment, it provided additional specifics regarding the deployment. See DAF ¶¶ 28-31. When deployment occurred, Bitmanagement reacted with enthusiasm. See DAF ¶¶ 32-33; see also Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1235-36 (11th Cir. 2009) (holding that an implied license was created by the plaintiff's delivery of customized artwork and plaintiff's conduct and knowledge at the time of delivery).

After NAVFAC deployed BS Contact Geo across the NMCI network, Bitmanagement highlighted the action in its promotional materials. See DAF ¶¶ 34-36; see also DAF ¶ 30 (highlighting the action **before** deployment). Bitmanagment **never** requested that NAVFAC uninstall BS Contact Geo. See DAF ¶ 40. Thus, the objective intent factors suggest that Bitmanagement intended that NAVFAC deploy BS Contact Geo on Navy networks.

---

[19] See also Wilchombe v. TeeVee Toons, Inc., 555 F.3d 949, 956 (11th Cir. 2009) ("In determining whether an implied license exists, a court should look at . . . whether the copyrighted material was delivered without warning that its further use would constitute copyright infringement.") (citation omitted).

To the extent that the non-exclusive <u>Danielson</u> intent factors cited by Bitmanagement are relevant here, the factors indicate that Bitmanagement's objective intent does not support summary judgment in its favor. <u>See</u> Pl. Memo at 31 (citing <u>Danielson</u>, 322 F.3d at 41). The first <u>Danielson</u> factor – the relationship between the parties – is arguably neutral. While NAVFAC and Bitmanagement had more of an "ongoing relationship" than "a short-term discrete transaction," <u>id.</u>, the parties were not in direct contractual privity for **any** transaction. The second <u>Danielson</u> factor – Bitmanagement's use of written contracts – arguably favors an implied license. Bitmanagement used written contracts haphazardly, often waiting until the transaction had concluded to execute them – if at all. Bitmanagement did not incorporate or require a vendor agreement with NAVFAC for the 2008 Contract and 2012 Contract. The third <u>Danielson</u> factor – Bitmanagement's conduct during the creation and delivery of BS Contact Geo 8.001 – strongly favors an implied license, for all of the reasons discussed above. Thus, even using the non-exclusive <u>Danielson</u> construct, the disputed facts favor an implied license.

## IV. TO THE EXTENT THAT BITMANAGEMENT ASSERTS A BREACH OF CONTRACT, ITS CLAIM IS JURISDICTIONALLY BARRED

Bitmanagement's breach of contract claims are factually unsupported and jurisdictionally barred. For example, Bitmanagement asserts that: (1) the 2012 Contract "was conditioned on the Navy's tracking of BS Contact Geo via the Flexera software"; (2) "the Government elected to disable Flexera in 2014"; and (3) Flexera failed to limit the use of BS Contact Geo on the ONE-Net network. Pl. Memo at 35-36. The Government genuinely disputes each of these assertions. First, the plain terms of the 2012 Contract contain no "tracking" requirement.[20] Second, while NAVFAC did ultimately disable the Flexera license manager, NAVFAC did not

---

[20] Indeed, the only "tracking" term appears in Planet 9's proposal. <u>See</u> A241 (including "bug tracking" within product support). Similarly, the only license use "reporting" term appears in Planet 9's proposal. <u>See</u> A242. These terms highlight that the parties' course of performance was inspired by the terms of the proposal, rather than the 2012 Contract.

take that action until mid-2015. See A1407 (Chambers 30(b)(6) Tr. 130:1-31:16). Third, Flexera did limit the use of BS Contact Geo on ONE-Net. See A1408-09 (Chambers 30(b)(6) Tr. 164:13-66:22). Given these genuine disputes, this issue is unsuitable for summary judgment.

But more fundamentally, Bitmanagement's "Flexera tracking" argument is based on a contractual covenant, rather than a copyright-enforceable condition. See MDY Indus., LLC v. Blizzard Entertainment, Inc., 629 F.3d 928, 939-40 (9th Cir. 2010) ("Wherever possible, equity construes ambiguous contract provisions as covenants rather than conditions."). NAVFAC's **use** of BS Contact Geo, whether enabled with Flexera or not, cannot infringe Bitmanagement's exclusive rights to reproduction (or any other exclusive right protected under the Copyright Act). See Storage Tech. Corp. v. Custom Hardware Eng. & Consulting, Inc., 421 F.3d 1307, 1315-16 (Fed. Cir. 2005) ("the source of the copyright owner's complaint must be grounded in a right protected by the Copyright Act, such as unlawful reproduction or distribution"); see also MDY, 629 F.3d at 941 ("We conclude that for a licensee's violation of a contract to constitute copyright infringement, there must be a nexus between the condition and the licensor's exclusive rights of copyright.); 17 U.S.C. § 106. Since Bitmanagement has not pled a breach of contract action in this case – and cannot do so[21] – the Court should disregard Bitmanagement's "Flexera tracking" argument.

## V. 28 U.S.C. § 1498(c) BARS BITMANAGEMENT'S INFRINGEMENT CLAIM WITH RESPECT TO THE OVERSEAS ONE-NET NETWORK

Section 1498(c) bars Bitmanagement's copyright infringement claim with respect to the deployment of BS Contact Geo on the Navy's overseas ONE-Net network. As Bitmanagement asserts, ONE-Net is the Navy's "unclassified network **outside** the continental United States."

---

[21] "Privity of contract between a plaintiff and the government, however, generally is required to bring a cause of action in the United States Court of Federal Claims for both express and implied contracts." Keehn v. United States, 110 Fed. Cl. 306, 327 (2013) (J. Horn) (citing Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998); 28 U.S.C. § 1491(a)(1)).

PAF ¶ 31 (emphasis added); see also Pl. Memo at 22 (describing it as "the Government's overseas ONE-Net network"). Bitmanagement's claim is barred because "[t]he provisions of [28 U.S.C. § 1498] shall not apply to any claim arising in a foreign country." 28 U.S.C. § 1498(c).

In Leonardo v. United States, this Court held that Section 1498(c) barred a Section 1498(b) copyright infringement claim that arose from alleged actions that took place in the American Cultural Center in Brussels, Belgium. See 55 Fed. Cl. 344, 353-54 (2003) (J. Hewitt). After carefully considering the language and legislative history of Section 1498(c), the Court concluded that the statute foreclosed jurisdiction for claims that originated outside of the United States – even claims that originated in government facilities located abroad. See id.

Similarly, this Court should conclude as a matter of law that Section 1498(c) bars Bitmanagement's claims with respect to the "overseas ONE-Net network." Pl. Memo at 22. Bitmanagement bears the burden of establishing jurisdiction in light of Section 1498(c), and its asserted facts fail to meet the burden to show that its ONE-Net claim arose in the United States. See, e.g., A1404 (Chambers 30(b)(6) Tr. 78:9-18) (describing ONE-Net and testifying that "Hawaii is a part of NMCI," rather than ONE-Net).

## CONCLUSION

In view of the foregoing, Bitmanagement has not met its burden of establishing liability as a matter of undisputed fact or law. Accordingly, the Government respectfully requests that the Court deny Bitmanagement's motion for partial summary judgment.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

GARY L. HAUSKEN
Director


  s/ Scott Bolden            

Of Counsel:                      SCOTT BOLDEN
RICHARD J. HUBER             Deputy Director
Department of the Navy         Commercial Litigation Branch
                                 Civil Division
                                 Department of Justice
April 13, 2018                Washington, DC  20530
                                 Email: Scott.Bolden@USDOJ.gov
                                 Telephone:    (202) 307-0262
                                 Facsimile:    (202) 307-0345