**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BITMANAGEMENT SOFTWARE GMBH, | |
| Plaintiff, | Case No. 16-840 C |
| v. | |
| THE UNITED STATES OF AMERICA, | Senior Judge Edward J. Damich |
| Defendant. | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**

**CONTAINS PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH
THE UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

I. THE GOVERNMENT CANNOT DEMONSTRATE THAT IT OBTAINED AN
EXPRESS LICENSE TO MAKE HUNDREDS OF THOUSANDS OF COPIES OF BS
CONTACT GEO BECAUSE NO CONTRACT EXPRESSLY ALLOWED IT TO DO
SO ........................................................................................................................ 2

    A.    The 2012 Reseller Agreement Expressly Authorized Only 18 Copies of BS
Contact Geo ...................................................................................................... 2

    B.    The Government's Concession that the 2012 Contract between the Navy and
Planet 9 is Ambiguous Forecloses its Defense of an Express License ................ 7

    C.    The 2012 Navy Contract on its Face Did Not Authorize Mass Copying ............ 8

    D.    Extrinsic Evidence Cannot Establish an Express License Because
Bitmanagement Never Agreed to Mass Copying of BS Contact Geo ................ 9

II. THE GOVERNMENT NEVER OBTAINED AN IMPLIED LICENSE TO MAKE
HUNDREDS OF THOUSANDS OF COPIES OF BS CONTACT GEO .................... 15

    A.    The Government Cannot Prove an Implied License Where Express Written
Licenses Govern the Navy's use of BS Contact Geo ........................................ 16

    B.    Bitmanagement's Modifications to BS Contact Geo Do Not Manifest Intent to
Authorize the Navy to Install Hundreds of Thousands of Copies of BS Contact
Geo Without Remuneration ............................................................................. 16

    C.    Bitmanagement's Conduct Did Not Otherwise Convey an Implied License to
Install Hundreds of Thousands of Copies of BS Contact Geo Without
Remuneration .................................................................................................. 17

III. THE GOVERNMENT'S ANCILLARY ARGUMENTS ARE MERITLESS ............. 19

    A.    The Government Is Liable for Copyright Infringement on the ONE-Net Network
......................................................................................................................... 19

    B.    The Government's Claim That Bitmanagement Asserted a Breach of Contract
Claim Is Baseless ............................................................................................ 20

CONCLUSION......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*,
634 F.3d 112 (2d Cir. 2011)..........................................................................4

*Anderson v. U.S.*,
344 F.3d 1343 (Fed. Cir. 2003)..................................................................2, 7

*Asset Marketing Sys., Inc. v. Gagnon*,
542 F.3d 748 (9th Cir. 2008) ......................................................................16

*Barron Bancshares, Inc. v. U.S.,*
366 F.3d 1360 (Fed. Cir. 2004)....................................................................3

*Broadcast Music, Inc. v. 84-88 Broadway, Inc.*,
942 F. Supp. 225 (D.N.J. 1996) ....................................................................3

*Brown v. Dep't of Army*,
157 Fed. App'x 295 (Fed. Cir. 2005)............................................................5

*Chattler v. U.S.*,
632 F.3d 1324 (Fed. Cir. 2011)..................................................................2, 9

*City of Tacoma v. U.S.*,
31. F.3d 1130 (Fed. Cir. 1994)....................................................................3, 9

*Cohen v. U.S.*,
98 Fed. Cl. 156 (2011) ...........................................................................3, 7, 8

*David Nassif Assoc. Liquidating Trust v. U.S.*,
122 Fed. Cl. 366 (2015) .............................................................................2, 7

*Evolution Online Sys., Inc. v. Koninklijke Nederland N.V.*,
41 F. Supp. 2d 447 (S.D.N.Y. 1999)............................................................5

*Evox Productions LLC v. Kayak Software Co.*,
No. CV15-5053 PSG, 2017 WL 5634858 (C.D. Cal. Apr. 4, 2017) ...................16

*Gaylord v. U.S.*,
595 F.3d 1364 (Fed. Cir. 2010).....................................................................1

*Ground Improvement Techniques, Inc. v. U.S.*,
618 Fed. App'x 1020 (Fed. Cir. 2015)........................................................16

*I.A.E., Inc., v. Shaver*,
  74 F.3d 768 (7th Cir. 1996) ......................................................................16

*John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*,
  322 F.3d 26 (1st Cir. 2003) .......................................................................17

*Kofax, Inc. v. U.S.*,
  No. 11-449 C, 2013 WL 4040870 (Fed. Cl. Aug. 8, 2013) ....................2

*Leonardo v. U.S.*,
  55 Fed. Cl. 344 (2003) ..............................................................................19

*Nelson-Salabes, Inc. v. Morningside Development, LLC*,
  284 F.3d 505 (4th Cir. 2002) ..............................................................17, 18

*Oracle Am., Inc. v. Terix Comp. Co., Inc.*,
  No. 5:13-cv-03385-PSG, 2015 WL 2090191 (N.D. Cal. 2015) ...........16

*Oracle USA, Inc. v. Rimini St., Inc.*,
  6 F. Supp. 3d 1086 (D. Nev. 2014) ..........................................................9

*S.O.S., Inc. v. Payday, Inc.*,
  886 F.2d 1081 (9th Cir. 1989) ...................................................................9

*Schism v. U.S.*,
  316 F.3d 1259 (Fed. Cir. 2002) (en banc).............................................16

*Ulysses, Inc. v. U.S.*,
  110 Fed. Cl. 618 (2013) ..............................................................................5

**Other Authorities**

Black's Law Dictionary (10th ed. 2014)........................................................7

*Commercial Software Licensing Pricing Models*, Department of Defense,
  (Jan. 2013)...................................................................................................8

2 *Patry on Copyright* § 5:131 ......................................................................15

3 *Nimmer on Copyright* § 10.10[B] ..............................................................9

## INTRODUCTION

The Government concedes that Bitmanagement has established a prima facie case of copyright infringement because: (1) Bitmanagement owns a valid copyright in BS Contact Geo 8.001, the software at issue; and (2) the Government copied the BS Contact Geo software. Opp. 20; *see also Gaylord v. U.S.*, 595 F.3d 1364, 1372 (Fed. Cir. 2010). Partial summary judgment is therefore warranted for Bitmanagement unless the Government will be able to prove—by a preponderance of the evidence—an affirmative defense to infringement.

The undisputed material facts make clear that the Government could not meet that burden on either its express or implied license defenses (the only grounds on which the Government opposes summary judgment). The Government devotes the vast majority of its argument to the proposition that Bitmanagement *expressly* licensed the mass copying and installation of BS Contact Geo onto at least 429,604 separate computers. Opp. 20-34; DAF ¶ 32. That argument fails, as a matter of law, for four separate reasons: (1) the 2012 agreement between Bitmanagement and its reseller, Planet 9 (the "2012 Reseller Agreement"), expressly and unambiguously authorized the copying and installation of no more than 18 copies of Bitmanagement's software; (2) the Government itself characterizes the 2012 contract between the Navy and Planet 9 (the "2012 Navy Contract") as ambiguous, which is fatal to its *express* license defense, which requires *unambiguous* offer and acceptance; (3) in fact, that contract between the Navy and Planet 9 does *not* license the copying of Bitmanagement's software on a mass scale; and (4) even if parol evidence could establish an *express* license, the Government will not be able to show that the extrinsic evidence in this case does so.

The Government also halfheartedly argues that Bitmanagement *impliedly* licensed the mass copying and installation of BS Contact Geo. Opp. 34-38. Proving an implied license is a

high bar that the Government simply cannot satisfy: the Navy's authorization is governed by

express written contracts and the Government will not be able to show that Bitmanagement

affirmatively intended to allow unlimited copying of its software without compensation.

I.  **THE GOVERNMENT CANNOT DEMONSTRATE THAT IT OBTAINED AN EXPRESS LICENSE TO MAKE HUNDREDS OF THOUSANDS OF COPIES OF BS CONTACT GEO BECAUSE NO CONTRACT EXPRESSLY ALLOWED IT TO DO SO**

It is well established that an express contract "requires proof of mutual intent to contract,

including an offer, an acceptance, and consideration." *Chattler v. U.S.*, 632 F.3d 1324, 1330

(Fed. Cir. 2011). In particular, there must be "an unambiguous offer and acceptance." *David*

*Nassif Assoc. Liquidating Trust v. U.S.*, 122 Fed. Cl. 366, 373 (2015); *see also Anderson v. U.S.*,

344 F.3d 1343, 1353 (Fed. Cir. 2003) (same). For each of four independent reasons, the

Government cannot, as a matter of law, prove these elements and establish an express license

authorizing its mass copying of BS Contact Geo.

A.  **The 2012 Reseller Agreement Expressly Authorized Only 18 Copies of BS Contact Geo**

The Government's express license defense rests entirely upon its preferred interpretation

of a contract between the Navy and Planet 9 Studios—a contract to which Bitmanagement, the

copyright owner, was not even a party. Opp. 20-34; DAF ¶ 24. As a matter of law, however, a

software reseller cannot convey more rights in software than it purchased from the software

owner. Mem. 24 (citing *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007)); *see also Kofax, Inc. v.*

*U.S.*, No. 11-449 C, 2013 WL 4040870, at *4 (Fed. Cl. Aug. 8, 2013) (software reseller "could

resell and convey to the [Government] only the licenses for which it had paid [software

developer] . . . if [reseller] purchased a limited license from [developer], it could resell only what

it acquired"). The Government's rights in the BS Contact Geo software (including the scope of

2

its license) are therefore limited by the scope of Planet 9's license regardless of whether the Government was aware of the terms of that license. *See Broadcast Music, Inc. v. 84-88 Broadway, Inc.*, 942 F. Supp. 225, 230 (D.N.J. 1996).

That should end the matter, as the 2012 contract between Bitmanagement and Planet 9 (the "2012 Reseller Agreement") expressly provides for only "18 PC-licenses" of Bitmanagement's software and expressly states that "BS Contact [Geo shall] be enabled by [Planet 9] for 18 PCs." SUMF ¶ 21. The 2012 Reseller Agreement also provides that Planet 9 "is permitted to provide the software . . . to NAVFAC for the customers usage according to this agreement." *Id.* The language in the 2012 Reseller Agreement is thus clear and unambiguous on its face: it licenses the resale of Bitmanagement's software by Planet 9 to the Navy for installation on 18 PCs only. *Id.* Not surprisingly, the Government's own witnesses have repeatedly and correctly acknowledged that a PC license for software authorizes the installation of software onto a specified number of computers. SUMF ¶ 8; Mem. 23.

If a contract is clear and unambiguous on its face, the plain and ordinary meaning of the agreement governs, and extrinsic evidence cannot be used to change the terms of the contract. *See Barron Bancshares, Inc. v. U.S.*, 366 F.3d 1360, 1375-1376 (Fed. Cir. 2004); *City of Tacoma v. U.S.*, 31. F.3d 1130, 1134 (Fed. Cir. 1994) ("Outside evidence may not be brought in to create an ambiguity where the language is clear."). Moreover, with respect to copyright licenses in particular, this Court has explained that "agreements should, wherever possible, be construed in favor of the copyright transferor." *Cohen v. U.S.*, 98 Fed. Cl. 156, 164 (2011) (quoting 1 William F. Patry, *Copyright Law and Practice* 392 (1994)). The 2012 Reseller Agreement expressly authorized the Navy to make 18 copies of BS Contact Geo, foreclosing the Government's defense of an express license to make hundreds of thousands of copies.

The Government acknowledges that "a party cannot convey more than it owns." Opp. 31.[1] It also does not deny that, on its face, the 2012 Reseller Agreement does not provide a license to make hundreds of thousands of copies of BS Contact Geo. The Government instead urges the Court to disregard that agreement, characterizing it as somehow "misleading" and arguing that because the agreement is unsigned, it constitutes "inadmissible hearsay without proper authentication for the parties' final agreement." Opp. 29-30; Obj. ¶ 1.

These objections are meritless. The 2012 Reseller Agreement is a valid and enforceable contract because it was exchanged between the parties and fully performed and paid according to its terms, thereby manifesting Bitmanagement and Planet 9's mutual intent to be bound by the agreement. It has long been established that an unsigned contract is valid and enforceable so long as an objective intent to be bound exists. *See, e.g.*, *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 124 (2d Cir. 2011) ("[A]n unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound." (citation omitted)). Here, the undisputed material facts establish that both Bitmanagement and Planet 9 understood the unsigned 2012 Reseller Agreement represented their final and complete agreement on Planet 9's authority to resell 18 PC licenses to the Navy; that the parties exchanged the 2012 Reseller Agreement, A.2011 (BITMGMT_0021499); that both parties intended to be bound by that agreement; that Planet 9 performed under the 2012 Reseller Agreement by reselling 18 BS Contact Geo licenses to the Navy in 2012, DAF ¶ 24, SUMF ¶ 22; that Bitmanagement invoiced Planet 9 for the 18 licenses on June 29, 2012, SUMF ¶ 21 n.3,

---

[1] Bitmanagement's finder's fee agreement with Planet 9 specifically stipulated that Planet 9 "is neither entitled to represent [Bitmanagement] in any legal or other transaction nor to make any binding or nonbinding statement on behalf of [Bitmanagement]." SUMF ¶ 7.

referencing in the invoice its "Offer dated June 14, 2012," A.261 (Planet9_0004828 at -831), and

seeking an amount ($4,222.98) that matches the amount in the 2012 Reseller Agreement,

*compare* A.256 *with* A.261; and that Planet 9 paid Bitmanagement for the 18 PC licenses sold

under the 2012 Reseller Agreement, A.2016 (BITMGMT_0047023).[2]  As a result, there can be

no doubt that the 2012 Reseller Agreement represents a contract between Bitmanagement and

Planet 9 for resale of licenses to the Navy.  *See Evolution Online Sys., Inc. v. Koninklijke*

*Nederland N.V.*, 41 F. Supp. 2d 447, 450 (S.D.N.Y. 1999) (finding valid and enforceable

contract where parties exchanged unsigned written drafts because the parties "reached agreement

as to the essential terms embodied in these drafts" as illustrated by their "extensive performance

in accordance with the basic terms of the draft contracts," including delivering contracted-for

products and making payments pursuant to unsigned drafts); *see also Brown v. Dep't of Army*,

157 Fed. App'x 295, 298 (Fed. Cir. 2005) (per curiam) (enforcing unsigned settlement

agreement because of "strong evidence in the record that the parties understood and intended"

the unsigned agreement to be binding).

In a final effort to dispel the controlling 2012 Reseller Agreement, the Government

suggests that the date of the contract somehow negates its relevance.  Opp. 29-31.  But the

Government fails to mention that the 2012 contract between the Navy and Planet 9 ("2012 Navy

Contract") was a "purchase order" that merely constituted an offer from the Government to

Planet 9 for the future delivery of 18 BS Contact Geo licenses.  *See Ulysses, Inc. v. U.S.*, 110

Fed. Cl. 618, 637 (2013) ("A purchase order is *an offer by the government* to the supplier to buy

certain supplies or services upon specific conditions.  A contract is established when the supplier

---

[2] Planet 9's payment of $10,696.96 to Bitmanagement included the $4,222.99 stated in the 2012
Reseller Agreement.  *See* A.2018 (BITMGMT_0047024 at -025).

accepts the order, by furnishing the supplies or services ordered.") (emphasis added); A.224 (US-0010004 at -027); A.229 (US-0010004 at -032) ("CLIN 001 [18 BS Contact Geo licenses] DELIVERY DATE 21-JUN-2012"); A.033 (Buckley Tr. 67:25-68:4).  And it is undisputed that the modified version of BS Contact Geo 8.001 (the version at issue) was not delivered to the Navy until July 23, 2012, after the exchange and invoicing of the 2012 Reseller Agreement.  DAF ¶ 27.  The Government points to no law suggesting that a reseller agreement entered into *after* a purchase order is somehow void, because no such law exists.  Indeed, the Government admits that Bitmanagement's typical process involved executing resale agreements after the underlying contract was finalized: "Bitmanagement and Planet 9 typically did not enter into a license agreement until well after the customer's acceptance of the offer."  Opp. 31.  Likewise, the Government's reliance on informal communications between Bitmanagement and Planet 9 (*id.*) cannot change the unambiguous language of the actual contract they exchanged.

In any event, the Government does not actually argue that the 2012 Reseller Agreement is invalid and unenforceable because it post-dated the 2012 Navy Contract.  That should come as no surprise, as such an argument would destroy its defense entirely: it would mean that the Government illegally obtained the BS Contact Geo licenses from a company with *no* contract to resell *any* licenses.

In sum, and at a minimum, the 2012 Reseller Agreement manifests Bitmanagement's objective intent to convey 18 PC licenses for resale to the Navy, and nothing more.  With such unambiguous documentary evidence, the Navy cannot, as a matter of law, establish that it had an express license for the mass installation that occurred here.

**B.     The Government's Concession that the 2012 Contract between the Navy and Planet 9 is Ambiguous Forecloses its Defense of an Express License**

The Government's contention that an *ambiguous* contract somehow gave it an *express* license to make unlimited copies of Bitmanagement's software fails as a matter of law. Tellingly, the Government cites no case, in any court, where an admittedly ambiguous contract has ever been held to establish an *express* copyright license.  Putting aside whether the Government's agreement with Planet 9 is relevant to whether the copyright owner, Bitmanagement, provided express consent—which it is not—the Government itself contends that the 2012 Navy Contract "is ambiguous as to the types of license procured by the Navy" and that "the 2008 and 2012 [Navy] Contracts are silent with respect to the extent of the installation of BS Contact Geo."  Opp. 4, 20, 33.

An "express license" based on an ambiguous agreement is a contradiction in terms. *Anderson*, 344 F.3d at 1353 (stating that express contract with the Government requires "lack of ambiguity in offer and acceptance"); *David Nassif*, 122 Fed. Cl. at 373, 374 (same); *see also* Black's Law Dictionary (10th ed. 2014) (defining "express" as "[c]learly and unmistakably communicated; stated with directness and clarity").  Moreover, the "terms" of an express contract must be "explicitly set forth in an instrument."  *David Nassif*, 122 Fed. Cl. at 373.

Finally, interpreting any ambiguity in the Government's favor would be particularly unwarranted because "this court must construe any ambiguity in the authorization against the drafter."  *Cohen*, 98 Fed. Cl. at 165 (citation omitted).  The Government has acknowledged that Navy representatives drafted the 2012 Navy Contract.  A.117 (Viana 30(b)(6) Tr. 63:19-64:9).

### C.     The 2012 Navy Contract on its Face Did Not Authorize Mass Copying

Even if an ambiguous contract could in theory establish an express license, the plain

language of the 2012 Navy Contract unambiguously does *not* authorize a concurrent license or

the mass copying of BS Contact Geo.  *See* A.223-238 (US-0010004).  The 2012 Navy Contract

provides for 18 "BS Contact Geo Version 7.215 Licenses," DAF ¶ 24, and the Government's

well-documented understanding of a generic "license" is a seat license.  *See* A.096 (Viana Tr.

70:13-23) ("Q.  So even though the contract didn't specify it was a seat license, you understood

it to be a seat license?  A.  Yes.  Q.  Because if it was a different kind of license would it—it

would have said so, right? . . . .  A.  Yes."); *see also* A.2030 (*Commercial Software Licensing*

*Pricing Models*, Department of Defense (Jan. 2013), *available at*

http://www.esi.mil/download.aspx?id=3485) (stating that a "traditional software license model"

is "per seat").  Government witnesses also admit that the 2012 Navy Contract never mentions the

term "concurrent," nor does it provide any authorization for mass copying.  DAF ¶ 25; *see also,*

*e.g.*, A.111, A.119 (Viana 30(b)(6) Tr. 40:25-41:7; 71:16-72:20).  To the contrary, Alex Viana—

a 30(b)(6) witness—testified on behalf of the Government that the 2012 Navy Contract *did not*

authorize the mass deployment.  A.114 (Viana 30(b)(6) Tr. 52:13-17) ("Q.  And is it your

understanding that the actual contract that was executed in 2012 allowed for unlimited copies of

BS Contact Geo?  A.  No.").

Copyright owners "retain all rights unless specifically transferred."  *Cohen*, 98 Fed. Cl. at

164.  All rights not unambiguously granted in a copyright license are, by law, excluded from the

license.  *See id.* ("Courts have 'held that a license of rights in a given medium . . . includes only

such uses as fall within the unambiguous core meaning of the term . . . and exclude[s] any uses

that lie within the ambiguous penumbra. . . .  Thus, any rights not expressly (in this case meaning

unambiguously) granted are reserved." (quoting 3 Nimmer on Copyright § 10.10[B] (2010)).

Because a copyright license "prohibit[s] any use not authorized," *S.O.S., Inc. v. Payday, Inc.*, 886

F.2d 1081, 1088 (9th Cir. 1989), the Government's admission that the Navy contracts "are silent

with respect to the extent of the installation of BS Contact Geo" (Opp. 33) forecloses the

Government's express license defense. *See Oracle USA, Inc. v. Rimini St., Inc.*, 6 F. Supp. 3d

1086, 1093 (D. Nev. 2014) (stating that party asserting affirmative defense has the "burden to

identify any license provision(s) that it believes excuses its infringement").

Because the 2012 Navy Contract unambiguously does not authorize mass copying or a

concurrent license, the Government's reliance on extrinsic evidence is irrelevant. *City of*

*Tacoma*, 31. F.3d at 1134.

### D. Extrinsic Evidence Cannot Establish an Express License Because Bitmanagement Never Agreed to Mass Copying of BS Contact Geo

The Government hinges its express license defense on the argument that extrinsic

evidence "suggest[s] that [the parties] interpreted the ambiguous 'licenses' term in the 2012

Contract as 'concurrent licenses,'" and therefore "the parties interpreted the 2012 Contract to

expressly authorize NAVFAC's deployment of BS Contact Geo on its computer networks."

Opp. 22-29; 33-34. This argument is wrong on both the facts and the law, and the Government's

efforts to bring in extrinsic evidence only illustrate the weakness of its "express license" defense.

The extrinsic evidence the Government relies upon cannot establish an express license for

mass copying of BS Contact Geo, because it offers no proof of Bitmanagement's express

"mutual intent" to assent to a concurrent license, let alone mass installation. *See Chattler*, 632

F.3d at 1330. The Government does not—and cannot—point to a single communication or

document in which Bitmanagement expressly consented to mass installation. And the

Government's repeated theme that Bitmanagement was "willing[] to work with NAVFAC on licensing"—based on a 2006 email, *six years* before any relevant agreements took place—is a far cry from an express license to mass install its software. Opp. 22; DAF ¶ 9. The extrinsic evidence cannot establish, by a preponderance of the evidence, that Bitmanagement ever expressly authorized the mass installation of its software without additional compensation.

Addressing the extrinsic evidence proffered by the Government in turn:

- **"Enabled by NAVFAC Using Flexera" 2012 Navy Contract Language**

The Government argues that the language in the 2012 Navy Contract stating that the 18 BS Contact Geo licenses should be "enabled by NAVFAC using Flexera Software's FlexWrap utility" implies that the 2012 Navy Contract contemplated a concurrent license.[3] Opp. 23-24. But the Government's own 30(b)(6) witness on the Navy's "practices, policies and procedures related to the licensing of software"—Samuel Chambers—testified in his personal capacity and again on behalf of the Government that Flexera could be used to manage a seat or PC license, debunking the Government's claim (Opp. 24) that "there is no logical reason" to use Flexera with a PC license. A.065 (Chambers 30(b)(6) Tr. 197:4-16); A.043 (Chambers Tr. 41:17-19). Moreover, Flexera's tracking functionality was useful for PC/seat licenses because it allowed the Navy to track which users were actually using the software. *See* A.107 (Viana Tr. 247:10-14).

Furthermore, multiple Government witnesses—including the Contracting Officer who signed the 2012 Navy Contract—admitted that a contract for concurrent use licenses "would

---

[3] The Government also argues that this language is a contractual covenant, rather than a copyright-enforceable condition on the use of BS Contact Geo, and therefore falls within the realm of breach of contract. Opp. 38-39. The Government cannot have it both ways, however. If the language is solely a contractual covenant as the Government claims, it has no bearing on the scope of the Navy's copyright license.

clearly state that it is a concurrent user license," which the 2012 Navy Contract did not. SUMF ¶ 25. And the primary Navy employee responsible for the procurement of BS Contact Geo—Alex Viana—did not even point to the "enabled by NAVFAC using Flexera" language as support for the 2012 Navy Contract contemplating a concurrent use license. A.2002 (Viana 30(b)(6) Tr. 105:14-24). Indeed, as late as 2015, Mr. Viana did not even believe the Navy had procured concurrent licenses through the 2012 Navy Contract. A.2034 (US-0000114) ("The assumption (from my understanding) was each unique user = license implementation.").

- **Stella Rizalla Email**

The Government points to an isolated and ambiguous email from Stella Rizalla, a NAVFAC contracting specialist with limited involvement in the procurement, as evidence that Bitmanagement understood the 2012 Navy Contract to convey "concurrent" licenses. Opp. 25-26. But Bitmanagement never responded to her email with any affirmative acceptance of any supposed offer for such licenses. The Government does not—and could not—argue that Rizalla's email inquiring about "(concurrent)" licenses constituted Bitmanagement's express consent to mass copying of its software. *See* SUMF ¶ 21 n.3; DAF ¶ 23.

- **Planet 9 Proposal**

The Government relies heavily on a January 2012 proposal from Planet 9 to the Navy that referenced "network (concurrent) license[s]" as proof that Bitmanagement understood that the licenses in the 2012 Navy Contract were concurrent use licenses. Opp. 25-34. But the Government omits that Bitmanagement *never saw* the proposal, which Planet 9 drafted at the Navy's request. SUMF ¶¶ 18-19. In fact, it was Alex Viana of the Navy who—without consulting Bitmanagement—directed Planet 9 to include the "concurrent" language in the proposal. SUMF ¶ 18. Thus, the Planet 9 proposal surely does not evince Bitmanagement's

assent to the Navy's purported concurrent license or to anything else. Not an iota of evidence indicates that Bitmanagement ever saw the proposal or authorized its language.

Moreover, even if the Government had procured a "concurrent" use license in 2012—which it did not—that alone would not constitute express authorization for mass copying of BS Contact Geo. Nowhere in the Department of Defense's own definition of a concurrent user license—or in any other evidence—does it state that a concurrent use license authorizes unlimited installations of the licensed software. A.363 (Buckley Ex. 2 at 2).

- **Communications Regarding a "Floating License"**

The Government asserts that Bitmanagement agreed to a "floating license scheme" and therefore consented to a concurrent use license. Opp. 25. But the Government fails to explain how a floating license equals a concurrent license, let alone how it authorizes hundreds of thousands of copies. Nor could it: the Government's own witnesses find the term "floating license" vague. *See* A.094 (Viana Tr. 39:14-16); A.043 (Chambers Tr. 38:24-39:2); *see also* A.105 (Viana Tr. 197:17-23) ("I don't understand the technical terms specifically related to it. My impression is that it's a license that floats."). To the extent they understood it at all, the Government's 30(b)(6) witness testified that a "floating license server" could be used for *both* PC/seat licenses *and* concurrent licenses, illustrating that the term "floating license" by itself hardly connoted a concurrent license. *See* A.044 (Chambers Tr. 56:15-20); A.065 (Chambers 30(b)(6) Tr. 196:20-197:3).

- **Bitmanagement's Modifications to BS Contact Geo**

The Government interprets Bitmanagement's routine, technical modifications to BS Contact Geo—which were made at the request of the Navy—as evidence that Bitmanagement assented to a concurrent license. Opp. 26-27. The Government's analysis misrepresents the

scope of these modifications, none of which acted as an authorization for mass reproduction without additional licenses. As Bitmanagement's CEO explained, the "silent installer capability" that the Government highlights had nothing to do with concurrent use or mass deployment. A.088 (Schickel 30(b)(6) Tr. 177:2-14). Rather, the "silent installer" functionality simply allowed the software to be installed in the background of a computer without any disruption to the end user. A.2009 (Schickel 30(b)(6) Tr. 128:19-129:3). Indeed, Bitmanagement provided a silent installer for the licenses the Navy procured in 2008, which the Government admits were seat licenses, not concurrent licenses. A.1062 (Planet9_0005377 at -378); Opp. 22.

- **Communications from the Navy Regarding Mass Deployment**

The Government attempts to conflate emails sent by the Navy after the execution of the underlying agreements with an express license permitting mass copying. Opp. 27-28. These communications do not constitute an express license for mass installation as matter of law.

*First*, these communications occurred well *after* the 2012 agreements. For instance, the Navy first mentioned a hypothetical eventual plan to "deploy the application across the NMCI enterprise" in August 2012, months after the 2012 Navy Contract and 2012 Reseller Agreement. DAF ¶ 28. It was not until the following year that the Navy provided any specifics about such a plan. Tellingly, the Government's 30(b)(6) witness could not point to any communication from the Navy to Bitmanagement *before* the 2012 Navy Contract and 2012 Reseller Agreement were written that suggested the Navy intended to mass deploy BS Contact Geo. A.123 (Viana 30(b)(6) Tr. 94:13-95:11). And the Government cites no evidence, at any point before the mass deployment, where the Navy informed Bitmanagement that the 2012 contracts permitted it to copy Bitmanagement's software on a mass scale. Nor does it cite any evidence that Bitmanagement expressly authorized the deployment as permitted under the existing licenses.

13

*Second*, the Government fails to provide any context for the Navy's communications regarding the mass deployment in late 2012 and 2013, which gave Bitmanagement the plain impression that the Navy would soon issue a new, comprehensive contract to Bitmanagement that would cover the additional licenses required for the mass deployment. SUMF ¶¶ 36-38. Indeed, when Alex Viana notified Bitmanagement of the Navy's intent to mass copy the software, he stated that the deployment would "facilitate . . . purchas[ing] additional licenses," and later indicated that "there will be great opportunity to increase the number of B[S] Contact Geo licenses in the future." SUMF ¶¶ 36-37. Likewise, Bitmanagement "did not expect the rollout specifically without having an adequate contract." SUMF ¶ 36. In fact, David Colleen of Planet 9 relayed Bitmanagement's understanding to the Navy in October 2013: "When Bitmanagement saw the 100,000+ distributions, they thought that the Navy had purchased that many copies of BS Contact and that a large check was soon to be in the mail." SUMF ¶ 38. This is why Bitmanagement was "ex[c]ited that [the Navy] install BS Contact Geo on 553,000 seats"—Bitmanagement believed it would be paid for each and every copy the Navy made. DAF ¶ 31. As a result, these Navy communications about the mass deployment only further show that Bitmanagement never expressly authorized the Navy's mass copying.

- **Bitmanagement Marketing Materials**

Finally, the Government claims that Bitmanagement's marketing materials somehow illustrate its assent to the Navy's mass deployment. Opp. 28-29. Both before and long after the mass copying, Bitmanagement valued its commercial relationship with the Navy and believed that its successful use on a Navy platform could provide an effective marketing tool for other business. A.091 (Schickel 30(b)(6) Tr. 187:3-9) ("[W]e have great respect for the Navy and really couldn't imagine that they wanted a rollout over any kind of relevant – over relevant

14

licenses, that they would execute such a rollout without having a corresponding contract of equal relevance."). Moreover, even after it learned the Navy had no plans to compensate Bitmanagement for its unauthorized copying, Bitmanagement had few options but to make the best of the situation.

In addition, the Government notes that Bitmanagement advertised BS Contact Geo as providing the Navy "with [a] simple interface for concurrent usage for multiple users." Opp. 29. This is a complete mischaracterization. Bitmanagement's statement in its marketing materials about "concurrent usage" referred to a key feature of BS Contact Geo's interactive functionality, not its license terms with the Navy. Bitmanagement has always promoted BS Contact Geo as providing a collaborative environment where multiple users can view the same content concurrently in real time. *See, e.g.*, A.1335-1336 (BITMGMT_0005769 at -775-776) (marketing presentation stating that BS Contact Geo is "extensively multi-user capable" and allows for "multi-user collaboration" on SPIDERS 3D).

## II. THE GOVERNMENT NEVER OBTAINED AN IMPLIED LICENSE TO MAKE HUNDREDS OF THOUSANDS OF COPIES OF BS CONTACT GEO

The Government faces a heavy burden to establish not only the existence of an implied license, but also that such a license authorized the mass installation of BS Contact Geo. *See* 2 *Patry on Copyright* § 5:131. Any implied license defense, however, is foreclosed by the existence of express written contracts covering the same subject matter. Moreover, an implied license only exists if there is sufficient evidence of the copyright owner's intent to authorize the mass installation with an implied license. Because Bitmanagement did not manifest an intention to authorize the Navy to install hundreds of thousands of copies of BS Contact Geo without compensation, the Government's implied license defense cannot succeed.

## A. The Government Cannot Prove an Implied License Where Express Written Licenses Govern the Navy's use of BS Contact Geo

The Government argues that it had an express license to make copies of BS Contact Geo. Opp. 20-34. Bitmanagement agrees that express written agreements govern what the Navy was, and was not, authorized to do with respect to BS Contact Geo. *See supra* sections I.A, I.C. These contracts are fatal to any defense of an implied license. "It is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter . . . ." *Schism v. U.S.*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc); *see also Ground Improvement Techniques, Inc. v. U.S.*, 618 Fed. App'x 1020, 1030 (Fed. Cir. 2015) ("there cannot be an implied-in-fact contract … when, as here, there are already two express contracts governing the same subject matter"); *Oracle Am., Inc. v. Terix Comp. Co., Inc.*, No. 5:13-cv-03385-PSG, 2015 WL 2090191, at *8 (N.D. Cal. 2015) (rejecting an implied copyright license defense because "implied terms should never be read to vary express terms").

## B. Bitmanagement's Modifications to BS Contact Geo Do Not Manifest Intent to Authorize the Navy to Install Hundreds of Thousands of Copies of BS Contact Geo Without Remuneration

The Government urges the court (Opp. 35-38) to adopt the test for an implied license articulated by the Seventh and Ninth Circuits in *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008) and *I.A.E., Inc., v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996). The elements of this test require that (1) the alleged infringer requested the creation of a work; that (2) the creator delivered the work to the requesting party; and that (3) the creator intended that the alleged infringer reproduce and distribute the work. *Id.*

To start, "[b]ecause the [copyrighted work] at issue [was] not created at [Defendant's] request … this theory of implied license is inapplicable in this case." *Evox Prods. LLC v. Kayak*

*Software Corp.*, No. CV15-5053 PSG (AGRX), 2017 WL 5634858, at \*7 (C.D. Cal. Apr. 4, 2017) (rejecting *Asset Marketing* test and granting summary judgment against defendant's implied license defense). The Government does not, and cannot, claim that Bitmanagement *created* BS Contact Geo version 8.001 at the Navy's request.

The parties do not dispute that Bitmanagement *modified* BS Contact Geo 8.001 and delivered it to the Navy. Opp. 36. But the Government will also not be able to prove the third element: Bitmanagement's intent. Bitmanagement's modification and delivery of BS Contact Geo illustrate its intent to demonstrate the compatibility of its software with the Navy's technical needs, *not* to give away its intellectual property for free.

During the testing and certification process for upgrading to the latest version of BS Contact Geo, Alex Viana asked Bitmanagement if BS Contact Geo could be modified with a "silent installer" that would allow the software to be installed remotely without end user interaction. SUMF ¶ 27. Indeed, Bitmanagement provided a similar silent installer for the licenses of BS Contact that the Navy procured in 2008, A.1061-1062 (Planet9_0005377 at -378), which the Government acknowledges were seat (or PC) licenses, Opp. 22. The Government does not explain how a modification familiar to the parties and previously used for a small number of PC licenses somehow evidences Bitmanagement's intent to allow the Navy to make hundreds of thousands of copies.

**C.** **Bitmanagement's Conduct Did Not Otherwise Convey an Implied License to Install Hundreds of Thousands of Copies of BS Contact Geo Without Remuneration**

As Bitmanagement explained in its opening brief, the factors courts consider in determining whether there was intent to create an implied license all undermine the Government's position. *See* Mem. 31-32; *John G. Danielson, Inc. v. Winchester-Conant Props.,*

*Inc.*, 322 F.3d 26, 41 (1st Cir. 2003); *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 516 (4th Cir. 2002) (considering (1) whether the parties engaged in a short term discrete transaction or an ongoing relationship; (2) whether the creator used written contracts limiting the right to use or make additional copies without the creator's involvement or permission; and (3) whether the creator's conduct during the creation or delivery of the work indicated that further use or reproduction without the creator's involvement or consent was authorized).

First, the Government concedes that Bitmanagement and the Navy had an "ongoing relationship," which weighs against an implied license. Opp. 38. The Government's unrelated point that the parties had no direct contractual privity, *id.*, only underscores the parties' expectation that the sale of any new licenses be executed through a reseller.

The second factor also weighs against the Government. Both of Bitmanagement's reseller agreements specified the number, price, and type of license sold. *See* Mem. 32; A.170 (BITMGMT_0001032 (2008 reseller agreement)); A.251 (BITMGMT_0021514 (2012 reseller agreement)); SUMF ¶¶ 8, 21. The Government argues in response that Bitmanagement did not execute vendor agreements with the Navy directly. Opp. 38. This assertion is not only irrelevant, but highly misleading: the Navy—by its own account—refused to contract directly with Bitmanagement based on advice from legal counsel against contracting with foreign entities. SUMF ¶ 7.

Third, Bitmanagement's conduct undoubtedly did not indicate that the Navy was authorized to make hundreds of thousands of copies of BS Contact Geo without compensating Bitmanagement. Indeed, it strains credulity that any for-profit entity would do so. Rather, the Government focuses its argument on tangential issues including Bitmanagement's enthusiasm with respect to the deployment and Bitmanagement's not requesting that the Navy uninstall the

18

software.  Opp. 37.  But these facts cannot obfuscate that Bitmanagement did not authorize the

Navy (or any customer) to make hundreds of thousands of copies without compensation.  For

example, in July 2013, shortly before the deployment, Mr. Viana sent Bitmanagement a

deployment schedule writing: "Looks like there will be great opportunity to increase the number

of B[S] Contact Geo licenses in the future."  SUMF ¶ 37.  Mr. Viana's email and corroborating

deposition testimony fatally undermine any inference that there was an existing implied license

for the deployment, or that Bitmanagement assented to the mass copying without the expectation

that the Navy would pay for additional licenses.  *See* A.2005 (Viana Tr. 188:16-189:12)

(admitting that the Navy must purchase additional licenses to scale up to the capability

contemplated in the deployment schedule).  Likewise, Bitmanagement did not request that the

Navy uninstall the software because it repeatedly attempted to engage with the Navy for

compensation through as late as 2016.  *See, e.g.*, A.2084 (SSD007317).

## III. THE GOVERNMENT'S ANCILLARY ARGUMENTS ARE MERITLESS

### A. The Government Is Liable for Copyright Infringement on the ONE-Net Network

Bitmanagement's claim of copyright infringement does not arise abroad because its

software was deployed by U.S.-based Navy personnel from their workstations in the United

States.  Alex Viana, who is based at NAVFAC's Washington, D.C. headquarters, admitted that

he authorized the deployment of BS Contact Geo to ONE-Net.  A.2003 (Viana 30(b)(6) Tr.

169:11-14) ("Q.  And you initiated a request to deploy BS Contact Geo onto the ONE-Net

network; correct?  A.  Correct.").  Thus, because the copyright infringement claim does not

"arise in a foreign country"—as Mr. Viana authorized the ONE-Net deployment in the United

States—the Government cannot escape liability under § 1498(c).  *See Leonardo v. U.S.*, 55 Fed.

Cl. 344, 354 (2003) ("an act arises where the . . . act or omission occurs" and "not at the place where the act or omission had its operative effect" (internal quotation marks omitted)).

Moreover, even if the Government could escape liability for unauthorized copies installed on ONE-Net, that would not affect Bitmanagement's right to summary judgment for the hundreds of thousands of unauthorized copies made and installed on the NMCI network within the United States.

**B.      The Government's Claim That Bitmanagement Asserted a Breach of Contract Claim Is Baseless**

At no point has Bitmanagement asserted a breach of contract claim against the Government.  It is common ground between the parties that they have no direct contractual relationship.  This fact only underscores that to establish an express license, the Government has to show that (1) Bitmanagement expressly sold its reseller the rights to unlimited copies of BS Contact Geo, and (2) the reseller in turn expressly transferred those rights to the Navy.  The record evidence cannot establish such a defense.

## CONCLUSION

The Court should grant Plaintiff's motion for partial summary judgment because the Government cannot prove that Bitmanagement granted either an express or implied license authorizing the Navy to copy BS Contact Geo onto hundreds of thousands of computers.

Dated: May 4, 2018

Respectfully Submitted,

*Attorneys for Plaintiff*

/s/ Carl J. Nichols
Carl J. Nichols
*Counsel of Record*
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: carl.nichols@wilmerhale.com

*Of Counsel*
Adam Raviv
David G. Beraka
Michael Carpenter
Kirsten Donaldson
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: adam.raviv@wilmerhale.com
       david.beraka@wilmerhale.com
       michael.carpenter@wilmerhale.com
       kirsten.donaldson@wilmerhale.com

Allison Trzop
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
Email: allison.trzop@wilmerhale.com

*Counsel for Bitmanagement Software GmbH*