IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BITMANAGEMENT SOFTWARE GMBH,

      Plaintiff,

  v.

THE UNITED STATES,

      Defendant.

**<span style="color:red">REDACTED VERSION</span>**

No. 16-840 C

Senior Judge Edward J. Damich

## DEFENDANT'S SUPPLEMENTAL BRIEF ON DAMAGES

SARAH HARRINGTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

SCOTT BOLDEN
Deputy Director
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
Email:     Scott.Bolden@USDOJ.gov
Telephone:  (202) 307-0262
Facsimile:   (202) 307-0345

*Attorneys for Defendant the United States*

Of Counsel:
PATRICK C. HOLVEY
Department of Justice

JENNIFER S. BOWMAR
ANDREW P. ZAGER
Department of the Navy

July 30, 2021

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 2

    I.      LEGAL STANDARDS ................................................................... 2

    II.     CONSTRUCTION OF THE HYPOTHETICAL NEGOTIATION ...................... 4

         A.     The Date of the Hypothetical Negotiation ................................... 5

         B.     The Parties to the Hypothetical Negotiation ............................... 5

         C.     Objective Considerations to the Hypothetical Negotiation, Such as the Respective Bargaining Strengths of the Parties ................................... 6

    III.    THE ROYALTY BASE ................................................................. 9

         A.     The Proper Royalty Base Comprises the Copies of BS Contact Geo and Their Use by the Navy ................................... 10

         B.     Bitmanagement Improperly Inflates the Royalty Base ............................. 13

    IV.    THE LICENSE TYPE ................................................................. 15

          A.     The Court Should Use Objective Evidence to Correlate the Hypothetical License to the Navy's Use of BS Contact Geo .................. 17

         B.     Alternative I – A Website License ............................................. 18

         C.     Alternative II – A Mixed License ............................................. 20

         D.     Bitmanagement is Not Entitled to a Running Royalty for Every Installed Copy of BS Contact Geo ............................................. 20

    V.    THE ROYALTY RATE AND BASE COMPENSATION ................................... 22

         A.     The Royalty Rate for a Hypothetically Negotiated Website License ....... 23

         B.     The Royalty Rate for a Hypothetically Negotiated Mixed License .......... 25

         C.     Bitmanagement's Royalty Rate is Erroneous ........................................... 26

              1.     Graff Rejected Evidence on Arbitrary and Legally-Erroneous Grounds ........................................................ 27

              2.     Graff Ignored Different Types of Hypothetical License Structures ........................................................ 29

        3.    Graff Ignored Evidence Supporting a Greater Volume Discount ...................................................................................... 30

   VI.   DELAY COMPENSATION.................................................................. 31

CONCLUSION........................................................................................................ 32

# TABLE OF AUTHORITIES

## Cases

Bitmanagement Software GmbH v. United States,
144 Fed. Cl. 646 (2019) ............................................................................ *passim*

Bitmanagement Software GmbH v. United States,
989 F.3d 938 (Fed. Cir. 2021) .................................................................... *passim*

Cohen v. United States,
100 Fed. Cl. 461 (2011) ...................................................................................... 3

Dash v. Mayweather,
731 F.3d 303 (4th Cir. 2013) ............................................................................. 3

Davidson v. United States,
138 Fed. Cl. 159 (2018) ...................................................................... 16, 17, 20

Exxon Chem. Pats., Inc. v. Lubrizol Corp.,
137 F.3d 1475 (Fed. Cir. 1998) ......................................................................... 3

Fromson v. W. Litho Plate & Supply Co.,
853 F.2d 1568 (Fed. Cir. 1988) ......................................................................... 9

Gaylord v. United States,
678 F.3d 1339 (Fed. Cir. 2012) ................................................................ *passim*

Gaylord v. United States,
777 F.3d 1363 (Fed. Cir. 2015) ................................................................ *passim*

Georgia-Pacific Corp. v. U.S. Plywood Corp.,
318 F. Supp. 1116 (S.D.N.Y. 1970) .................................................................. 6

Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,
383 F.3d 1337 (Fed. Cir. 2004) ......................................................................... 9

LaserDynamics, Inc. v. Quanta Computer, Inc.,
694 F.3d 51 (Fed. Cir. 2012) ............................................................................. 5

Leesona Corp. v. United States,
599 F.2d 958 (Ct. Cl. 1979) ........................................................................ 2, 22

Lucent Techs., Inc. v. Gateway, Inc.,
580 F.3d 1301 (Fed. Cir. 2009) ........................................................ 4, 6, 15, 20

MSC.Software Corp. v. Heroux-Devtek, Inc.,
  No. 819CV01987SBDFMX, 2021 WL 1324535 (C.D. Cal. Feb. 22, 2021)............................ 21

On Davis v. The Gap, Inc.,
  246 F.3d 152 (2d Cir. 2001) ........................................................................... 3, 21, 22

Pitcairn v. United States,
  547 F.2d 1106 (Ct. Cl. 1976) ................................................................................... 32

Sinclair Ref. Co. v. Jenkins Petroleum Co.,
  289 U.S. 689 (1933)................................................................................................... 9

Thoroughbred Software Int'l, Inc. v. Dice Corp.,
  488 F.3d 352 (6th Cir. 2007) ........................................................................... 20, 21

Total Containment, Inc. v. Environ Prod., Inc.,
  106 F.3d 427 (Fed. Cir. 1997) .................................................................................. 8

Waite v. United States,
  282 U.S. 508 (1931)................................................................................................. 31

Wall Data Inc. v. Los Angeles Cty. Sheriff's Dep't,
  447 F.3d 769 (9th Cir. 2006) ........................................................................... 20, 21

Wechsberg v. United States,
  54 Fed. Cl. 158 (2002)............................................................................................ 3

Zumerling v. Marsh,
  783 F.2d 1032 (Fed. Cir. 1986) ............................................................................. 32

**Statutes**

28 U.S.C. § 1498.............................................................................................. *passim*

28 U.S.C. § 1961............................................................................................... 32

# INTRODUCTION

Pursuant to the Court's Order dated May 24, 2021, see ECF 143, Defendant the United States ("the Government") respectfully submits its itemization of the proper amount of damages in this case, based on two alternative methods for calculating compensation:

| | **Alternative 1:** Compensation based on a Website License | **Alternative 2:** Compensation based on a Mixed License |
|---|---|---|
| **Hypothetical Negotiation Date** See *infra* Section II.A. | July 18, 2013 | |
| **Negotiating Parties** See *infra* Section II.B. | Bitmanagement and the Navy | |
| **Objective Factors** See *infra* Section II.C. | Navy has stronger bargaining position | |
| **Royalty Base** See *infra* Section III. | 429,604 copies, for 650 unique users, requiring 100 additional simultaneous-use licenses | |
| **License Type** See *infra* Section IV. | Website License | Mixed License |
| **Royalty Rate** See *infra* Section V. | $200,000 (for 1 website license) | $200,000 (for 1 website license) + $35,000 (for 100 additional simultaneous-use licenses) |
| **Base Compensation** See *infra* Section V. | $200,000 | $235,000 |
| **Delay Compensation** See *infra* Section VI. | 52-week Treasury rate compounded annually from July 18, 2013 to payment of judgment | |
| **Reasonable and Entire Compensation** | $200,000 + Delay Compensation | $235,000 + Delay Compensation |

The Government respectfully submits its justification for the alternative calculations below.[1]

The Government opposes the demand by Plaintiff Bitmanagement Software GmbH

---

[1] On May 24, 2021, the Court stayed consideration of the Government's motion for reconsideration of the exclusion of the Government's damages expert, David Kennedy ("Kennedy"). See ECF 143; ECF 139. The Government proffers that, if allowed to testify, Kennedy would have opined in rebuttal to Bitmanagement's expert, and would have opined in favor of a third alternative method for calculating compensation, focusing on his estimate of the Navy's number of unique users of BS Contact Geo 8.001.

("Bitmanagement") for an award of $155,400,000.00 in damages as advanced in its Brief Regarding Damages Calculation.  See ECF 146 ("Damages Brief").

**ARGUMENT**

Bitmanagement – the party that bears the burden of proof – cannot support its nine-figure claim for compensation as a matter of law or fact.  The Court should reject Bitmanagement erroneous argument that it is entitled to a running royalty for every infringing copy of BS Contact Geo 8.001, especially where Bitmanagement offers no evidence that the Navy ever used the overwhelming majority of those copies after installation.  Instead, the Court should construct a hypothetical negotiation between the parties, using all of the relevant evidence, to determine the fair market value of a license covering "the Navy's actual usage of BS Contact Geo in excess of the limited usage contemplated by the parties' implied license."  Bitmanagement Software GmbH v. United States, 989 F.3d 938, 951 n.5 (Fed. Cir. 2021) ("Bit II").

**I.      LEGAL STANDARDS**

Pursuant to the limited waiver of sovereign immunity in 28 U.S.C. § 1498(b), a copyright owner can recover "reasonable and entire compensation" in this Court for the Government's infringement of a copyrighted work.   28 U.S.C. § 1498(b).   "Reasonable and entire compensation" is akin to just compensation, and "the proper measure . . . is what the owner has lost, not what the taker has gained."  Gaylord v. United States, 678 F.3d 1339, 1342-43 (Fed. Cir. 2012) ("Gaylord II") (quoting Leesona Corp. v. United States, 599 F.2d 958, 969 (Ct. Cl. 1979)).  Pursuant to Section 1498(b), a plaintiff who establishes liability has lost "what is essentially a compulsory, non-exclusive license on the plaintiff's copyright."  Gaylord II at 1343.  "[T]he methods used to determine 'actual damages' under the copyright damages statute, 17 U.S.C. § 504, are appropriate for measuring the copyright owner's loss" of such a license.  Id.

Bitmanagement bears the burden of proof on damages.  See Cohen v. United States, 100 Fed. Cl. 461, 477-79 (2011); Wechsberg v. United States, 54 Fed. Cl. 158, 166 (2002) ("A recovery of 'reasonable and entire compensation' [under 28 U.S.C. § 1498(b)] suggests that the burden of proof lies with Plaintiff.").  While a plaintiff can recover "actual damages based on 'the fair market value of a license covering the defendant's use,'" Gaylord II at 1343 (citing On Davis v. The Gap, Inc., 246 F.3d 152, 167 (2d Cir. 2001)), "the amount of damages sought cannot be based on 'undue speculation.'"  Dash v. Mayweather, 731 F.3d 303, 313 (4th Cir. 2013) (citing On Davis, 246 F.3d at 166).  As explained by the Federal Circuit in Gaylord III:

> Determining a reasonable royalty does not require "mathematical exactness," but a "reasonable approximation" under the circumstances of a given case.  Other circuits have recognized the often-unavoidable uncertainties in establishing the fair market value of a reasonable license fee as well as the importance of avoiding undue speculation.  Some difficulty in quantifying the damages attributable to the infringement should not bar recovery.

Gaylord v. United States, 777 F.3d 1363, 1368 (Fed. Cir. 2015) ("Gaylord III") (citations omitted).

Bitmanagement errs to the extent that it asserts the Government bears the burden of proof on damages.  See ECF 146 at 5.  Bitmanagement relies on the Federal Circuit panel majority's observations in the appeal in this case for support for its position, but Bitmanagement previously conceded that the parties did not present the issue of damages on appeal.  See ECF 137 at 23 n.3.  Thus, the panel majority's views on damages in this case are not controlling.  See Exxon Chem. Pats., Inc. v. Lubrizol Corp., 137 F.3d 1475, 1478 (Fed. Cir. 1998) ("[I]t would be incorrect to conclude that the court's mandate encompassed an issue that was not presented to the court.").  Even so, the panel majority's views are useful to the extent they are grounded in relevant

authority.[2] At most, the panel majority observed that the Government bore the burden of proving

the contours of its licensing affirmative defense. See Bit II at 951 n.5. Ultimately, the panel

majority's observations cannot shift the burden of proof of damages to the Government, nor do

they allow Bitmanagement to engage in unfettered speculation.

## II. CONSTRUCTION OF THE HYPOTHETICAL NEGOTIATION

To determine the fair market value of a license covering the Government's use of

Bitmanagement's software, the Court should construct a hypothetical negotiation.

Bitmanagement agrees. See ECF 146 at 4 ("In this case, Bitmanagement's reasonable and entire

compensation is appropriately determined by assessing the fair market value of a license

covering the defendant's infringing use through a hypothetical negotiation."); id. at 5. The

Federal Circuit endorsed this approach in Gaylord II and Gaylord III:

> [T]he fair market value of a license covering the defendant's use . . . should be
> calculated based on a hypothetical, arms-length negotiation between the parties.

Gaylord II at 1343 (citations omitted).

> To calculate the fair market value, a court deciding a copyright case may use a
> tool familiar from patent law, without necessarily following every aspect of patent
> law's use of that tool. It may hypothesize a negotiation between the parties before
> the infringement occurred and determine the reasonable license fee on which a
> willing buyer and a willing seller would have agreed for the use taken by the
> infringer.

Gaylord III at 1367 (citations omitted); see also Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d

1301, 1324-25 (Fed. Cir. 2009) ("the hypothetical negotiation . . . attempts to ascertain the

royalty upon which the parties would have agreed had they successfully negotiated an agreement

---

[2] For example, the first half of the panel majority's observations cite, and are consistent
with, the Court's decisions in Gaylord II and Gaylord III. The second half of the panel
majority's observations are problematic to the extent they rely on breach of contract principles or
"wrongful conduct" in the context of this case. Compare Bit II at 951 n.5 with Gaylord II at
1342-43 (explaining that a Section 1498(b) action is akin to a Fifth Amendment taking).

-4-

just before infringement began"). Furthermore, the Court "must consider *all* evidence relevant to a hypothetical negotiation," <u>Gaylord II</u> at 1344, but with a focus on "objective considerations," <u>Gaylord III</u> at 1367-68.

Thus, the Court should construct a hypothetical negotiation by considering the date of the negotiation, the parties to the negotiation, and all objective considerations relating to the parties' views, expectations, and bargaining strengths. Each of these points is addressed below.

### A. The Date of the Hypothetical Negotiation

| Hypothetical Negotiation Date | July 18, 2013 |
|---|---|

The parties agree that the Court should use July 18, 2013 as the date of the hypothetical negotiation. Courts generally use the date of first infringement as the date of the hypothetical negotiation. <u>See</u> <u>LaserDynamics, Inc. v. Quanta Computer, Inc.</u>, 694 F.3d 51, 75 (Fed. Cir. 2012) ("In general, the date of the hypothetical negotiation is the date that the infringement began."). In this case, the parties agree that the date of the hypothetical negotiation is July 18, 2013. <u>See</u> ECF 139 at 37; ECF 137 at 31; <u>see also</u> ECF 146 at 7 n.9.

### B. The Parties to the Hypothetical Negotiation

| Negotiating Parties | Bitmanagement and the Navy |
|---|---|

The parties agree that the parties to the hypothetical negotiation would have been Bitmanagement (the licensor of BS Contact Geo 8.001) and the Navy (the licensee of the same). <u>See, e.g.</u>, ECF 146 at 11 ("in a hypothetical negotiation, Bitmanagement and the Navy would have agreed to a [volume] discount").

-5-

### C. Objective Considerations to the Hypothetical Negotiation, Such as the Respective Bargaining Strengths of the Parties

| Objective Factors<br>See *infra* Section II.C. | Navy has stronger bargaining position |
|---|---|

Objective factors establish that the Navy would have been in a stronger bargaining position than Bitmanagement during the hypothetical negotiation. See Gaylord III at 1367-68 (explaining that a trial court should focus on objective considerations in framing the hypothetical negotiation). In the context of patent infringement hypothetical negotiations, the Federal Circuit has repeatedly endorsed the use of the objective factors identified in the Georgia-Pacific case. See, e.g., Lucent, 580 F.3d at 1324-35 (endorsing and applying factors from Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). Objective factors ensure that a hypothetical negotiation does "not occur in a vacuum of pure logic," and include consideration of, *inter alia*, facts that relate to the parties' "relative bargaining strength." Georgia-Pacific, 318 F. Supp. at 1121. Here, the Court should consider the following objective factors:

- **The market for BS Contact Geo was limited.** See Tr. 93:19-24 (Schickel). Between 2007 and 2016, Bitmanagement sold licenses for BS Contact Geo to no more than 17 entities. See P011.3-4; Tr. 93:11-18 (Schickel).

- **Interest in Bitmanagement's software was declining.** Schickel could not identify any new versions of BS Contact released during the six-year span prior to trial. See Tr. 85:1-86:9. Bitmanagement last released a new version of BS Contact Geo in 2016. See D511.10-13. Bitmanagement last sold a license for BS Contact Geo in March 2016. See P011.2-4; see also Tr. 93:2-10 (Schickel); Tr. 599:2-6 (Koerfer). Downloads of the free version of BS Contact Geo generally declined between 2011 and 2017, from a high of 338 downloads (in 2011) to a low of 118 downloads (in 2017). See id.; Tr. 110:5-17 (Schickel).

- **Bitmanagement was in poor financial condition.** In 2013, Bitmanagement was experiencing an approximate 50% drop in yearly operating revenue. See D122.11, 16-Tr.[3] Bitmanagement stopped updating BS Contact, its "core product." See Tr. 85:1-86:9

---

[3] As of August 2013, Bitmanagement's revenues were derived from sales of BS Contact, related variants (including BS Contact Geo), and associated services. See Stip. ¶ 23. For 2013,

(Schickel). Bitmanagement was only completing a few licenses per year with respect to BS Contact Geo. See P011.2-4.

- **Bitmanagement valued the Navy as a customer, and was reluctant to lose its business.** In July 2013, Bitmanagement and the Navy had a good relationship. See Tr. 260:22-61:12, 294:18-95:15 (Schickel); Tr. 933:20-35:3 (Viana); see also Tr. 1186:20-87:18 (Brutzman) (supporting Bitmanagement with testing and marketing). Bitmanagement and the Navy repeatedly "worked together to resolve" licensing and technical issues with the deployment of BS Contact Geo. Bitmanagement Software GmbH v. United States, 144 Fed. Cl. 646, 650-54 (2019) ("Bit I"). Bitmanagement had already cited its work with the Navy to potential customers, and wanted to continue advertising its work with the Navy to future customers. See P170.1-2; P257 ¶ 78. Bitmanagement valued the Navy as a customer, and Bitmanagement leveraged its work with the Navy in its advertising and presentations to potential customers. See Bit I at 654; ECF 75 ¶¶ 79, 96 (hereinafter, "Stip."); D103.32-Tr (citing Navy deployment in an offer to a potential customer); D145.1-2 (requesting modification of a film to include slide). Bitmanagement lauded the Navy's deployment of BS Contact Geo in its communications and presentations to potential customers. See, e.g., Tr. 308:11-09:3 (Schickel) (discussing D143.1-Tr); Tr. 644:8-45:4, 646:25-48:9 (Koerfer); D140.6; D143.1-Tr; D144.1-Tr; D147.2; D148-1, 3, 7.Tr; D149.4, 8-Tr; D160.1-Tr. Bitmanagement cited the Navy's use to potential customers before deployment, see, e.g., D103.32-Tr; after the deployment, see, e.g., D131.11-17; and after it filed suit against the Government, see D197.2, 7-8, 26, 41-42. In its presentation talking points, Bitmanagement asserted that BS Contact Geo provided the Navy with a "simple interface for concurrent Usage for multiple users." Bit I at 654; D150.4, 27; D151.6, 51; D197.26, 75. Bitmanagement used the SPIDERS 3D film and these talking points in many presentations between 2014 and 2016. See id.; Bit I at 657; Tr. 320:5-23:17 (Schickel) (admitting use of the film and talking points in presentations for ███████████████ ██████████████████████████████████████████████ ).

- **The Navy's demand for an X3D viewer was limited.** The Navy did not need BS Contact Geo for any purpose other than SPIDERS 3D. See Tr. 905:10-17, 936:4-14 (Viana); Tr. 866:5-9 (Chambers); see also Tr. 1132:2-17 (Brutzman) (testifying that there were less than five members of the community of X3D users within the Navy prior to SPIDERS 3D); Tr. 1184:18-85:13 (Brutzman) (testifying there were almost no complaints when X3D repositories were inaccessible).

- **In 2013, the Navy was facing significant financial pressure.** See Tr. 719:20-20:9 (Colleen); D097.1. In its past negotiations to license BS Contact Geo for SPIDERS 3D, the Navy used two primary factors to determine the number of licenses to purchase: (1) the anticipated number of users for SPIDERS 3D; and (2) the available budget. See Tr. 904:18-25, 940:24-41:9 (Viana); see also Tr. 511:3-17 (Graff) ("the primary

---

Bitmanagement reported sales revenues of €341,470.50 (compared with €736,269.07 in 2012), and a net profit of €936.55 (compared with a net loss of €92,477.85 in 2012). D122.25-26-Tr.

consideration is what would the customer be willing to pay for this particular product"); Tr. 719:24-20:25 (Colleen).

- **If Bitmanagement demanded a significant royalty to license BS Contact Geo, the Navy had other options.** See Gaylord III, 777 F.3d at 1370 ("alternatives available to a potential licensee provide an important constraint in a hypothetical negotiation"). Other X3D viewers were available in 2005. See Tr. 667:15-68:22 (Colleen); see also Tr. 903:16-22 (Viana). The Navy also considered using a government-owned viewer, but decided that the viewer was not robust enough at that time. See Tr. 903:23-04:13 (Viana). Bitmanagement believed that potential customers for BS Contact Geo were also considering use of X3DOM – a free, open-source framework for 3D graphics. See, e.g., D131.47 (comparing rendering speeds); Tr. 123:8-25:25 (Schickel). X3DOM permits a user to view X3D rendering in a browser without separate plugin software. See Tr. 75:6-9 (Schickel); Tr. 727:9-28:17 (Colleen); Tr. 1140:9-42:4, Tr. 1161:4-14 (Brutzman). After Bitmanagement initiated this lawsuit, the Navy discontinued all use of BS Contact Geo and now uses X3DOM as the rendering component of SPIDERS 3D. See Tr. 901:1-17, 944:8-46:2 (Viana); Tr. 1106:5-12 (Vadnais); Tr. 1139:13-42:7, 1160:25-61:3 (Brutzman); see also Bit I at 654.

These objective factors demonstrate that the Navy would have been in a much stronger bargaining position than Bitmanagement during the hypothetical negotiation.

Bitmanagement ignores these objective factors in its Damages Brief, with one exception. Bitmanagement asserts that the Navy lacked "viable alternatives" to BS Contact Geo because the Navy identified the software as a "critical component" in two sole-source purchase orders. ECF 146 at 13-14. Bitmanagement, however, fails to acknowledge the limited value of those purchase orders. See JX016.25 (identifying a value of $15,240.00); JX031.1 (identifying a value of $56,480.00). The value of the transactions is key context in determining the availability of alternatives. See Gaylord III at 1370 (explaining that a willing buyer "will not ordinarily pay more for a license than its anticipated benefit"); see also Total Containment, Inc. v. Environ Prod., Inc., 106 F.3d 427 (Fed. Cir. 1997) (unpublished) ("In a competitive industry, when faced with an unreasonably high license fee for [intellectual property], the market players ordinarily opt for noninfringing alternatives."). Thus, the Navy's alternatives to BS Contact Geo function

as an "important constraint" in the hypothetical negotiation, <u>Gaylord III</u> at 1370, especially in response to the nine-figure royalty demanded by Bitmanagement.

## III.    THE ROYALTY BASE

In constructing the hypothetical negotiation, the Court should assume that the parties would have been aware of material facts occurring after the hypothetical negotiation. The hypothetical negotiation "often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." <u>Fromson v. W. Litho Plate & Supply Co.</u>, 853 F.2d 1568, 1575-76 (Fed. Cir. 1988)[4] (citing <u>Sinclair Ref. Co. v. Jenkins Petroleum Co.</u>, 289 U.S. 689, 698-99 (1933)). Courts use this approach – known as the "Book of Wisdom" – to inform the parties' views as to the royalty base and rate during the hypothetical negotiation.

In this litigation, **both** parties request that the Court construct the hypothetical negotiation with facts revealed after the negotiation. <u>See</u> *supra*; ECF 146 at 5-6 (citing the number of installations after 2013); <u>id.</u> at 10 (citing rates from documents after 2013). As described below, the relevant facts of record, both before and after the date of the hypothetical negotiation, demonstrate that the proper royalty base should encompass:  429,604 copies, for 650 unique users, requiring 100 additional simultaneous-use[5] licenses.

---

[4] <u>Overruled on other grounds</u> by <u>Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.</u>, 383 F.3d 1337 (Fed. Cir. 2004).

[5] Throughout the record, representatives from both parties described simultaneous-use licenses as "floating" licenses. <u>See, e.g.</u>, D026.1 ("Let's go for the floating license server approach."); D053.2 ("The 20 old and 30 new copies of Contact would be available in the Navy['s floating license system"). The Court found that Bitmanagement authorized these licenses in conjunction with Flexera, which "would limit the number of simultaneous *users* of BS Contact Geo, regardless of how many copies were installed on Navy computers." <u>Bit I</u> at 658 (emphasis in original).

## A. The Proper Royalty Base Comprises the Copies of BS Contact Geo and Their Use by the Navy

| Royalty Base | 429,604 copies, for 650 unique users, requiring 100 additional simultaneous-use licenses |
|---|---|

For the hypothetical negotiation in 2013, Bitmanagement and the Navy would have considered the total number of copies of BS Contact Geo needed by the Navy, but would have primarily focused on how the Navy planned to use[6] those copies. Immediately prior to 2013, the parties had already focused on anticipated use in negotiating the 2012 purchase order. See Bit I at 651-52; J018.1 ("we will push it out . . . to begin tracking the usage and demand signal of the 20 license keys"). In addition, the parties' licensing efforts were driven by anticipated use, rather than installations. Bitmanagement's website explained that it priced website licenses based "on the general expected usage of the viewer in a specific time from a respective Internet or Intranet-address" and provided several example usage questions.[7] J027.1. While Bitmanagement sought information as to the "expected users downloading and using BS Contact," J027.1, Bitmanagement often proposed "unlimited" downloads in its offers. See D016.1; D089.1-Tr; D094.1-Tr; D108.2; D140.2-4; Tr. 605:18-06:3 (Koerfer). Similarly, the Navy's purchasing decisions were driven by, inter alia, the anticipated number of users for SPIDERS 3D. See Tr. 904:18-25, 940:24-41:9 (Viana); see also Tr. 719:24-20:25 (Colleen). Accordingly, for purposes of determining a royalty base, the parties would have considered the number of copies, but

---

[6] "Use" in this context means accessing and viewing content with the software, as opposed to the Navy's deployment of the software. Schickel admitted that "usage" meant viewing and manipulating content with the software. See Tr. 317:25-20:4. Koerfer separately testified that he understood "use" to mean accessing and viewing content. See Tr. 606:16-07:7, 617:7-10, 657:24-58:16.

[7] Graff testified that the usage questions were appropriate for any type of negotiated license. See Tr. 513:5-25.

would have primarily focused on the number of simultaneous-use licenses needed to cover the Navy's actual users of the software.

Based on the unrebutted evidence of record, the Navy made 429,604 copies of BS Contact Geo 8.001 on NMCI computers before the Navy uninstalled the software in September 2016. See P010.6-9; see also P010.19 (verifying); Tr. 1110:9-14:3 (Vadnais) (same). The Navy also maintained weblogs that captured information regarding the visitors to the SPIDERS 3D website between August 30, 2014 and September 2, 2016. See J035.1-51; Tr. 854:5-14, 861:2-6, 865:14-17 (Chambers) (testifying that the weblog data was "[a]bsolutely reliable"). The weblogs show that the total number of visits to SPIDERS 3D between August 30, 2014 and September 2, 2016 was 1,142. See J035.12, 23. They show that the highest number of visits per day to SPIDERS 3D during this time was 36. See J035.3-12; J035 (native). The weblogs show that the total number of unique visitors to SPIDERS 3D during this time was 411. See J035.13-23; J035 (native); but see P142.1-2, Tr. 864:12-65:13 (Chambers) (counting 446 unique visitors).

While the weblogs capture the visits to the SPIDERS 3D website during the last two years of liability, the weblogs do not capture visits from July 18, 2013 through August 29, 2014 – roughly, the first year of liability. Thus, the parties to the hypothetical negotiation would have estimated the unique users and total uses of the SPIDERS 3D website during the three years of liability by extrapolating from the two years of data provided in the weblogs:

| SPIDERS 3D Weblogs | Total Tracked 8/30/2014 – 9/2/2016 | Total Estimated 7/18/2013 – 9/2/2016 |
|---|---|---|
| Maximum Uses per Day of SPIDERS 3D | **36** See J035.3-12 | **36** |
| Unique Users of SPIDERS 3D | **411** See J035.13-23 | **650** (# tracked x 1.56, rounded up) |
| Total Uses of SPIDERS 3D | **1142** See J035.12, .23 | **1800** (# tracked x 1.56, rounded up) |

Thus, using the Book of Wisdom, the parties would have been aware that the Navy anticipated making 429,604 copies of BS Contact Geo 8.001 for approximately 650 unique users.

The parties would have then attempted to determine the number of additional licenses necessary to fully cover the Navy's use of BS Contact Geo 8.001 for SPIDERS 3D. At the time of the hypothetical negotiation, the Navy had already purchased 38 licenses. See Bit I at 658 n.10 ("[T]he Navy still had 38 licenses to use BS Contact Geo version 8.001 from the 2012 Navy Purchase Order"); Bit II at 951 n.4 ("We do not disturb the Claims Court's uncontested finding that at least 38 copies . . . were authorized based on 38 remaining licenses from the 2012 Navy Purchase Order."). The parties intended that the 38 licenses, in conjunction with license-management software, would allow a maximum of 38 simultaneous uses of BS Contact Geo. See Bit I at 658 ("Bitmanagement agreed to this licensing scheme because Flexera would limit the number of simultaneous users of BS Contact Geo, regardless of how many copies were installed on Navy computers."); Bit II at 941, 945-46 ("The implied license was conditioned on the Navy['s use of] Flexera[] to . . . monitor the number of simultaneous users"). The weblog data shows that 38 simultaneous-use licenses would have completely covered the Navy's actual use during the three years of liability, because the maximum daily uses of SPIDERS 3D was 36.[8]

Nevertheless, the Court could reasonably conclude that the Navy would have agreed to procure 100 additional simultaneous-use licenses from Bitmanagement in a hypothetical negotiation in 2013. As described above, 100 additional licenses would have more than covered the Navy's actual use during the three years of liability. Significantly, **both** Bitmanagement and the Navy made (or considered making) offers for approximately 100 additional licenses between

---

[8] See J035.3-12. In addition, the weblog count of uses per day likely overestimates the number of required simultaneous-use licenses, because the 36 visits recorded on August 30, 2014 were attributable to one (1) user. Compare J035.3 with J035.40-41.

2013 and 2015.  See J023.1-7 (Bitmanagement draft license agreement for 93 licenses in March 2013); Stip. ¶ 78; Bit I at 654 (citing J031.1-5, 31) (Navy unfulfilled purchase order for 88 licenses in September 2015).  The procurement of 100 additional licenses would have been consistent with both parties' hopes for increased use of SPIDERS 3D and BS Contact Geo.  See Bit I at 658 ("Bitmanagement and the Navy both anticipated a future purchase of additional licenses to cover the Navy's usage.").  Thus, the proper royalty base encompasses 429,604 copies of BS Contact Geo 8.001, for 650 unique users, requiring 100 additional simultaneous-use licenses.

## B.  Bitmanagement Improperly Inflates the Royalty Base

Bitmanagement's estimate of 600,000 infringing copies is not supported as a matter of fact or law.  Bitmanagement rejects the Navy's verified count of 429,604 installations in favor of alleged deployments from:  an aspirational NMCI deployment schedule; new computers cycled onto the NMCI network; "an unknown subset" of the ONE-NET network; and "[a]n unknown number" of other computers.  ECF 146 at 5-8.  Bitmanagement's arguments are not credible.

First, the deployment schedule cited by Bitmanagement includes more than 415,000 **Windows XP** seats that never received the software.  Compare J025.8-9 with Bit I at 654 ("the Navy installed BS Contact Geo version 8.001 on all non-classified NMCI computers running **Windows 7**") (emphasis added); Tr. 1093:1-94:1 (Vadnais); see also D129.5 (identifying Windows 7 as a prerequisite for using SPIDERS 3D).  Bitmanagement's expert conceded that the schedule could not establish the number of actual installations.  See Tr. 474:22-75:14 (Graff) ("I saw no evidence whatsoever on the actual number of installed . . . .  I never saw anything one way or the other as to whether or not they actually met their goal of installing it on the 558,000 seats.").  In its Damages Brief, Bitmanagement asserts that the argument is a "red herring" because the Navy later upgraded all of its NMCI computers to Windows 7, ECF 146 at 7, but

Bitmanagement offers no evidence that **every** NMCI Windows XP seat counted in the deployment schedule was upgraded in this way. Ultimately, Bitmanagement asserts that the Court should credit its speculation regarding the deployment schedule because "[t]he Navy has no better evidence of what was actually installed," ECF 146 at 7, but Bitmanagement's litigation assertion is directly contradicted by its contemporaneous understanding and verified record evidence. Specifically, one month after the deployment of the software, the Navy reported to Bitmanagement that the software had been successfully "pushed" to 104,922 NMCI seats. See J029.1-3.[9] Bitmanagement's representative acknowledged this information, and queried whether the Navy would deploy the software to the other seats identified on the aspirational deployment schedule. See J029.1. The Navy provided Bitmanagement with verified information on the number of installs four years ago, see P010.6-9, 19; the number of installations was corroborated at trial, see J029.1-3, Tr. 1093:1-94:1, 1113:8-14:3 (Vadnais); and Bitmanagement submits only speculation and unreliable attorney argument on an issue for which it bears the burden of proof.

Second, Bitmanagement increases the number of infringing installations to account for the 40,000 new computers cycled onto the NMCI network between July 2013 and July 2016, see ECF 146 at 7, but the Navy's total count of installations already incorporated these computers, see P010.8 (explaining that "the install count includes devices now retired and their replacements").

Third, Bitmanagement's estimate of 28,000 infringing installs on the Navy's overseas ONE-Net network is factually and legally unsupported. The evidence of record shows that the software was installed on only 21 ONE-Net computers in August 2016, and all of those

---

[9] This report of actual installations strongly corroborates that the Navy installed the software only on Navy's **Windows 7** seats. Compare J029.1-3 (identifying 104,922 successful pushes on August 21, 2013) with J025 (native) (identifying 101,876 Windows 7 seats on the NMCI network on July 18, 2013).

installations were extraterritorial.  See P010.8; D207.1 (indicating that the users were based out

of the European Union ("EU1") or the Far East ("FE1")); Stip. ¶ 86.  Thus, Bitmanagement's

allegations are jurisdictionally barred.  See 28 U.S.C. § 1498(c); Leonardo v. United States, 55

Fed. Cl. 344, 353-54 (2003).

Fourth, Bitmanagement asserts that the Navy made "[a]n unknown number of additional

copies on non-NMCI computers," ECF 146 at 8, but the record shows that, at most, the Navy

provided one (1) copy to a contractor who supported SPIDERS 3D, see Tr. 941:22-43:4 (Viana).

Thus, Bitmanagement's estimate of 600,000 infringing copies is not credible.  In

addition, the Court should reject Bitmanagement's estimate because it fails to encompass how

the Navy actually used the infringing copies – a key consideration of law and fact.

## IV.     THE LICENSE TYPE

| License Type | Alternative 1: | Alternative 2: |
|---|---|---|
| | Website License | Mixed License |

Bitmanagement asserts that the Court may calculate just compensation by multiplying a

disputed number of infringing copies by a disputed running royalty rate.  See ECF 146 at 4-5

("(600,000 x $259)"); ECF 146-1 at 2.  But, if the Court were to do so, it would likely err, as the

result would not be a negotiation, but a capitulation, where the Navy's bargaining position is

ignored.  See Gaylord II at 1343 ("It is incorrect in a hypothetical negotiation inquiry for a court

to limit its analysis to only one side of the negotiating table.").[10]  Even though the parties did not

present any issue of damages to the Federal Circuit on appeal, the panel majority observed that

Bitmanagement was "not entitled to recover the cost of a seat license for each installation."  Bit

---

[10] A hypothetical negotiation should address "the question of whether the licensor and licensee would have agreed to a lump-sum payment or instead to a running royalty based on ongoing sales or usage."  Lucent, 580 F.3d at 1325-27; see also Gaylord II at 1344-45.

II at 951 n.5.  Instead, citing <u>Gaylord II</u> and <u>Gaylord III</u>, the panel majority cautioned that damages should be determined by "a hypothetical negotiation" based on "the Navy's **actual usage** of BS Contact Geo in excess of the limited usage contemplated by the parties' implied license." <u>Id.</u> (emphasis added).

<u>Gaylord II</u> establishes that the Court should use objective evidence to shape the hypothetical license (or licenses) to the defendant's actual use of the copyrighted work.  There, "[t]he Postal Service issued roughly 86.8 million" copies of a commemorative stamp held to infringe a copyright.  <u>Gaylord II</u> at 1341.  The Federal Circuit observed that the Postal Service sold the infringing stamp in three different ways, and directed the trial court to assess whether "different license fees are appropriate for the three categories."  <u>Id.</u> at 1344-45.  Instead of mandating a running royalty against 86.8 million infringing copies, the appellate court explained that "the trial court must determine whether an ongoing royalty or a one-time fee more accurately captures the fair market value of a license" for each of the three categories.  <u>Id.</u> Ultimately, the Federal Circuit affirmed a running royalty assessed against the Postal Service's profits on two of the categories, representing approximately 14.5 million stamps.  See <u>Gaylord III</u> at 1368-72.

This Court applied the <u>Gaylord II</u> approach to award damages in another Section 1498(b) case involving a different postage stamp.  See <u>Davidson v. United States</u>, 138 Fed. Cl. 159, 180-82 (2018) (J. Bruggink).  There, the Postal Service issued approximately 5 billion stamps held to infringe a copyright.  See <u>id.</u> at 168.  Despite billions of infringing copies, the Court identified three categories of infringing uses and awarded "a mixed license which employ[ed] a [$5,000] flat fee for the [] stamps used to send mail and a [5%] running royalty for retained stamps and philatelic products."  <u>Id.</u> at 180-82.

**A. The Court Should Use Objective Evidence to Correlate the Hypothetical License to the Navy's Use of BS Contact Geo**

As described above, Gaylord II and Davidson show that the Court should use objective evidence to shape the hypothetical license (or licenses) to the Navy's actual use of BS Contact Geo. The evidence of record identifies two distinct categories that describe how the Navy used the software:

**Category I – Installed Copies Actually Used to Access SPIDERS 3D**:  The      first category encompasses the copies of BS Contact Geo that Navy personnel actually used to access SPIDERS 3D content.  As described *supra*, the Navy's actual use was minimal.  The total number of visits to the SPIDERS 3D website between August 30, 2014 and September 2, 2016 was 1,142.  See J035.12, 23.  The highest number of visits per day to the SPIDERS 3D website during this time period was 36.  See J035.3-12; J035 (native).  The total number of unique visitors to the SPIDERS 3D website during this time period was 411.  See J035.13-23; J035 (native).

**Category II – Installed Copies Available for Use**:  The second category encompasses the remaining copies of BS Contact Geo that the Navy installed throughout the NMCI network, for which there is **no** evidence of actual use.  The Navy's interest in BS Contact Geo was limited to its use for SPIDERS 3D.  See Tr. 905:10-17, 936:4-14 (Viana); Tr. 866:5-9 (Chambers); see also Tr. 1132:2-17 (Brutzman) (testifying that there were less than five members of the community of X3D users within the Navy prior to SPIDERS 3D); Tr. 1184:18-85:13 (Brutzman) (testifying there were almost no complaints when X3D repositories were inaccessible).  The Navy and Bitmanagement intended that the software be deployed throughout the NMCI network so that Flexera could manage actual use of the software.  See Bit I at 651-52.  After authorizing the approach with Bitmanagement, the Navy deployed the software to facilitate the use of

-17-

SPIDERS 3D.  See id. at 651-52; see also P161.1 (explaining that broad deployment of BS Contact Geo would permit use of SPIDERS 3D "on an ad hoc basis across the broadest spectrum of weapon platform acquisition stakeholders").  At most, while approximately 300,000 active Navy computers had the software available for use at any one time,  only 15,944 users had access to SPIDERS 3D on NAVFAC's internal enterprise portal.  See D129.5; D187.8-10; Tr. 844:2-45:1, 849:9-19 (Chambers).  Other than the SPIDERS 3D weblogs (and the quarterly reports), there is no evidence that any of these "available for use" copies were actually used for any purpose.

Indeed, the evidence indicates that these copies were not actually used.  The Navy did not need BS Contact Geo for purpose other than SPIDERS 3D, and the Navy's actual use within this context was limited.  See supra.  This is consistent with Bitmanagement's own evidence that there was little consumer demand for BS Contact Geo, and it was only completing a few licenses per year for its software.  See P011.2-4.  By July 2013, even the number of downloads of Bitmanagement's free test version of its software was declining.  See D515.4.

## B.  Alternative I – A Website License

In a hypothetical negotiation, the parties would have considered Bitmanagement's website, IP-range, and domain licenses (hereinafter "website licenses")[11] as comparable to the Navy's use of BS Contact Geo.  Bitmanagement's website licenses contemplated the two categories of the Navy's use discussed above – copies actually used by a licensee, as well as unused copies that were available for use.  And it was Bitmanagement's practice for website licenses to allow a licensee to make massive – even "unlimited" – copies of the software.  See D016.1;  D089.1-Tr;  D094.1-Tr;  D103.3-Tr;  D108.2;  D140.3;  Tr.  605:18-06:3,  611:19-24

---

[11] Bitmanagement refers to these licenses as "domain licenses."  See ECF 146 at 14.

(Koerfer); see also D136.3-Tr ("[a]ll accessing clients"); D119.1 (enabling installation on 50,000 PCs for a IP-range license).

Bitmanagement mischaracterizes the evidence in an effort to distinguish these licenses. First, Bitmanagement describes the licenses as "only allow[ing] BS Contact Geo to view limited content hosted on a specific website," ECF 146 at 14, but this restriction is consistent with the Navy's use of the software for SPIDERS 3D. See Tr. 859:25-61:13 (Chambers) (explaining how users accessed SPIDERS 3D); D129.4-5 (providing the SPIDERS 3D website URL on the NAVFAC internal enterprise portal). Second, Bitmanagement website licenses contemplated unlimited downloads of BS Contact Geo. See D089.1-20-Tr ("unlimited number of end users"); D094.1-4-Tr ("unrestricted number of citizens / users"); D103.1-18-Tr ("unlimited in time and number of users"); D110.4, 9-Tr ("unlimited web license"); D140.1-10 ("unlimited number of users"). Third, Bitmanagement asserts that a website license "would not have covered the Navy's infringing use" because the Navy's copies "could view X3D content hosted anywhere," ECF 146 at 14, but Bitmanagement's conjecture as to how the software "could" be used is largely irrelevant to how the Navy actually used the software. The Navy was only interested in using BS Contact Geo for SPIDERS 3D. In a hypothetical negotiation, the Navy would have been most interested in obtaining a website license (allowing "unlimited" downloads for the SPIDERS 3D website) because that type of license would have been consistent with how it had actually used – and anticipated using – the software. Accordingly, Bitmanagement's website licenses are directly comparable to the Navy's actual use of BS Contact Geo.

In the hypothetical negotiation, Bitmanagement and the Navy would have found the financial and administrative aspects of a lump-sum royalty for a website license to be far more preferable than for a running royalty for individual licenses. A lump-sum royalty would have

provided Bitmanagement with up-front revenue – something it desperately needed at the time of the hypothetical negotiation.  See *supra* at 6-7 n.3; Lucent, 580 F.3d at 1326.  The parties could have negotiated the lump-sum royalty by "consider[ing] the expected or estimated usage" of BS Contact Geo, and a single lump-sum would have reduced the administrative burdens of the contracting process.  Lucent, 580 F.3d at 1326-27.

### C.  Alternative II – A Mixed License

Alternatively, the Court could find that Bitmanagement and the Navy would have agreed to a mixed license that covered the Navy's different uses of BS Contact Geo.  As described above, the Federal Circuit remanded Gaylord II for a consideration of a mixed license, and the Court of Federal Claims found and applied a mixed license in Davidson.  Using the same approach in this case, the Court could conclude that the parties would have negotiated a running royalty for a sufficient number of simultaneous-use licenses to cover the Navy's actual use of the software in SPIDERS 3D, while also negotiating a lump-sum website license to cover the Navy's unused copies of the software that were available for use.

### D.  Bitmanagement is Not Entitled to a Running Royalty for Every Installed Copy of BS Contact Geo

From the dawn of this litigation, Bitmanagement has asserted that it is automatically entitled to a running royalty for every infringing copy of BS Contact Geo.  See, e.g., ECF 1 ¶¶ 5, 22, 26; id. at 9.  Bitmanagement's assertion is legally incorrect and factually unsupported.

Bitmanagement relies on Wall Data and Thoroughbred in its Damages Brief for this flawed legal proposition, as it has throughout the case.  See ECF 146 at 9 (citing Wall Data Inc. v. Los Angeles Cty. Sheriff's Dep't, 447 F.3d 769, 779, 787 (9th Cir. 2006) and Thoroughbred Software Int'l, Inc. v. Dice Corp., 488 F.3d 352 (6th Cir. 2007)); see also ECF 80 at 2; ECF 137

at 22. Neither case cites or applies 28 U.S.C. § 1498(b). In addition, neither support a court's award of a running royalty for all infringing copies.

First, <u>Wall Data</u> does not require that damages be based on the number of unauthorized copies. Instead, the court held that the distinction between used and unused copies was not dispositive for the purpose of fair use – an infringement inquiry, rather than damages. See <u>Wall Data</u>, 447 F.3d at 779. With respect to the damages award, the Ninth Circuit upheld jury instructions that were focused on "the actual use made by the Los Angeles Sheriff's department of the plaintiff's work," and affirmed the award, even though "[i]t [was] not clear how the jury calculated this award." <u>Id.</u> at 786-87.

Second, <u>Thoroughbred</u> is distinguishable. There, the defendant used a "crack" program to surreptitiously copy the plaintiff's software onto computers that it rented to other customers, in violation of its license agreement. See <u>Thoroughbred</u>, 488 F.3d at 355-57. The <u>Thoroughbred</u> defendant's conduct and business strongly suggested that it benefited from the use of copies it characterized as "unused." See <u>id.</u> at 355-57. Furthermore, the parties' license agreement specifically set a price for each "copy" that the defendant made (even if not used). See <u>id.</u> at 356, 359. These facts are not present in this case. Thus, <u>Wall Data</u> and <u>Thoroughbred</u> do not support Bitmanagement's argument that it is entitled to a running royalty for every infringement.[12]

In its *sua sponte* observation, the Federal Circuit panel majority considered and rejected Bitmanagement's damages assertion. See <u>Bit II</u> at 951 n.5 (asserting that Bitmanagement "is not

---

[12] A district court rejected the same argument in a breach of contract case involving computer software server "tokens." See <u>MSC.Software Corp. v. Heroux-Devtek, Inc.</u>, No. 819CV01987SBDFMX, 2021 WL 1324535, at *6 n.7 (C.D. Cal. Feb. 22, 2021) ("Neither <u>On Davis</u> nor <u>Thoroughbred</u> suggests that a licensing fee should be paid in all circumstances of infringement.").

entitled to recover the cost of a seat license for each installation").  The panel majority's observations on this point are in complete accord with both Gaylord II and On Davis.  See Gaylord II at 1344-45 ("it is certainly permissible for the court to conclude that a lump sum license might be appropriate" for different categories of infringing goods); On Davis, 246 F.3d at 161 (explaining that the evidence supported a lump-sum royalty "of at least" $50 for millions of alleged infringing copies).

The record and principles of just compensation further establish that Bitmanagement is not entitled to a running royalty for every infringing copy of BS Contact Geo.  Just compensation pursuant to 28 U.S.C. § 1498(b) is based on "what the owner has lost, not what the taker has gained."  Gaylord II at 1343 (quoting Leesona, 599 F.2d at 969).  Bitmanagement did not lose the opportunity to sell hundreds of thousands of licenses to the Navy, because there was no demand to actively use that many licenses in connection with SPIDERS 3D.  See supra Section III.A.  Bitmanagement did not lose hundreds of millions in lost licensing fees, and its reseller doubted that the Navy would be willing to pay even $1 million for an unlimited license in 2014.  See D127.2; Tr. 719:20-21:25 (Colleen).

## V.      THE ROYALTY RATE AND BASE COMPENSATION

|  | Alternative 1: | Alternative 2: |
|---|---|---|
| Royalty Rate | $200,000 (for 1 website license) | $200,000 (for 1 website license) + $35,000 (for 100 additional simultaneous-use licenses) |
| Base Compensation | $200,000 | $235,000 |

As described above, Bitmanagement and the Navy would have negotiated either a website license or a mixed license to cover the Navy's use of BS Contact Geo.  In determining a reasonable royalty, "past arms-length licensing practices by the copyright owner or the infringer

for similar uses and 'benchmark' licenses by others in the industry may be useful." <u>Gaylord III</u>

at 1368; <u>see also</u> <u>Gaylord II</u> at 1344 ("evidence of past license agreements for the work in

question is certainly relevant to a hypothetical negotiation analysis").  The practices and licenses

must be comparable to the hypothetical license.  See <u>Gaylord III</u> at 1368 ("[T]he use of past

licenses as evidence must always take account of economically relevant differences between the

circumstances of those licenses and the circumstances of the matter in litigation.").

### A.  The Royalty Rate for a Hypothetically Negotiated Website License

Bitmanagement's comparable licenses and offers show that the parties would have agreed

to a non-exclusive website license for a lump-sum royalty of $200,000 in a hypothetical

negotiation.  The benchmark licenses and offers[13] include the following:

| Date | Record | Licensor / Licensee | Status / Licensed Work | License Type / Summary of Terms / Total Royalties Paid |
|------|--------|---------------------|------------------------|--------------------------------------------------------|
| 1/22/2013 | D089.1-20-Tr | **Bitmanagement** ▮▮▮▮▮ | Offer (approved, sent) BS Contact | Website License Total Software Price: €7,500 (one year) or €25,000 (perpetual) "unlimited number of end users" |
| 2/25/2013 | D094.1-4-Tr | **Bitmanagement** ▮▮▮▮▮ | Offer (approved, sent) BS Contact GEO | Website License Total Software Price: €45,000 (three years) "unrestricted number of citizens / users" |
| 7/5/2013 | D103.1-18-Tr | **Bitmanagement** ▮▮▮ | Offer (approved, sent) BS Contact GEO Other development | Website License Total Software Price: €11,000 "unlimited in time and number of users" |
| 7/18/2013 | ← *Date of hypothetical negotiation between Bitmanagement and the Navy* | | | |
| 9/9/2013 | D110.1-10-Tr | **Bitmanagement** ▮▮▮▮▮ | Offer (approved, sent) BS Contact BS SDK | Multiple Licenses BS Contact (Website license) BS SDK (PC license) Total Software Price: €5,000 per year or €15,000 unrestricted |

---

[13] For the convenience of the Court and counsel, the Government previously provided a
table summarizing all of the agreements and offers in evidence.  <u>See</u> ECF 121 at 54-58.

| 4/2014 | P011.4 D116.1-9 | **Bitmanagement** ██████████ | Agreement BS Contact GEO | Website License Total Software Price: €15,000 |
|---|---|---|---|---|
| 5/13/2014 | D140.1-10 | **Bitmanagement** ██████████ | Agreement BS Contact | Test License 1 free 90 day Website license Total Software Price:  None "unlimited number of users" |
| 9/15/2014 | D157.1-20 | **Bitmanagement** ██████████ | Offer (approved, sent) BS Contact GEO | Multiple Licenses $180-250 / license for 10-30 PC licenses Total Software Price:  $5,400 Same price for Website & OEM license |

These agreements and offers strongly support the conclusion that Bitmanagement and the Navy would have negotiated a website license for SPIDERS 3D for $200,000.  They represent arms-length agreements and offers with terms directly comparable to the hypothetical license at issue in this case.[14]    A $200,000 lump-sum license would have been more than double than Bitmanagement's highest website license offer – its 2013 offer to license BS Contact Geo to the city of ███████████, and host a webserver rendering the entire city, "for unrestricted number of citizens / users, with no additional license costs."  D094.1-4-Tr (license offer for €45,000 lump-sum royalty).   A $200,000 lump-sum license would have been approximately ten times more than Bitmanagement's highest website license agreement – its 2014 agreement to license BS Contact Geo to ██████████████████████ with a "non restricted license key" that enabled perpetual updates.   D116.1-9 (license agreement and invoice for €15,000 lump-sum payment).  Indeed, a $200,000 lump-sum license would have been more than double

---

[14]  Bitmanagement's expert, however, did not rely on these agreements and offers.  See Tr. 488:3-89:5, 490:6-20, 549:22-53:19, 553:20-58:3, 559:9-60:25 (Graff).

than the total of **all** of Bitmanagement's paid licenses for BS Contact Geo over 10 years.  See
P011.2-4.

### B. The Royalty Rate for a Hypothetically Negotiated Mixed License

Alternatively, the Court may conclude that the parties would have negotiated a two-component mixed license for the Navy's uses of BS Contact Geo:  (1) a per-seat simultaneous-use license covering the installed copies actually used to access SPIDERS 3D; and (2) the $200,000 lump-sum website license covering the remaining copies available for use, as described above.  For the hypothetical per-seat simultaneous-use license, Bitmanagement's comparable licenses and offers suggest that the parties would have agreed to 100 non-exclusive simultaneous-use licenses for a royalty of $350 per-seat in a hypothetical negotiation.  The benchmark licenses and offers include the following:

| Date | Record | Licensor / Licensee | Status / Licensed Work | License Type / Summary of Terms / Total Royalties Paid |
|---|---|---|---|---|
| 2/12/2008 | J006.2-9 | Planet 9  **NAVFAC** | Agreement  BS Contact VRML/X3D | Licenses  $300 / license for 100 licenses  Total Software Price:  $30,000 |
| 5/21/2012 | J016.24-38 | Planet 9  **NAVFAC** | Agreement  BS Contact GEO | Licenses  $305 / license for 18 licenses "enabled by NAVFAC using Flexera Software's FlexWrap Utility"  Total Software Price:  $5,490 |
| 7/18/2013 | ← *Date of hypothetical negotiation between Bitmanagement and the Navy* | | | |
| 9/15/2015 | J031.1-31 | Synergy  **NAVFAC** | Agreement (cancelled)  BS Contact GEO | Licenses  $350 / license for 88 NMCI enterprise capable application license keys (option for $370 / license for additional licenses)  Total Software Price:  $30,800 (not including options) |

These benchmark agreements establish that, for quantities between 18-100 seats, the Navy was willing to pay a running royalty of $300-370 for each actively-used seat license of BS Contact

Geo.  In connection with the above, and for the same quantities, Bitmanagement was willing to accept a running royalty of $210-235 for each actively-used seat license of BS Contact Geo after factoring its reseller fee with Planet 9.  See J007.1-6; J022.1-14.  These agreements strongly support the conclusion that Bitmanagement and the Navy would have negotiated 100 additional simultaneous-use licenses for $350/seat as a component of a mixed license in 2013.[15]  Thus, the parties would have agreed to a mixed license whereby the Navy paid Bitmanagement a total of $235,000, comprised of:  (1) $35,000 for 100 additional simultaneous-use licenses covering the software copies actively-used for SPIDERS 3D; and (2) $200,000 for the website license covering deployment throughout the Navy.

### C.  Bitmanagement's Royalty Rate is Erroneous

In its Damages Brief, Bitmanagement relies on Graff's written direct testimony for its assertion that "[t]he parties would have agreed to a final negotiated price of $259 per copy" for each of the asserted 600,000 infringing copies.  ECF 146 at 9-11 (citing Graff Direct ¶¶ 20-65.  As described above, Bitmanagement's assertions of a running royalty and 600,000 infringing copies are fundamentally flawed.  But assuming, *arguendo*, that the Court awards a running royalty for each infringing copy, Bitmanagement assertion of "a final negotiated price of $259 per copy" vastly overvalues the rate in the light of the evidence of record.  As described below, Bitmanagement and Graff ignore strong evidence of Bitmanagement's own licensing practices and other highly relevant evidence.

---

[15] For greater quantities of licenses (beyond 100), Bitmanagement's arms-length offers establish that the parties would have negotiated a significantly escalating volume discount.  See *infra* Section V.C.3; Stip. ¶ 40 (500 licenses for $1.98/license); J009.2-7 (50,000 licenses for $10/license); see also D149.1-Tr (escalating discounts, 251-500 licenses for €85/license).

### 1. Graff Rejected Evidence on Arbitrary and Legally-Erroneous Grounds

Graff considered only three licenses to be relevant to the hypothetical negotiation. See Graff Direct ¶ 45. Graff rejected using Bitmanagement's other agreements and offers to frame the hypothetical negotiation because they allegedly involved: (1) different software (*i.e.*, BS Contact); (2) different customers; and (3) a different "commercial history." Graff Direct ¶ 49.

Graff's first rationale – that significant differences between BS Contact and BS Contact Geo preclude reliance on agreements and offers for BS Contact[16] – was contradicted by the trial record. BS Contact is Bitmanagement's "core product," and BS Contact Geo is an upgraded version of the core product. Bit I at 648. Bitmanagement and Planet 9 often referred to "BS Contact Geo" as "BS Contact" in their communications and their agreements. See Tr. 832:1-11 (Colleen) ("BS Contact and BS Contact Geo were interchangeable terms in our daily discussions."); Tr. 835:10-15 (Colleen) (stating that it was "common parlance" to refer to BS Contact Geo as BS Contact); see also J017.21; J022.13; J023.7; J027.1; D108.1; Tr. 817:3-8, 828:19-30:7, 839:3-24 (Colleen). Bitmanagement provided the option of either product in a license agreement, labeling both generically as "BS Contact." D009.6; see also Tr. 558:4-59:8 (Graff). In fulfilling the 2008 purchase order, "Bitmanagement delivered *BS Contact Geo*" to the Navy "despite the [order's] express reference to BS Contact." Bit I at 650 (emphasis in original). Two witnesses who were familiar with both products testified that there were few differences between the products. See Tr. 832:13-18 (Colleen); Tr. 1160:11-21 (Brutzman) ("I had trouble distinguishing any difference between [BS Contact and BS Contact Geo]."). Schickel admitted that Bitmanagement sometimes sold the products at the same price. See Tr. 334:22-24.

---

[16] See Graff Direct ¶ 49 (describing BS Contact as "completely different Bitmanagement software"); see also ECF 146 at 11-12.

Accordingly, the BS Contact licenses and discount structures were relevant, objective evidence that Bitmanagement and Graff should have used, but, instead, improperly rejected.

Graff's second rationale – rejecting Bitmanagement's agreements and offers with different customers – is legal error. See Gaylord II at 1344 (holding that "evidence of past license agreements for the work in question is certainly relevant to a hypothetical negotiation analysis."). "The hypothetical-negotiation determination must be tied to the particular work at issue and its marketplace value. . . ." Gaylord III at 1368. The marketplace value is informed by all licenses and offers and Graff's indifference to every license or offer except the three he summarily identified as relevant with minimal analysis invites error in the Court's damages calculation.

Graff's third rationale – excluding other offers or agreements that "do not reflect the commercial history that the Navy had with Bitmanagement and the value of BS Contact Geo to the Navy" – is also legal error. See Graff Direct ¶ 49. Graff never defined the arbitrary "commercial history" rationale he applied, but it contradicts the Federal Circuit mandate that "the trial court must consider **all** evidence relevant to a hypothetical negotiation." Gaylord II at 1344 (emphasis in original); see also id. at 1343 ("It is incorrect in a hypothetical negotiation inquiry for a court to limit its analysis to only one side of the negotiating table.").

Graff's rationales were even contradicted by Schickel, whose written testimony suggests other directly-comparable agreements. Schickel stated that Bitmanagement "sold BS Contact Geo to large institutional customers like the United States Navy, the ███████████████, and ███████████." P257 ¶ 23. Nevertheless, Graff rejected use of the ████████ and ████████

licenses, based on his flawed rationale of rejecting negotiations with other customers.[17]   See Graff Direct at 31, 34.   Accordingly, the Court should ignore Graff's erroneous approach and consider all arms-length agreements and offers from Bitmanagement for BS Contact and BS Contact Geo.  See ECF 121 at 54-58 (summarizing agreements and offers in evidence).

### 2.   *Graff Ignored Different Types of Hypothetical License Structures*

Graff and Bitmanagement incorrectly assert that the hypothetical license must be for hundreds of thousands of PC licenses, even though Bitmanagement's website and IP-range licenses are directly comparable to the Navy's use of BS Contact Geo 8.001.   Each of these licenses allowed enterprise installations of the software.   See D016.1; D089.1-Tr; D094.1-Tr; D103.3-Tr; D108.2; D140.3; Tr. 605:18-06:3, 611:19-24 (Koerfer); see also D136.3-Tr ("[a]ll accessing clients"); D119.1 (enabling installation on 50,000 PCs for a IP-range license). Bitmanagement's website and IP-range licenses were tied to particular network locations and/or content, a restriction that was consistent with the Navy's demand for BS Contact Geo.

Graff and Bitmanagement ignore these licenses because they support a much smaller royalty than demanded.   For example, the ███████████ license provided multiple licenses for BS Contact Geo – a website license for "anyone wishing to view the Licensee's . . . content, including but not limited to the Licensee's employees," as well as 11 PC licenses, and 500 CD licenses per year – for six (6) years for a total royalty of €5,900.   See D009.6-7.   The ███████████ license ultimately provided a perpetual website license for BS Contact Geo for

---

[17] For example, Graff rejected the ███████████ license as "involv[ing] earlier, less advanced software," Graff Direct at 31, even though Schickel **and** the license stated the ███████ licensed BS Contact Geo, see P257 ¶ 23; D009.6.  Graff also ignored key terms of the agreement, which included a website license for "anyone wishing to view . . . content." D009.6. Graff rejected the ███████ agreement because it allegedly only permitted use for only 5-10 seats, but there is no objective support for this self-serving allegation.  Compare Graff Direct at 34 with Tr. 97:21-101:23 (Schickel), D029.1-47 (containing no such limitation in 47 pages of correspondence and invoicing); D116.1-9 (containing no such limitation).

€15,000, including free upgrades.  See P011.4; D116.1-9.  Five months before the hypothetical negotiation, Bitmanagement offered to provide a website license for BS Contact Geo to an "unrestricted number of citizens / users" for ███████████ "as well as web server hosting for 3 years for a one-time lump fee of €45,000 net."  D094.1-Tr.  Bitmanagement's website, IP-range, and OEM licenses are directly comparable to the Navy's use, and the Court should consider them in the context of the hypothetical negotiation.

### 3.  *Graff Ignored Evidence Supporting a Greater Volume Discount*

Finally, Graff completely subverts his rationale for rejection of licenses with other companies and involving other software by relying on a volume discount benchmark for different software (Autodesk or AutoCAD LT) from a different licensor (DLT Solutions).  See Graff Direct ¶¶ 52-58; Bit. Br. at 36.  Graff relies on this incomparable discount while ignoring Bitmanagement's arms-length discount offers to the Navy and other customers.[18]

For example, Graff ignored Bitmanagement's 2005 draft offer to the Navy for 500 licenses of BS Contact VRML/X3D at $1.98/license.  See Stip. ¶ 40; J001.1; J002.5.  Graff ignored the 2010 quote for 50,000 seats of BS Contact Geo for $10/license.  See J009.2-7; D209.1; D016.1.  Indeed, Graff did not consider Planet 9's email summation of the commercial history between Bitmanagement and the Navy laid out a year and a half before the date of the hypothetical negotiation.  See J014.1; Tr. 549:3-20.  In another instance, Graff acknowledged that Bitmanagement had offered BS Contact Geo at €85/license for volume purchases of 251 or more PC licenses, but claimed, without support, that the offer related to "an OEM license" and

---

[18] And even if the DLT Solutions / Autodesk discount was relevant, Graff ignored that the discount he relied on was the lowest possible discount for a range of discounts.  See Tr. 528:1-30:4.  The DLT / Autodesk agreement also related to a "network license," Tr. 530:10-20, but Graff refused to consider all other agreements and offers with similar licenses.

that "pricing was significantly lower for [an] OEM license." Tr. 567:6-10.[19]  Finally, Graff

ignored Planet 9's skepticism in 2014 that the Navy would be willing to pay even $1 million for

an unlimited license.  See D127.2; Tr. 719:20-21:25 (Colleen).

Ultimately, Graff's testimony is not reliable.[20]  Accordingly, the Court should reject

Bitmanagement's proposed calculation of the royalty rate.

## VI.    DELAY COMPENSATION

| Delay Compensation | 52-week Treasury rate compounded annually from July 18, 2013 to payment of judgment |
|---|---|

Finally, delay compensation is awardable as part of "reasonable and entire compensation"

under Section 1498(b).  See Gaylord II, 678 F.3d at 1345; see also Waite v. United States, 282

U.S. 508, 508-09 (1931).  The parties have stipulated that "a 52-week United States Treasury

rate compounded annually is the appropriate benchmark for determining delay compensation."

Stip. ¶ 101.  As previously represented, "the Government agrees with Bitmanagement's proposal

that delay compensation may be calculated from July 18, 2013" and will "confer with

Bitmanagement to present a joint calculation of delay compensation" upon the Court's request.

ECF 139 at 37; id. at n.20.

---

[19] Graff's assertion was based on a previously undisclosed and hearsay conversation with
Schickel.  See id.  The assertion was directly contradicted by Koerfer, see Tr. 616:3-17:10
(explaining that OEM license pricing varied case-by-case), and by an exhibit, see D157.1
(pricing an OEM license the "same" as PC and website licenses "based on the number of
users/licenses per year").

[20] Graff is an attorney and a mediator with no formal expertise in valuation.  See Graff
Direct ¶ 2; Tr. 387:10-22, 388:3-12, 395:10-19.  Bitmanagement's attorneys were significantly
involved in drafting his written testimony.  See Tr. 447:18-22, 450:7-51:14 (Graff).  During trial,
Bitmanagement's attorneys were notably more familiar with Graff's expert report and witness
statement than he was.  See Tr. 389:23-90:2, 406:7-18.  At times, he contradicted his own
testimony.  Compare Tr. 461:4-21 (identifying €800/license for BS Contact Geo as a price
considered in his opinion) with Tr. 523:9-12 (admitting that the €800 base price played no
consideration); compare Tr. 510:1-8 ("I did not rely on BS contact pricing in my analysis.") with
Graff Direct ¶ 23 (using assumed BS Contact pricing to calculate BS Contact Geo total cost).

Bitmanagement errs by interpreting the parties' stipulation concerning "delay compensation" as limited to "pre-judgment interest," requiring a separate demand for "post-judgment interest under 28 U.S.C. § 1961(c)(3)." Compare Stip. ¶ 101 with ECF 146 at 15. As an initial matter, the statute that Bitmanagement relies upon for its demand, 28 U.S.C. § 1961, is inapplicable because it waives sovereign immunity for interest "only" in tax cases or where otherwise expressly provided. See 28 U.S.C. § 1961(c)(3). The present case is not a tax case, and Bitmanagement identifies no other applicable provisions. See generally Zumerling v. Marsh, 783 F.2d 1032, 1036 n.12 (Fed. Cir. 1986) ("This is not an internal revenue tax case, and there are no other provisions of law that are applicable.").

Nevertheless, Bitmanagement's separate demand for post-judgment interest is unnecessary, because delay compensation inherently encompasses Bitmanagement's demand for "pre-judgment interest" and "post-judgment interest." Delay compensation under Section 1498 "extend[s] from the dates of [the Government's infringements] until the date of payment of the court's judgment." Pitcairn v. United States, 547 F.2d 1106, 1120 (Ct. Cl. 1976).

Accordingly, the parties have stipulated to "the appropriate benchmark for determining delay compensation," Stip. ¶ 101, and agree that delay compensation should be calculated from July 18, 2013. The Government will confer with Bitmanagement to present a joint calculation of delay compensation upon the Court's request.

## CONCLUSION

In view of the foregoing, the Court should deny Bitmanagement's request for $155 million. The Court should award damages based on the value of a hypothetical website or mixed license that covers the Navy's actual use of the software.

Respectfully submitted,

SARAH HARRINGTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

s/Scott Bolden

| | |
|---|---|
| Of Counsel: | SCOTT BOLDEN |
| PATRICK C. HOLVEY | Deputy Director |
| Department of Justice | Commercial Litigation Branch |
| | Civil Division |
| JENNIFER S. BOWMAR | Department of Justice |
| ANDREW P. ZAGER | Washington, DC 20530 |
| Department of the Navy | Email: Scott.Bolden@USDOJ.gov |
| | Telephone: (202) 307-0262 |
| | Facsimile: (202) 307-0345 |

July 30, 2021                    *Attorneys for Defendant the United States*