**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BITMANAGEMENT SOFTWARE GMBH, | Case No. 16-840 C |
| Plaintiff, | Senior Judge Edward J. Damich |
| v. | |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

**<u>PLAINTIFF'S REPLY REGARDING DAMAGES CALCULATION</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

    I.      The Navy Bears The Burden Of Showing That The Extent Of Its Infringement Was Lower Than The 600,000 Copies Bitmanagement Has Proven ............................................................................................................ 2

    II.     The Government Cannot Meet Its Burden Of Proving That The Navy Made Fewer Than 600,000 Infringing Copies Of BS Contact Geo ...................... 5

    III.    In A Hypothetical Negotiation, Bitmanagement Is Entitled To Damages Covering Every Infringing Copy Made By The Navy .......................................... 8

           A.     Bitmanagement's Damages Should Not Be Limited to Only the Copies of BS Contact Geo That the Navy Claims Were Accessed ........... 8

           B.     The Navy's Records Fail to Provide an Accurate Accounting of Its Access of BS Contact Geo ...................................................................... 11

    IV.    The Navy's Patent-Law "Objective Factors" Play No Role In The Hypothetical Reconstructed Negotiation ................................................................ 12

    V.     The Government Cannot Rely On License Types That Bitmanagement Would Not Have Offered For The Navy's Infringing Use ................................... 15

           A.     Only PC Licenses—And Not a Website License—Would Cover the Navy's Infringing Use .................................................................... 16

           B.     Bitmanagement Never Offered "Mixed" or "Simultaneous-Use" Licenses .................................................................................................. 18

    VI.    Bitmanagement Is Entitled to Pre-Judgment and Post-Judgment Interest ........... 20

CONCLUSION ....................................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Baisden v. I'm Ready Productions, Inc.*,
    693 F.3d 491 (5th Cir. 2012) ...................................................................................4

*Banks v. United States*,
    741 F.3d 1268 (Fed. Cir. 2014) ...............................................................................3

*Bitmanagement Software GmBH v. United States*,
    144 Fed. Cl. 646 (2019) ...........................................................................................7

*Bitmanagement Software GmbH v. United States*,
    989 F.3d 938 (Fed. Cir. 2021) .......................................................................... *passim*

*Chamberlain Group, Inc. v. Skylink Technologies, Inc.*,
    381 F.3d 1178 (Fed. Cir. 2004) ...............................................................................4

*Davidson v. United States*,
    138 Fed. Cl. 159 (2018) ..............................................................................14, 19, 20

*Gaylord v. United States*,
    678 F.3d 1339 (Fed. Cir. 2012) ......................................................................... *passim*

*Gaylord v. United States*, 112 Fed. Cl. 539 (2013), *aff'd*, 777 F.3d 1363 (Fed. Cir.
    2015) .......................................................................................................................19

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970) ...................................................................12, 13

*King v. Erickson*, 89 F.3d 1575 (Fed. Cir. 1996), *rev'd on other grounds sub nom.*
    *LaChance v. Erickson*, 522 U.S. 262 (1998) ...........................................................3

*Muhammad-Ali v. Final Call, Inc.*,
    832 F.3d 755 (7th Cir. 2016) ...................................................................................4

*On Davis v. The Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001) .......................................................................4, 9, 15, 16

*Pitcairn v. United States*,
    547 F.2d 1106 (Ct. Cl. 1976) ..................................................................................20

*Sygma Photo News, Inc. v. High Society Magazine*,
    778 F.2d 89 (2d Cir. 1985) .......................................................................................4

*Thoroughbred Software International, Inc. v. Dice Corp.*,
    488 F.3d 352 (6th Cir. 2007) .....................................................................9, 10, 16, 19

*Wall Data Inc. v. Los Angeles County Sheriff's Department*,
    447 F.3d 769 (9th Cir. 2006) ..............................................................................10, 16, 19

## STATUTES

28 U.S.C. § 1498(b) ......................................................................................................20

48 U.S.C. § 734 ..............................................................................................................7

48 U.S.C. § 1405q ..........................................................................................................7

48 U.S.C. § 1421n ..........................................................................................................7

48 U.S.C. § 1801 ............................................................................................................7

# INTRODUCTION

At its core, the Government's response is a plea for the Court to disregard the Federal Circuit's decision.  The Federal Circuit left no room for doubt that, "[a]s the party who breached the Flexera requirement in the implied license, *the Navy bears the burden of proving its actual usage of the BS Contact Geo software and the extent to which any of it fell within the bounds of any existing license.*"  *Bitmanagement Software GmbH v. United States*, 989 F.3d 938, 951 n.5 (Fed. Cir. 2021) (emphasis added).  And the Government ignores the Circuit's key holding—that the Navy infringed Bitmanagement's copyright to the extent that it failed to use Flexera to monitor the software upon installation—instead asking the Court to accept its absurdly low estimate of the number of copies that were *accessed*, and to disregard its widespread installation of unmonitored infringing *copies*.  The government's contention (Opp. 3-4) that a precedential Federal Circuit decision "cannot shift the burden of proof of damages to the Government" is an invitation to nullify a directly controlling appellate mandate.  The Court should reject the invitation to risk reversal on appeal, and award damages for the full value of what the Navy actually took from Bitmanagement:  600,000 copies of its software, which the Navy installed throughout its network and elsewhere, without any monitoring by Flexera.

The Federal Circuit was also crystal clear that the Navy's infringement consisted of its failure to monitor Bitmanagement's software using Flexera *upon installation* of the hundreds of thousands of copies that it made.  As the Federal Circuit explained, "the *only* feasible explanation for Bitmanagement allowing mass copying of its software, free of charge, was the use of Flexera *at the time of copying*."  *Bitmanagement*, 989 F.3d at 950.  "This condition rendered reasonable the otherwise objectively unreasonable decision of Bitmanagement to allow the Navy to make unlimited copies of its commercial product."  *Id.*  As the Federal Circuit concluded, "the Navy's failure to abide by the Flexera condition of [its implied] license renders

1

its copying of the program copyright infringement," and "*[s]uch unauthorized copying* is copyright infringement." *Id.* at 951 (emphasis added).  The Government now argues, in direct defiance of that holding, that Bitmanagement is not entitled to any damages for the vast majority of that unauthorized copying.  Instead, the Government suggests that Bitmanagement can at most recover damages for the handful of copies the Navy itself thinks *might* have been accessed based on its incomplete weblogs.  The Court should reject the Government's attempt to benefit from its own failure to monitor the software to wriggle out of a just and equitable damages award for its infringement.

The absurdly low damages figure that the Government proposes should be rejected.  As explained in Bitmanagement's opening brief, a hypothetical negotiation for the 600,000 copies the Navy made would have resulted in a final price of $259 per license, for a total of $155,400,000 in damages (600,000 × $259)—a significant discount off the list price.  The Court should enter a damages award for that amount, which reflects the value the parties would have negotiated for the massive number of copies the Navy made that were not monitored by Flexera.

## ARGUMENT

## I.  The Navy Bears The Burden Of Showing That The Extent Of Its Infringement Was Lower Than The 600,000 Copies Bitmanagement Has Proven

Realizing that it has no reliable way to determine the extent to which BS Contact Geo was either copied or accessed on either Navy or non-Navy computers, the Government now asserts that "Bitmanagement bears the burden of proof on damages," Opp. 3, despite the Federal Circuit's clear mandate that the Navy bears that burden of proving its actual usage and whether any of it was licensed.  As the Federal Circuit stated:

> As the party who breached the Flexera requirement in the implied license, the Navy bears the burden of proving its actual usage of the BS Contact Geo software and the extent to which any of it fell within the bounds of any existing license.

2

*Bitmanagement*, 989 F.3d at 951 n.5.  Thus, pursuant to the Federal Circuit's mandate, this Court should construe any uncertainty regarding the extent of the Navy's infringement in Bitmanagement's favor.

Having previously declared that it "disagrees with the panel majority's observations" regarding the burden of proof and invited the Court to simply disobey the Federal Circuit's mandate, Dkt. 139 at 13 n.7, the Government now tries a softer tack, suggesting that the Federal Circuit's statement regarding the burden of proof is "not controlling" because damages were not briefed on appeal.  Opp. 3.  But as the Federal Circuit explained in rejecting a similar attempt to deny binding weight to its opinions, "a rule announced without full briefing does not necessarily lack precedential weight."  *King v. Erickson*, 89 F.3d 1575, 1583 (Fed. Cir. 1996), *rev'd on other grounds sub nom. LaChance v. Erickson*, 522 U.S. 262 (1998).

In any event, it is irrelevant whether certain aspects of the Federal Circuit's decision *in this case* amount to controlling precedent as a general matter.  The Federal Circuit's determination that the Government bears the burden of proving the extent of infringement is binding by operation of the mandate rule.  *See Banks v. United States*, 741 F.3d 1268, 1276 (Fed. Cir. 2014) ("The mandate rule, encompassed by the broader law-of-the-case doctrine, dictates that an inferior court has no power or authority to deviate from the mandate issued by an appellate court. . . . Once a question has been considered and decided by an appellate court, the issue may not be reconsidered at any subsequent stage of the litigation, save on appeal." (internal quotation marks and citations omitted)).  This Court should not depart from the Federal Circuit's directive that the Government bears the burden of proving the extent of its infringement, and any failure by the Government to meet that burden must be held against the Government in calculating damages.

Moreover, the Federal Circuit's ruling that the Government bears the burden of proving the extent to which its use was authorized is correct as a matter of law.  The copyright infringer—not the copyright owner—bears the burden of proving the extent to which any of its copying was authorized when asserting a license defense like the Government has done here. *See Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1193 (Fed. Cir. 2004) ("[A] plaintiff only needs to show that the defendant has used her property; the burden of proving that the use was authorized falls squarely on the defendant."); *Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 760-61 (7th Cir. 2016) ("[T]he burden of proving that the copying was authorized lies with the defendant. . . . The burden is therefore on the alleged infringer to show that the use was authorized—not on the plaintiff to show it was not."); *Baisden v. I'm Ready Prods, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012).  The Federal Circuit's directive is consistent with this longstanding precedent.

Likewise, the Federal Circuit's admonition that any uncertainty regarding the extent of the Navy's infringement should be held against the Government is equally supported by law.  In the context of copyright damages, courts have repeatedly held that when the extent of infringement cannot be determined because of the infringer's actions—as happened here with the Navy's failure to enable the Flexera license management software as it was required to do—the uncertainty in calculating damages falls on the infringer.  *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 164 (2d Cir. 2001) ("Courts and commentators agree [actual damages under the Copyright Act] should be broadly construed to favor victims of infringement."); *Sygma Photo News, Inc. v. High Society Magazine*, 778 F.2d 89, 95 (2d Cir. 1985) (courts confronted with imprecision in calculating damages "should err on the side of guaranteeing the plaintiff a full recovery").

**II.     The Government Cannot Meet Its Burden Of Proving That The Navy Made Fewer Than 600,000 Infringing Copies Of BS Contact Geo**

The Government concedes that the Navy made at least 429,604 copies of BS Contact Geo on its NMCI network, but disputes Bitmanagement's conservative estimate that the Navy made 600,000 infringing copies.  Opp. 13-15.  The Navy's own records, however, indicate that it copied BS Contact Geo onto at least 600,000 computers.  While the Government quibbles that the Navy's internal deployment plan from July 2013 was only a plan, it does not dispute that it shows that the Navy intended for BS Contact Geo to be copied onto 558,466 NMCI computers.  Nor does it dispute that Navy witness Norman Vadnais conceded at trial that BS Contact Geo was in fact ultimately "deployed to all [NMCI] seats."  J025.9; 4/29/19 Tr. (Vadnais) at 1083:5-1083:7.  All seats would necessarily have included at least all 558,466 in the plan.

The Government claims that the Navy did not install BS Contact Geo on all 558,466 computers on the July 2013 deployment schedule because the schedule contained Windows XP computers, an operating system that came before Windows 7 and with which BS Contact Geo was not compatible.  Opp. 13.  But the evidence adduced at trial shows that the Navy upgraded its NMCI Windows XP computers to Windows 7, which *was* compatible with BS Contact Geo, meaning that all 558,466 computers on the July 2013 deployment schedule would have received copies of BS Contact Geo.  *See* 4/29/19 Tr. (Vadnais) at 1093:12-20, 1118:23-1119:1.  The Government argues that it provided Bitmanagement with verified information four years ago that it made only 429,604 installations of BS Contact Geo on the NMCI.  *See* Opp. 14; P010.6-9.  But Mr. Vadnais acknowledged at trial that these after-the-fact records of NMCI installations may have undercounted the total number of copies of BS Contact Geo actually made by the Navy, and that the 429,604 figure was based only on the number of installations he was able to find on the NMCI.  4/29/19 Tr. (Vadnais) at 1113:17-1114:3.  Given this uncertainty, the issue should be

resolved against the Government and the Court should find that the evidence establishes that BS Contact Geo was copied onto 558,466 NMCI computers.

In addition, Navy documents show that 40,000 additional computers were added to the 558,466 NMCI computers between July 2013 and July 2016.  Mr. Vadnais testified that BS Contact Geo would have been copied onto these new computers as they were added to the NMCI network.  P010; 4/29/19 Tr. (Vadnais) at 1108:17-22.  The Navy claims that these 40,000 new computers are already incorporated into the count of 429,604 copies of BS Contact Geo it concedes were made.  Opp. at 14.  But it cites no evidence for this supposition beyond its self-serving interpretation of its own interrogatory response.  *Id.* (citing P010.8).  Moreover, Mr. Vadnais subsequently clarified at trial that BS Contact Geo was copied onto computers added to the NMCI network from July 2013 to July 2016.  4/29/19 Tr. (Vadnais) at 1108:17-22.  This concession should be given substantially greater weight than attorney argument offered by the Government based on its own interrogatory response.

Adding the 40,000 computers to the 558,466 NMCI computers reflected in the installation plan brings the estimated number of installations to nearly 600,000 before any consideration of the installations on ONE-Net and outside the Navy.  However, the evidence also establishes that the Navy copied BS Contact Geo onto its 28,000-computer ONE-Net network, as well as computers outside the Navy's networks.  As Government witnesses acknowledged, the Navy has no idea how many additional copies were made on ONE-Net or beyond.  4/29/19 Tr. (Vadnais) at 1117:25-1118:4; 4/26/19 Tr. (Chambers) at 885:2-10.

The Government asserts that the 28,000 copies of BS Contact Geo made to ONE-Net computers should not be counted because the installations were extraterritorial.  Opp. 14-15.  But this is both beside the point and wrong.  First, the 28,000 copies made to ONE-Net are additional

to Bitmanagement's calculation that the Navy made at least 600,000 infringing copies of BS

Contact Geo.  The point is that the 600,000 copies is a *conservative* estimate of the total number

of copies made because the Navy made copies beyond this number on ONE-Net.  Second, this

Court found that ONE-Net comprises the Navy's computer network outside the *continental*

United States.  *Bitmanagement Software GmbH v. United States*, 144 Fed. Cl. 646, 649 n.5

(2019) ("ONE-NET, for all intents and purposes, is a separate network which is quite simply an

NMCI [for] the outside continental United States.").  As a result, ONE-Net includes computers

that, though not within the continental United States, are located within U.S. territories, which

*are* covered by United States copyright law.  *See* 4/26/19 Tr. (Chambers) at 849:3-6; 4/29/19 Tr.

(Vadnais) at 1079:11-25, 1114:13-25; 48 U.S.C. §§ 734, 1405q, 1421n, 1801 (copyright

infringement occurring in United States territories outside the continental United States is not

"extraterritorial").  The government says that BS Contact Geo was installed on 21 ONE-Net

computers in August 2016 which were based in the European Union and the Far East, but that

cannot account for the remaining 27,979 in ONE-Net.  Opp. 14-15.  Beyond the 21, the

Government has no idea how many and which ONE-Net computers received copies of BS

Contact Geo.  Therefore, any uncertainty about whether copying BS Contact Geo onto ONE-Net

computers occurred outside U.S. territories must be resolved in favor of Bitmanagement.

The Government also faults Bitmanagement for not pointing to evidence detailing the

extent of the distribution of copies of BS Contact Geo outside of the Navy.  Opp. 15.  But this

too is on top of the 600,000 installations discussed above.  Moreover, the lack of evidence is the

Navy's doing, not Bitmanagement's.  Government witnesses acknowledged that they did not

know the extent of the distribution of any copies of BS Contact Geo outside of the Navy, *see*

4/26/19 Tr. (Chambers) at 874:11-22; 4/29/19 Tr. (Vadnais) at 1117:25-1118:4, and the Navy's

failure to keep records of BS Contact Geo installations means that the extent of this copying outside of the Navy is unclear.  Again, the point is that the 600,000 figure is a conservative estimate because it does not include distribution of copies outside of the Navy.

The Government also attempts to refute Bitmanagement's conservative 600,000 copies estimate by seizing on Mr. Graff's testimony that he did not know how many copies of BS Contact Geo the Navy actually made.  Opp. 13.  But Mr. Graff cannot be expected to know how many copies the Navy made when the Navy itself does not know either: the whole problem is that the Navy failed to keep adequate records.  By faulting Mr. Graff for what the Navy itself does not know, the government improperly seeks to shirk its burden to prove any authorized use, contrary to the Federal Circuit's directive.  Since the Navy failed to keep reliable records of its installations, any uncertainty must be resolved in favor of Bitmanagement.  In sum, nothing the Government has presented proves that the Navy made only 429,604 copies of BS Contact Geo; rather, the evidence overwhelmingly establishes that the Navy made at least 600,000 copies.

III.   **In A Hypothetical Negotiation, Bitmanagement Is Entitled To Damages Covering Every Infringing Copy Made By The Navy**

The Government argues that the infringing use is not the number of unauthorized copies made by the Navy, but the number of copies *accessed* by Navy personnel.  This flies in the face of Federal Circuit precedent and its opinion in this case, under which the value of each infringing *copy* of BS Contact Geo must be assessed based on a reconstructed hypothetical negotiation between the parties.  *Bitmanagement*, 989 F.3d at 951 n.5 (citing *Gaylord v. United States*, 678 F.3d 1339, 1343 (Fed. Cir. 2012)).

A.      **Bitmanagement's Damages Should Not Be Limited to Only the Copies of BS Contact Geo That the Navy Claims Were Accessed**

Consistent with copyright law and the Federal Circuit's directive, Bitmanagement bases its damages calculation on a hypothetical negotiation over what the Navy *actually took* from

Bitmanagement—i.e., the Navy's "actual" infringing use—which here amounts to the Navy's installation of at least 600,000 fully functional copies of the BS Contact Geo plugin without Flexera license management software.  *See Bitmanagement*, 989 F.3d at 951 n.5 ("[T]he proper measure of damages shall be determined by the Navy's *actual usage of BS Contact Geo* in excess of the limited usage contemplated by the parties' implied license." (emphasis added)); *see also Gaylord*, 678 F.3d at 1343 ("[T]he court's task is to determine the reasonable license fee on which a willing buyer and willing seller would have agreed for *the use taken by the infringer*." (emphasis added)); *On Davis*, 246 F.3d at 172 (actual damages are the "fair market value of a license *covering the defendant's infringing use*" (emphasis added)).  As the Federal Circuit concluded, "the Navy's failure to abide by the Flexera condition of [its implied] license renders its *copying* of the program copyright infringement," and "[s]uch unauthorized *copying* is copyright infringement."  *Id.* at 951 n.5. (emphasis added).

The Government's cramped interpretation of "use" ignores the many hundreds of thousands of copies that were copied onto Navy computers and *available* for use.  Yet it also expressly concedes that actual "use" includes *both* those copies accessed *and those downloaded and available for use*:  (1) "Installed Copies Actually Used to Access SPIDERS 3D"; and (2) "Installed Copies Available for Use."  Opp. 17.  But the Government suggests that in a hypothetical negotiation, the Navy would rely on hindsight to purchase a license that only covers the relatively small number of BS Contact Geo copies the government now asserts were *actually accessed*, rather than the 600,000 copies the Navy *actually installed*.  *See id.* at 18-20.

The Government's argument is contrary to the law and this Court's prior rulings.  Damages for infringed copyrighted software must be based on a license that covers the fair market value of *each unauthorized copy* made.  *See Thoroughbred Software Int'l, Inc. v. Dice*

*Corp.*, 488 F.3d 352, 359 (6th Cir. 2007) (software infringer "is liable for the unpaid license fees for all the unauthorized copies it made, regardless of whether these copies were accessible to or used by" the defendant); *Wall Data Inc. v. L.A. Cty. Sheriff's Dep't*, 447 F.3d 769, 787 (9th Cir. 2006).  The Government's argument ignores the value it gained by having BS Contact Geo available on every computer.

Since a condition of the implied-in-fact license was that the copies of BS Contact Geo be monitored by Flexera, but none was, every copy made by the Government was an infringing copy.  As the Federal Circuit explained, "the *only* feasible explanation for Bitmanagement allowing mass copying of its software, free of charge, was the use of Flexera *at the time of copying*."  *Bitmanagement*, 989 F.3d at 951 n.5.  "This condition rendered reasonable the otherwise objectively unreasonable decision of Bitmanagement to allow the Navy to make unlimited copies of its commercial product."  *Id.*  The Federal Circuit concluded that by not enabling Flexera, the Navy's "unauthorized copying is copyright infringement."  *Id.*

The Government now argues, in direct defiance of the Federal Circuit's holdings, that Bitmanagement is not entitled to any damages for the vast majority of that unauthorized copying. Instead, the Government suggests that Bitmanagement can at most recover damages for the handful of copies the Navy itself thinks *might* have been accessed based on its incomplete weblogs.  The Court should reject the government's attempt to benefit from the Navy's own failure to monitor the software in order to escape a just and equitable damages award.  This includes both the actually accessed copies and the "available for use" copies.  The Flexera condition was not met for either category.  Thus, no copy "fell within the bounds of any existing license," as the Federal Circuit instructed the Court to determine.  *Id.* at 951 n.5.

Moreover, this Court has already decided that actual damages are determined by "the fair

market value of a license covering defendant's use—*the use in this case being the number of unauthorized copies made by the government*."  Dkt. 80 at 4-5 (emphasis added).  Accordingly, the Court should reject the Government's position that the hypothetical negotiation does not require a license covering all 600,000 infringing copies of BS Contact Geo made by the Navy.

### B.    The Navy's Records Fail to Provide an Accurate Accounting of Its Access of BS Contact Geo

Even if the Navy were only required to pay for the copies of BS Contact Geo that it accessed, the Navy cannot provide an accurate accounting even of that.  The Navy's failure to use Flexera means that it does not know the number of copies of BS Contact Geo that were accessed.  The only figure related to BS Contact Geo access that the Government can point to is the number of people who accessed its SPIDERS 3D program from August 30, 2014 to September 2, 2016, but that was only one way of using BS Contact Geo.  These SPIDERS 3D weblogs are a woefully inaccurate proxy for BS Contact Geo usage.

First, the weblogs are missing a year's worth of data, equal to one-third of the entire period that BS Contact Geo was in use.  The weblogs did not begin recording SPIDERS 3D usage until August 30, 2014, *more than a year* after the Navy began mass deploying BS Contact Geo, thus omitting entirely the period starting from the mass deployment of BS Contact Geo in July 2013 through August 2014.  J035.1-51.  Given the likely strong interest in BS Contact Geo after its initial installation, the missing first year may have been the heaviest use of SPIDERS 3D.  In any event, the Government offers no record evidence or anything other than attorney argument to conclude that extrapolating from the limited logs that do exist is statistically sound when 33 percent of the data is missing.

Second, the SPIDERS 3D weblogs do not capture any use of BS Contact Geo to view three-dimensional data outside of the SPIDERS 3D platform.  When the Navy installed BS

Contact Geo onto its computers, the software became the default viewer for three-dimensional, or "X3D files," so that when users opened a X3D file it would automatically launch BS Contact Geo to render and view that file.  P017.  This occurred even when the viewer was viewing data from outside of SPIDERS 3D.  While the weblogs recorded the use of the BS Contact Geo plugin (OCX version), they did *not* record use of the desktop (EXE) format.  *See* P010.  This means that the Navy has no record of usage of BS Contact Geo to view three-dimensional data outside of the SPIDERS 3D platform, a point the Navy does not dispute.  The Navy's failure to use Flexera makes it impossible to know the extent of this use beyond SPIDERS 3D.

Thus, while the Government strives mightily to extrapolate from the SPIDERS 3D weblogs, those logs are unreliable and reliance on them does not satisfy the Government's burden.  The logs neither cover the time period at issue nor cover all of the usage by its viewers.  Any doubt about this should be resolved in favor of Bitmanagement.

## IV.   The Navy's Patent-Law "Objective Factors" Play No Role In The Hypothetical Reconstructed Negotiation

As it has before, Dkt. 139 at 21, the Government erroneously cites patent case law to suggest irrelevant considerations for determining what would have occurred during a hypothetical negotiation.  The Government suggests that the factors considered in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), are relevant to determining damages here, yet is forced to concede that the Federal Circuit has only endorsed those factors in the patent context and cites no case law applying those factors in a copyright case.  *See* Opp. 6.

Moreover, the full list of those factors makes clear their inapplicability to a copyright-damages determination such as the one before the Court.  It includes such factors as "the anticipated amount of profits that the prospective licensor reasonably thinks he would lose as a

result of licensing the patent as compared to the anticipated royalty income" and "the anticipated amount of net profits that the prospective licensee reasonably thinks he will make." *Georgia-Pacific Corp.*, 318 F. Supp. at 1121.  Of course, unlike a patent licensor, Bitmanagement was not deciding between earning a royalty by licensing its intellectual property to the Navy as compared to earning profits from using the software itself.  Nor did the Navy expect to earn profits from its licensure of the software.  As this Court has previously noted, "[i]t is important not to confuse an infringement of copyright case with an infringement of patent case."  Dkt. 80 at 5.

The Government nonetheless seizes on one of these inapplicable *Georgia-Pacific* factors—the parties' "relative bargaining strength"—to argue that the Court should limit its damages determination because, supposedly, Bitmanagement was a small company in "poor financial condition" that would have been willing to accept whatever meager license fee it was offered for its undesirable product, whereas the Navy had no special need for BS Contact Geo, faced "significant financial pressure" that would have prevented it from paying much for the software, and "had other options" for purchasing X3D-rendering software.  Opp. 7-8.  In addition to being irrelevant, those assertions are contradicted by the evidence adduced at trial.

The Government has never identified any situation in which Bitmanagement's size or financial condition ever played a role in the parties' real-world negotiations.  Bitmanagement was a small company in 2012-2015, yet the Navy agreed to pay $305-$370 for each copy of its software—prices that Mr. Viana testified were "fair and reasonable."  4/29/19 Tr. (Viana) at 1035:15-20, 1038:3-6.  Moreover, the Government identifies no case where a party's small size has been used to decrease its "actual damages" for copyright infringement, and Bitmanagement has found no precedent in the copyright context allowing Bitmanagement's small size to be

13

considered.  Allowing size to decrease actual damages would establish a perverse incentive for large infringers to take advantage of small victims and pay minimal damages.

Even if the Court were to accept that *Gaylord* applies, to the extent that the Government suggests that financial pressure on the Navy and budgetary constraints would have prevented it from agreeing to something more than a miniscule license fee, Opp. 7, that argument fails as a matter of law.  *Gaylord*, 678 F.3d at 1343 ("Defendants cannot insulate themselves from paying for the damages they caused by . . . creating internal 'policies' that shield them from paying fair market value for what they took."); *Davidson v. United States*, 138 Fed. Cl. 159, 180 (2018) ("Having infringed the copyright billions of times, defendant cannot now shield itself from liability by claiming that it would have walked away from the deal.").

Finally, the Government claims that the Navy had "other options" to fulfill the function performed by BS Contact Geo.  Opp. 8.  But this is revisionist history.  The Navy certified in multiple "sole source" requests that it required BS Contact Geo and that there was no alternative available.  P184.2-3; J016.70; *see also* Stip. ¶¶ 28, 32.  As Bitmanagement previously explained, Br. 9-10, the Navy officially determined in April 2012 that BS Contact Geo was the "only source" of software that could satisfy its needs because "no other similar software is available." J016.70.  The Navy made the same determination again in 2015.  P184.2.  Indeed, even now, the Government concedes that the Navy's other option, a government-owned viewer, "was not robust enough at that time" of the hypothetical negotiation.  Opp. 8.

The Government's only response is to point to a free, open-source rendering software called X3DOM—for which it relies on a presentation dated nearly a year after the hypothetical negotiation.  *See id.*  That presentation only confirms that X3DOM was no substitute for BS Contact Geo.   It explains that BS Contact (the less-sophisticated predecessor to BS Contact Geo)

14

was capable of rendering frames at nearly *100 times* the rate per second of X3DOM. *See id.* (citing D131.47). That hardly establishes that X3DOM was a viable alternative to BS Contact—let alone the much more advanced BS Contact Geo that is at the heart of the case. And of course, the Navy chose to download 600,000 copies of BS Contact Geo, not the inferior X3DOM. The fact that the Navy had no real alternative to BS Contact Geo explains why it deemed BS Contact GEO a "critical component" that it "required," P184.2-3—and means that Bitmanagement would have had a significant advantage as a sole-source supplier in negotiating with the Navy.

## V. The Government Cannot Rely On License Types That Bitmanagement Would Not Have Offered For The Navy's Infringing Use

As explained above, the Government separates the Navy's 600,000 infringing copies into two categories—copies that accessed SPIDERS 3D and copies available for use. To avoid the Federal Circuit's ruling that every BS Contact Geo copy made by the Navy was infringing, see *Bitmanagement*, 989 F.3d at 951, the Government essentially airbrushes the "available for use" category out of the case by claiming that Bitmanagement would have agreed to a website license or "mixed" license grounded in the number of copies that were accessed. *See* Opp. 17-20. That suggestion would result in the Navy not paying for the unrestricted copies that were actually installed and available for use but may not have been accessed. It is also foreclosed by the Federal Circuit's decision for the simple reason that none of the "available for use" copies "fell within the bounds of any existing license." None of them was monitored by Flexera, and thus every BS Contact Geo copy installed by the Navy was an infringing copy regardless of whether it was accessed. *Bitmanagement*, 989 F.3d at 951 n.5. The hypothetical negotiation must result in a real-world license that covers a defendant's entire "infringing use"—not a make-believe license grounded in covering a limited subset of the infringing use. *See On Davis*, 246 F.3d at 164-172; *Gaylord*, 678 F.3d at 1343 (citing *On Davis*).

Indeed, courts that have considered this issue have squarely rejected the Government's position that copyright damages for software infringement should be calculated based on whether infringing copies were actually accessed. *See Wall Data*, 447 F.3d at 787 (rejecting notion that damages award should account for fact that "not all of the copies of [software] were actually used"); *Thoroughbred Software*, 488 F.3d at 358-360, 362-363 (defendant liable "for the unpaid license fees or all the unauthorized copies it made, regardless of whether these copies were accessible to or used"). Thus, the hypothetical negotiation must result in the Navy's purchase of BS Contact Geo PC licenses,[1] not a website or mixed license as the Government suggests.

## A.      Only PC Licenses—And Not a Website License—Would Cover the Navy's Infringing Use

As Bitmanagement has explained, only a PC license—and no other license type—would have covered the 600,000 unrestricted copies of BS Contact Geo made by the Navy. That is because only a PC license covers the installation of an unrestricted copy of BS Contact Geo onto an individual computer. *See* Br. 11; Dkt. 138 at 23-26; Dkt. 141 at 14-17.

The Government wrongly suggests that Bitmanagement would have agreed to a "website" license in the hypothetical negotiation. Opp. 18. This claim ignores a simple reality: because a website license would not have covered the Navy's infringing use, it cannot underlie the hypothetical negotiation. *See On Davis*, 246 F.3d at 172 ("[The Copyright Act] permits a copyright owner to recover actual damages . . . for the fair market value of a license *covering the defendant's infringing use*." (emphasis added)); *Gaylord*, 678 F.3d at 1344 (directing trial court to "determine the fair market value of a license for the *full scope of the [defendant's] infringing*

---

[1] The Government also incorrectly insinuates that Bitmanagement seeks "to recover *the cost of a seat license for each installation*." Opp. 15 (emphasis added). Bitmanagement's proposed hypothetical negotiation is not premised on the "cost of a seat license," but rather factors in a significant 75% volume discount from the BS Contact Geo list price. *See* Br. 1-2.

*use*" (emphasis added)).  A website license would not cover the Navy's infringing use because website licenses are content-restricted—meaning only certain content hosted on a particular website is viewable—whereas the 600,000 infringing copies of BS Contact Geo made by the Navy were unrestricted and able to view any and all X3D content regardless of its location.  Br. 11; 4/22/19 Tr. (Schickel) at 100:20-101:13, 130:24-131:2, 160:3-13; 4/24/19 Tr. (Graff) at 515:6-516:4; P257 ¶ 44.  Further, the Navy affirmatively installed unrestricted copies of BS Contact Geo onto its computers, whereas a website license requires individual users to download the software independently.  4/22/19 Tr. (Schickel) at 99:3-25 (testifying that with a website license, software is "not automatically installed on many computers . . . [installations occur] only on a case-by-case basis, people sporadically install it, and this means that only a few installations in the end happen").  The Navy, however, wanted fully functionable, unrestricted copies of BS Contact Geo pre-installed and ready-to-go on its computers.  As one Navy employee stated: "[BS Contact Geo] is required to be deployed Navy wide in order to effectively and efficiently utilize the [SPIDERS] 3D tool on an ad hoc basis across the broadest spectrum" of users.  P161.1.

In addition, the Government wrongly claims that the "Navy was only interested in using BS Contact Geo for SPIDERS 3D."  Opp. 19.  That is the opposite of what the evidence showed. The Navy both wanted to use BS Contact Geo beyond SPIDERS 3D, *see* J021, and had several X3D repositories outside SPIDERS 3D (in addition to external X3D repositories) with content users could view through BS Contact Geo.  *See* Stip. ¶ 15; 4/26/19 Tr. (Chambers) at 892:21-893:6; 4/29/19 Tr. (Brutzman) at 1182:6-1184:3.  And although the Government now claims that Bitmanagement's "conjecture" about the Navy's reliance on BS Contact Geo to view X3D content outside SPIDERS 3D is "largely irrelevant," Opp. 19, Bitmanagement (and the Court) are only left to guess at the Navy's usage of BS Contact Geo outside SPIDERS 3D because of

the Navy's own failure to track usage.  Once again, the uncertainty about the extent of

infringement must be held against the Government pursuant to the Federal Circuit's mandate.

*See Bitmanagement*, 989 F.3d at 951 n.5.

      **B.**      **Bitmanagement Never Offered "Mixed" or "Simultaneous-Use" Licenses**

      The Government also incorrectly suggests that, as an alternative to a website license,

Bitmanagement would have agreed to a "mixed" license combining a website license with

multiple "simultaneous-use" licenses.  Opp. 16, 20.  The Government's proposed mixed license

would consist of 100 "simultaneous-use" licenses to cover BS Contact Geo copies "actively-used

for SPIDERS 3D" plus a website license covering every other BS Contact Geo copy installed

onto Navy computers.  *Id.* at 25-26.  This argument also fails.

      *First*, Bitmanagement never sold "simultaneous-use" licenses or "mixed" licenses, so

they cannot form the basis for the hypothetical negotiation.  "Simultaneous-use" licenses appear

to be a made-for-litigation variant of "concurrent-use" licenses,[2] which Bitmanagement never

sold, nor could it have given technological restrictions in the BS Contact Geo software.  Dkt. 138

at 25. Separately, the Government has offered no record evidence—nor is there any—that

Bitmanagement ever sold (or even considered selling) "mixed" licenses that combined two or

more license types.  The hypothetical negotiation must be based on what a willing seller would

realistically offer, not on a fantasy negotiation that the Government dreamt up after unilaterally

appropriating 600,000 infringing software copies; in the words of the Government, the latter

---

[2] The Government describes "simultaneous-use" licenses as "floating" licenses that would limit
the number of "simultaneous users of BS Contact Geo."  Opp. 9 n.5.  A "concurrent" license
permits a set number of simultaneous users.  P203.2; 4/26/19 Tr. (Viana) at 963:17-24, 964:5-9;
P257 ¶ 51.  There is no evidence in the record regarding "simultaneous-use" licenses, and at trial,
Government counsel suggested that simultaneous licenses were equivalent to concurrent
licenses, to which Mr. Schickel testified:  "I don't know what a simultaneous license should be.
I've never heard this word."  4/22/19 Tr. (Schickel) at 152:11-153:16.

would result in unfair "capitulation" by Bitmanagement.  *See* Opp. 15.

*Second*, the Government identifies no copyright infringement case finding a mixed license in the context of computer software.  Instead, the two cases the Government cites—*Gaylord* and *Davidson*—involve the unauthorized use of copyrighted artwork on postage stamps sold to the public, a different situation than the Navy installing 600,000 infringing copies of software on its computers for its own benefit.  *See Gaylord*, 678 F.3d at 1341; *Davidson*, 138 Fed. Cl. at 161.  But as discussed, courts have rejected imposing different copyright damages depending on whether infringing copies were accessed or available for use.  *Wall Data*, 447 F.3d at 787; *Thoroughbred*, 488 F.3d at 358-360, 362-363.

In any event, the two cases the Government cites in support of a mixed license are inapposite.  In *Gaylord*, the Federal Circuit merely observed that different license fees might be appropriate for different categories of stamp sales—e.g., stamps used to send mail, stamps sold to collectors, and commercial merchandise featuring images of stamps, *see* 678 F.3d at 1344—but the trial court ultimately determined that the *same* license fee was appropriate for the different types of stamp sales.  *Gaylord v. United States*, 112 Fed. Cl. 539, 542-543 (2013), *aff'd*, 777 F.3d 1363 (Fed. Cir. 2015).  Here, unlike *Gaylord*, there is just one category of infringement and it occurred when the Navy downloaded the 600,000 copies without a fully functioning Flexera.  As the Federal Circuit concluded, "the Navy's failure to abide by the Flexera condition of [its implied] license renders its copying of the program copyright infringement," and "*[s]uch unauthorized copying* is copyright infringement."  *Bitmanagement*, 989 F.3d at 951 (emphasis added).

The other case cited by the Government in support of a mixed license, *Davidson*, is easily distinguishable on the facts.  The plaintiff in *Davidson*—a sculptor—had never previously

licensed his copyrighted artwork, so the Court was left to "craft a remedy" without guidance from the plaintiff's commercial licensing practices, ultimately deciding that different license fees were appropriate for stamps used to send mail and stamps sold to collectors based on the Postal Service's past practices for licensing stamps.  *See Davidson*, 138 Fed. Cl. at 169, 178-180. Bitmanagement, on the other hand, has commercialized its software through the sale of specific software license types, and has sold BS Contact Geo PC licenses to the Navy on several occasions.  Br. 6-7; J027.1.  Unlike *Davidson*, the Court here has guidance on the type of licenses Bitmanagement would have been willing to offer to the Navy—namely, PC licenses.[3]

## VI.  Bitmanagement Is Entitled to Pre-Judgment and Post-Judgment Interest

The Government concedes that Bitmanagement is entitled to pre-judgment and post-judgment interest as part of delay compensation under 28 U.S.C. § 1498(b) and that such interest should be calculated from July 18, 2013 until the date of payment of the Court's judgment using "a 52-week United States Treasury rate compounded annually."  *See* Opp. 31-32; Stip. ¶ 101; *Pitcairn v. United States*, 547 F.2d 1106, 1120 (Ct. Cl. 1976).

## CONCLUSION

As explained above and in Bitmanagement's Brief Regarding Damages Calculation, Dkt. 146, the Court should award Bitmanagement actual damages of $155,400,000 plus pre-judgment and post-judgment interest.

---

[3] Faced with the unrebutted expert testimony of George Graff on damages, the Government also tries—for the third time—to discount Mr. Graff's opinions as unreliable and argue that his analysis should be given little weight because of his purportedly "improper" damages analysis. Opp. 26-31.  Prior to trial the Court ruled that Mr. Graff was "qualified to testify on the issue of damages" because his "experience as an arbitrator and mediator in intellectual property matters qualify him to perform the hypothetical negotiations required in calculating infringement damages."  Dkt. 81 at 5.  Then at trial, the Court rejected another request to exclude Mr. Graff's testimony, 4/24/19 Tr. (Graff) at 385:9-398:16.  It also overruled various objections to superficial inconsistencies within his testimony.  4/24/19 Tr. (Graff) at 429:5-443:5.

Dated: August 13, 2021   Respectfully submitted,

        /s/ *Brent J. Gurney*_____
        Brent J. Gurney
        *Counsel of Record*
        Wilmer Cutler Pickering Hale and Dorr LLP
        1875 Pennsylvania Ave., N.W.
        Washington, D.C. 20006
        Telephone:  (202) 663-6000
        Facsimile:  (202) 663-6363
        Email:  brent.gurney@wilmerhale.com

        *Of Counsel*
        Leon T. Kenworthy
        Jamie Yood
        Michael Carpenter
        Wilmer Cutler Pickering Hale and Dorr LLP
        1875 Pennsylvania Ave., N.W.
        Washington, D.C. 20006
        Telephone:  (202) 663-6000
        Facsimile:  (202) 663-6363
        Email:  leon.kenworthy@wilmerhale.com
          jamie.yood@wilmerhale.com
          michael.carpenter@wilmerhale.com

        *Counsel for Bitmanagement Software GmbH*