IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BITMANAGEMENT SOFTWARE GMBH, | **REDACTED VERSION** |
| Plaintiff, | |
| v. | No. 16-840 C |
| THE UNITED STATES, | Senior Judge Edward J. Damich |
| Defendant. | |

**DEFENDANT'S SECOND SUPPLEMENTAL BRIEF ON DAMAGES**

Of Counsel:
PATRICK C. HOLVEY
Department of Justice

JENNIFER S. BOWMAR
ANDREW P. ZAGER
Department of the Navy

October 1, 2021

SARAH HARRINGTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

SCOTT BOLDEN
Deputy Director
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC  20530
Email:	Scott.Bolden@USDOJ.gov
Telephone:	(202) 307-0262
Facsimile:	(202) 307-0345

*Attorneys for Defendant the United States*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ......................................................................................................................... 1

    I.      The Proper Royalty Base Comprises the Total Number of Infringing Copies (429,567) and How the Navy Used Those Copies ..................................... 2

          A.     The Government is Liable for Each Unlicensed Copy Deployed in the United States ............................................................................................ 2

          B.     The Navy Made 429,567 Infringing Copies ................................................. 3

          C.     Bitmanagement Improperly Inflates the Number of Infringing Copies ............................................................................................................ 4

          D.     The Proper Royalty Base Contemplates the Navy's Actual Use ................ 4

    II.     Gaylord Provides the Framework for Determining Fair Market Value ................. 6

    III.    Bitmanagement's Royalty Calculations are Unjustified ....................................... 10

# TABLE OF AUTHORITIES

**Cases**

Bitmanagement Software GmbH v. United States,
   144 Fed. Cl. 646 (2019) ............................................................................................ *passim*

Bitmanagement Software GmbH v. United States,
   989 F.3d 938 (Fed. Cir. 2021) .................................................................................. *passim*

Davidson v. United States,
   138 Fed. Cl. 159 (2018) ..................................................................................................... 10

Gaylord v. United States,
   678 F.3d 1339 (Fed. Cir. 2012) ................................................................................ *passim*

Gaylord v. United States,
   777 F.3d 1363 (Fed. Cir. 2015) ................................................................................ *passim*

Jarvis v. K2 Inc.,
   486 F.3d 526 (9th Cir. 2007) ............................................................................................. 8

Leonardo v. United States,
   55 Fed. Cl. 344 (2003) ....................................................................................................... 4

On Davis v. The Gap, Inc.,
   246 F.3d 152 (2d Cir. 2001) .............................................................................................. 8

Oracle Corp. v. SAP AG,
   765 F.3d 1081 (9th Cir. 2014) .......................................................................................... 8

Zoltek Corp. v. United States,
   672 F.3d 1309 (Fed. Cir. 2012) ........................................................................................ 4

**Statutes**

28 U.S.C. § 1498 .................................................................................................................. 4, 7

**INTRODUCTION**

Pursuant to the Court's Order dated September 7, 2021, see ECF 152, Defendant the United States ("the Government") respectfully submits its second supplemental brief on damages, applying the Court's guidance. As explained below, the principles identified in Gaylord v. United States, 678 F.3d 1339 (Fed. Cir. 2012) ("Gaylord II") and Gaylord v. United States, 777 F.3d 1363 (Fed. Cir. 2015) ("Gaylord III") strongly support the Government's approach to compensation. See infra; ECF 148 (itemizing the Government's calculations).

**ARGUMENT**

Plaintiff Bitmanagement Software GmbH ("Bitmanagement") cannot support its $155,400,000 claim for compensation. The Government established that the Navy made 429,567 infringing copies of BS Contact Geo through unrebutted record evidence and lay witness testimony.[1] In response, Bitmanagement offers only speculation and mischaracterization.

In addition, the Court must examine **how** the Navy actually used the infringing copies. The evidence shows that the Navy actually used 650 – 1,800 copies to access SPIDERS 3D, with the remainder simply available for use. The parties would have contemplated a royalty based on: 429,567 copies, 650 unique users, and 100 additional simultaneous-use licenses.

Finally, Bitmanagement's premise that it is automatically entitled to a running royalty for each copy is fundamentally at odds with Gaylord II and Gaylord III. See also Bitmanagement Software GmbH v. United States, 989 F.3d 938, 951 n.5 (Fed. Cir. 2021) ("Bit II"). Those cases require that the Court consider the Navy's actual use, and construct a hypothetical negotiation with objective evidence to determine the fair market value of a license covering that use.

---

[1] Based on the observations of the Federal Circuit panel majority, the Court concluded that "[t]he government bears the burden to prove the number of unauthorized copies." ECF 152 at 4. The Government respectfully disagrees that it bears this particular burden, see ECF 148 at 8-9; nevertheless, the Government has followed the Court's instruction in this Brief.

-1-

I.  **THE PROPER ROYALTY BASE COMPRISES THE TOTAL NUMBER OF INFRINGING COPIES (429,567) AND HOW THE NAVY USED THOSE COPIES**

   A.  **The Government is Liable for Each Unlicensed Copy Deployed in the United States**

The Government is liable for each unlicensed copy of BS Contact Geo deployed by the Navy in the United States. In its Order, the Court instructed the parties to address the distinction between the Navy's use of BS Contact Geo's desktop executable file (EXE) and web browser plugin file (OCX). See ECF 152 at 3-4. The record illuminates the distinction, but the law of the case renders the distinction irrelevant:

*Each deployed copy of BS Contact Geo included one EXE file and one OCX file.* See Bitmanagement Software GmbH v. United States, 144 Fed. Cl. 646, 648 (2019) ("Bit I") (finding that the software included one of each file) (citing Stip. ¶ 18); see also Bit II at 951 (acknowledging finding); Stip. ¶ 80 (same).

*All of the installed EXE files were managed by Flexera.* See Tr. 1048:10-52:17 (McCarns); D123.1-5 (usage reports for the EXE file); Tr. 853:3-17 (Chambers) (disabling of reporting tool did not affect license management); Tr. 939:10-15 (Viana) (same).

*None of the installed OCX files were managed by Flexera.* See Stip. ¶ 95; Bit II at 951; ECF 152 ("no copies of the OCX file were authorized").

*The Federal Circuit held that the EXE/OCX distinction is irrelevant.* The appellate court held that the distinction between EXE files and OCX files was "of no moment to the [infringement] analysis" because the condition of the implied license "could not have been met by monitoring only *half* of each copy." Bit II at 951 (emphasis in original). Thus, even though Flexera managed all of the installed EXE files, the Government is liable for each unlicensed copy of BS Contact Geo 8.001 deployed by the Navy in the United States.

-2-

B. **The Navy Made 429,567 Infringing Copies**

Based on the Federal Circuit's decision and the trial record, the Navy made 429,567 infringing copies of BS Contact Geo 8.001. The Court should determine the number of infringing copies by first assessing the total number of copies made by the Navy, and then subtracting all licensed and extraterritorial copies, as summarized in the Table below:

| Source | Proven Copies | Record Citations | Infringement Defense | Infringing Copies |
|---|---|---|---|---|
| NMCI Original Deployment | 429,604 | P010.8; Tr. 884:10-13 (Chambers); Tr. 1110:9-14:3 (Vadnais) | License (38 computers) | 429,566 |
| NMCI Re-Deployment | 34 | P010.8 | License (38 computers) | 0 |
| ONE-Net Individual Deployments | 21 | P010.8-9 | Extraterritorial (all computers) | 0 |
| Distribution to SPIDERS 3D Contractor | 1 | Tr. 941:22-43:4 (Viana) | None | 1 |
| Total | | | | **429,567** |

**Table 1. The Number of Infringing Copies.**

***Proven copies.*** The Government established the total number of copies made at trial. The Navy made 429,604 copies of BS Contact Geo 8.001 on NMCI computers before the Navy uninstalled the software in September 2016. See P010.6-9; see also P010.19 (verifying); Tr. 1110:9-14:3 (Vadnais) (same); Tr. 884:10-13 (Chambers). The Navy "subsequently reinstalled the software on 34 seats." Bit I at 654 (citing P010.8). Apart from the NMCI network, the Navy also made the software available for installation to users on its extraterritorial ONE-Net network, and the software was installed on 21 ONE-Net computers in August 2016. See P010.8-9; Stip. ¶ 86. Finally, the Navy's primary point of contact for the development of SPIDERS 3D testified that he distributed one (1) copy to a SPIDERS 3D contractor. See Tr. 941:22-43:4 (Viana).

***Licensed copies.*** The law of the case establishes that Bitmanagement licensed the Government to use BS Contact Geo on 38 computers. After trial, the Court held that "the Navy

-3-

still had 38 licenses [and] had authorization to use BS Contact Geo version 8.001 on 38 computers." Bit I at 658 n.10; see Bit II at 951 n.4 (affirming as uncontested).

*Extraterritorial copies.* Finally, all of the identified ONE-Net deployments were extraterritorial, and thus, jurisdictionally barred. See 28 U.S.C. § 1498(c); Zoltek Corp. v. United States, 672 F.3d 1309, 1326 (Fed. Cir. 2012) ("[T]he plain language of § 1498(c) eliminates Government liability for claims 'arising in a foreign country.'"); Leonardo v. United States, 55 Fed. Cl. 344, 353-54 (2003). Users installed the software on only 21 ONE-Net computers in August 2016, and all of those installations were extraterritorial. See P010.8; D207.1 (users based out of the European Union ("EU1") or the Far East ("FE1")); Stip. ¶ 86.

### C. Bitmanagement Improperly Inflates the Number of Infringing Copies

Bitmanagement's estimate of 600,000 infringing copies is not supported. Bitmanagement has always expressed its estimate in speculative terms. See ECF 150 at 9 ("would necessarily have," "may have undercounted"); ECF 146 at 5-8 ("an unknown subset," "[a]n unknown number"); Tr. 474:22-75:14 (Graff) ("I saw no evidence whatsoever on the actual number of installed . . . . I never saw anything one way or the other as to whether or not they actually met their goal of installing it on the 558,000 seats."). Bitmanagement cannot rebut the Government's verified deployment figures with speculation. See Gaylord III at 1368 ("Other circuits have recognized . . . the importance of avoiding undue speculation.").

### D. The Proper Royalty Base Contemplates the Navy's Actual Use

The total number of copies would have been only one aspect of the royalty base in a hypothetical negotiation between Bitmanagement and the Navy. For the hypothetical negotiation in 2013, the parties would have considered the total number of copies, but would have primarily focused on how the Navy planned to use those copies. Indeed, this **hypothetical** approach is entirely consistent with the parties' **actual** approach in negotiating the 2012 purchase order. See,

-4-

e.g., Bit I at 651-52; D026.1 ("Let's go for the floating license server approach."); J018.1 ("we will push it out . . . to begin tracking the usage and demand signal of the 20 license keys"). The evidence shows that the Navy actually used 650 – 1,800 copies of BS Contact Geo to access SPIDERS 3D. For a hypothetical negotiation, the parties would have contemplated a royalty based on: 429,567 copies, 650 unique users, and 100 additional simultaneous-use licenses.

The SPIDERS 3D weblogs provide reliable[2] details regarding the Navy's use of the software over the last two years of liability, including: (1) the maximum uses per day (36); (2) the total number of unique users (411); and (3) the total number of uses of the software (1,142). The following Table extrapolates[3] the data over the entire time of liability:

| SPIDERS 3D Weblogs | Total Tracked 8/30/2014 – 9/2/2016 | Total Estimated 7/18/2013 – 9/2/2016 |
|---|---|---|
| Maximum Uses per Day of SPIDERS 3D | 36<br>See J035.3-12 | 36 |
| Unique Users of SPIDERS 3D | 411<br>See J035.13-23 | 650<br>(# tracked x 1.56, rounded up) |
| Total Uses of SPIDERS 3D | 1,142<br>See J035.12, .23 | 1,800<br>(# tracked x 1.56, rounded up) |

**Table 2. The uses and users of SPIDERS 3D.**

Based on the SPIDERS 3D weblogs, 650 unique users actually used BS Contact Geo 1,800 times during the time of liability. Thus, the number of copies of BS Contact Geo actually used to access SPIDERS 3D during the three years of liability was no less than 650 (one copy per user) and no more than 1,800 (one copy per use).

The parties would have then attempted to determine the number of additional licenses necessary to fully cover the Navy's use of BS Contact Geo 8.001 for SPIDERS 3D. At the time

---

[2] The Court admitted the weblogs as a **joint** exhibit, see J035.1-51, and a witness testified to its reliability, see Tr. 854:5-14, 861:2-6, 865:14-17 (Chambers). Once again, Bitmanagement engages in pure conjecture in an attempt to discredit record evidence. See ECF 150 at 15 ("the missing first year may have been the heaviest use of SPIDERS 3D").

[3] The Government estimated total users and uses by multiplying the tracked users and uses by 1.56, a factor derived from the ratio of liability days (1,142) vs. tracked days (734).

of the hypothetical negotiation, the Navy owned 38 licenses, see Bit I at 658 n.10; Bit II at 951 n.4, intended to allow a maximum of 38 simultaneous uses of the software. See Bit I at 658; Bit II at 941, 945-46. The weblog data shows that 38 simultaneous-use licenses would have completely covered the Navy's actual use during the three years of liability, because the maximum daily uses of SPIDERS 3D was 36. See J035.3-12; *supra* Table 2.

Nevertheless, the Court could reasonably conclude that the Navy would have agreed to procure 100 additional simultaneous-use licenses from Bitmanagement in 2013. As described above, 100 additional licenses would have more than covered the Navy's actual use during the three years of liability. Significantly, both parties made (or considered making) offers for approximately 100 additional licenses between 2013 and 2015. See J023.1-7 (Bitmanagement draft license agreement for 93 licenses in March 2013); Stip. ¶ 78; Bit I at 654 (citing J031.1-5, 31) (Navy unfulfilled purchase order for 88 licenses in September 2015). The procurement of 100 additional licenses would have been consistent with both parties' hopes for increased use of SPIDERS 3D and BS Contact Geo after the Navy-wide deployment of the software. See Bit I at 658 ("Bitmanagement and the Navy both anticipated a future purchase of additional licenses to cover the Navy's usage."). Thus, the proper royalty base encompasses 429,567 copies of BS Contact Geo 8.001, for 650 unique users, requiring 100 additional simultaneous-use licenses.

## II. GAYLORD PROVIDES THE FRAMEWORK FOR DETERMINING FAIR MARKET VALUE

Based on the principles identified in Gaylord II and Gaylord III, the Court should conclude that Bitmanagement and the Navy would have negotiated a website license or a mixed license to cover the Navy's actual use of BS Contact Geo. Below, the Government identifies five fundamental Gaylord principles that should guide the Court's analysis:

-6-

*Gaylord* Principle 1 – *"Reasonable and entire compensation" under 28 U.S.C. § 1498(b) is akin to just compensation, whereby a plaintiff may recover "the fair market value of a license covering the defendant's use."* Gaylord II at 1342-43; Gaylord III at 1367. Since Section 1498(b) allows recovery of just compensation for the taking of a nonexclusive copyright license, Bitmanagement bears the burden of establishing the fair market value for a BS Contact Geo license that would cover the Navy's actual use. Consistent with eminent domain and actual copyright damages, Bitmanagement cannot rely on "undue speculation" to establish fair market value and cannot base damages on "what [it] would like to have charged if unconstrained by reality." Gaylord III at 1368 (citation omitted). Here, the Gaylord principle illustrates that Bitmanagement could not have lost hundreds of millions in licensing fees from hundreds of thousands of licenses, because, *inter alia*, the Navy had no realistic demand to actively use that many licenses in connection with SPIDERS 3D.

*Gaylord* Principle 2 – *The Court "must consider all evidence relevant to a hypothetical negotiation," focusing on "objective considerations," and may use applicable tools "familiar from patent law."* Gaylord II at 1344; Gaylord III at 1367-68. The Federal Circuit expressly endorsed a court's use of objective factors to frame a hypothetical negotiation, including applicable considerations used in patent law. See id. Indeed, the Federal Circuit cited a patent case as authority that "alternatives available to a potential licensee provide an important constraint in a hypothetical negotiation" in a copyright case. Gaylord III at 1370. Here, the key objective factors include: the limited market for BS Contact Geo; the declining interest in the software; Bitmanagement's poor financial shape; Bitmanagement's desire to retain the Navy as a customer; the Navy's limited demand for an X3D viewer; the Navy's financial pressure; and the Navy's alternatives to a nine-figure royalty. See ECF 148 at 12-13.

-7-

This <u>Gaylord</u> principle refutes Bitmanagement's suggestion that objective factors are only relevant to hypothetical negotiations for a patent license. See ECF 150 at 16-17. The Federal Circuit sourced the use of objective factors from "[s]everal" **copyright** cases. <u>Gaylord III</u> at 1367-68 (citing <u>Oracle Corp. v. SAP AG</u>, 765 F.3d 1081 (9th Cir. 2014); <u>Jarvis v. K2 Inc.</u>, 486 F.3d 526 (9th Cir. 2007); <u>On Davis v. The Gap, Inc.</u>, 246 F.3d 152 (2d Cir. 2001)). Bitmanagement asserts that the objective factors are legally "inapplicable," ECF 150 at 17, but the Federal Circuit explained that "[d]ifferent kinds of evidence may be relevant" as long as they are "tied to the particular work at issue and its marketplace value." <u>Gaylord III</u> at 1368.[4]

***<u>Gaylord</u> Principle 3 – The Court "is not constrained to accept particular practices of the parties on either side."*** <u>Gaylord III</u> at 1368; <u>see also</u> <u>Gaylord II</u> at 1343 ("a court [cannot] limit its analysis to only one side of the negotiating table"). The Court should consider and weigh all of the objective evidence submitted by both parties, but should discount a party's "self-serving" arguments that its past practices would have limited the hypothetical negotiation to a particular license. <u>Gaylord II</u> at 1343-44. This <u>Gaylord</u> principle directly refutes Bitmanagement's argument that "'simultaneous-use' licenses or 'mixed' licenses" "cannot form the basis for the hypothetical negotiation" because it allegedly[5] "never sold" such licenses. ECF 150 at 22-23. Thus, Bitmanagement's argument is erroneous.

---

[4] Bitmanagement further asserts that the objective factors "are contradicted by the evidence at trial," but it provides almost no support for its broad assertion, ECF 150 at 17. To the extent Bitmanagement provides citations, it mischaracterizes the record. Compare, e.g., id. (asserting that "the Navy agreed to pay $305-$370 for each **copy**") with Bit I at 653-54 ("the 2012 Navy Purchase Order identified 'LICENSES' . . . but did not specify 'copies'").

[5] Bitmanagement's argument is factually erroneous in the light of the record and the law of the case – Bitmanagement actually sold such a license to the Navy in this case. See, e.g., J005.5 ("we are open for any licensing scheme that suits the US Navy better and are willing to do our utmost to enable [another] licensing functionality, if requested"); Bit II at 941, 945-46 ("The implied license was conditioned on the Navy['s use of] Flexera[] to . . . monitor the number of simultaneous users"); Bit I at 658 ("Bitmanagement agreed to this licensing scheme

-8-

*Gaylord* **Principle 4** – The Court should consider whether "different license fees are appropriate" for each type of infringing use and "whether an ongoing royalty or a one-time fee more accurately captures the fair market value of a license" for each. Gaylord II at 1344-45. Gaylord II establishes that the Court should use objective evidence to shape the hypothetical license (or licenses) to the defendant's actual use (or uses) of the copyrighted work. There, the Federal Circuit observed that the Postal Service sold 86.8 million infringing stamps in three different ways, and directed the trial court to assess whether "different license fees are appropriate" for each of the ways. Id. at 1344-45. Instead of mandating a running royalty, the appellate court explained that "the trial court must determine whether an ongoing royalty or a one-time fee more accurately captures the fair market value of a license" for each type of infringement. Id. Here, the record identifies two ways that the Navy used the infringing copies of BS Contact Geo: (1) copies actually used by Navy personnel to access SPIDERS 3D content; (2) unused copies available for use. See ECF 148 at 22-23 (citing record evidence).

In a hypothetical negotiation, the parties would have considered the types of licenses that would have best fit the Navy's anticipated use of BS Contact Geo. Bitmanagement's **website license** would have been, by far, the most comparable to the Navy's anticipated uses. Bitmanagement priced website licenses based "on the general expected usage of the viewer in a specific time from a respective Internet or Intranet-address." J027.1. Bitmanagement allowed website licensees to make massive – even "unlimited" – copies of BS Contact Geo. See D016.1; D089.1-Tr; D094.1-Tr; D103.3-Tr; D108.2; D140.3; Tr. 605:18-06:3, 611:19-24 (Koerfer); see also D136.3-Tr ("[a]ll accessing clients"); D119.1. Thus, using this model, the parties would have negotiated a website license that provided for a $200,000 lump-sum royalty covering both

because Flexera would limit the number of simultaneous users of BS Contact Geo, regardless of how many copies were installed on Navy computers.").

-9-

of the Navy's uses. See ECF 148 at 6. Alternatively, the parties could have used a **mixed license** comprising the $200,000 lump-sum royalty, as well as a running royalty for 100 additional simultaneous-use licenses. See id.; see also Davidson v. United States, 138 Fed. Cl. 159, 180-82 (2018) (J. Bruggink).

*<u>Gaylord</u> Principle 5 – The Court should consider "[p]ast arms-length licensing practices . . . for similar uses and 'benchmark' licenses by others."* Gaylord III at 1368. Beyond its per-seat licenses for the Navy, see ECF 148 at 30 (summarizing), Bitmanagement's website license agreements and offers are directly relevant. They are comparable, because they involve arms-length transactions for the work-in-suit with similarly large institutions, including a one of the largest companies in the world and the capital city of a European country. See ECF 148 at 28-29 (summarizing several comparable agreements and offers). Furthermore, they establish the reasonableness of a $200,000 lump sum license to the Navy – an amount more than double Bitmanagement's highest website license offer. See id.

### III. BITMANAGEMENT'S ROYALTY CALCULATIONS ARE UNJUSTIFIED

As the Gaylord principles demonstrate, Bitmanagement is not entitled to a running royalty based on each infringing copy of BS Contact Geo. That approach is inconsistent with "reasonable" (*i.e.*, just) compensation and the record in this case. Instead, Bitmanagement is entitled to a lump-sum royalty or a mixed royalty for all of the infringing copies.

Nevertheless, if the Court awards a running royalty for each infringing copy of BS Contact Geo, the Court should conclude that the parties would have negotiated a significant volume discount, resulting in a $2/copy royalty. That rate is consistent with Bitmanagement's other offers to the Navy for significant quantities of licenses. See Stip. ¶ 40; J001.1; J002.5 (2005 draft offer for 500 licenses for $2/license); see also J009.2-7; D209.1; D016.1. (2010 quote for 50,000 seats for $10/license).

|  | Respectfully submitted, |
|---|---|
|  | SARAH HARRINGTON<br>Deputy Assistant Attorney General |
|  | GARY L. HAUSKEN<br>Director |
|  | s/Scott Bolden |
| Of Counsel:<br>PATRICK C. HOLVEY<br>Department of Justice | SCOTT BOLDEN<br>Deputy Director<br>Commercial Litigation Branch<br>Civil Division |
| JENNIFER S. BOWMAR<br>ANDREW P. ZAGER<br>Department of the Navy | Department of Justice<br>Washington, DC 20530<br>Email: Scott.Bolden@USDOJ.gov<br>Telephone: (202) 307-0262<br>Facsimile: (202) 307-0345 |
| October 1, 2021 | *Attorneys for Defendant the United States* |

-11-